**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| DONALD BERDEAUX and CHRISTINE GRABLIS, Individually and on Behalf of All Others Similarly Situated,<br><br>                                Plaintiffs,<br><br>              -against-<br><br>ONECOIN LTD.; RUJA IGNATOVA, KONSTANTIN IGNATOV; SEBASTIAN GREENWOOD; MARK SCOTT; IRINA ANDREEVA DILINSKA; DAVID PIKE; and NICOLE J. HUESMANN,<br><br>                                Defendants. | Case No.: 1:19-cv-04074-VEC<br><br>CLASS ACTION<br><br>JURY TRIAL DEMANDED |

**FIRST AMENDED CLASS ACTION COMPLAINT**

# TABLE OF CONTENTS

Page

INTRODUCTION ........................................................................................................................1

NATURE OF THE ACTION .......................................................................................................2

JURISDICTION AND VENUE ...................................................................................................5

PARTIES AND RELEVANT NON-PARTIES ...........................................................................5

    I.       PLAINTIFFS ............................................................................................................5

    II.     DEFENDANTS .........................................................................................................6

          A.       THE ONECOIN DEFENDANTS......................................................................6

                1.     ONECOIN LTD. .....................................................................................6

                2.     RUJA IGNATOVA ................................................................................7

                3.     SEBASTIAN GREENWOOD.................................................................8

                4.     KONSTANTIN IGNATOV.....................................................................9

                5.     IRINA ANDREEVA DILINSKA.........................................................10

          B.       THE SCOTT GROUP........................................................................10

                1.     MARK S. SCOTT ................................................................................10

                2.     DAVID PIKE ........................................................................................11

                3.     NICOLE J. HUESMANN.....................................................................11

          C.       OTHER LIABLE PERSONS/ENTITIES..............................................11

PLAINTIFFS' CLASS ACTION ALLEGATIONS....................................................................12

SUBSTANTIVE ALLEGATIONS .............................................................................................14

    I.       BACKGROUND ON BLOCKCHAIN TECHNOLOGY AND INITIAL COIN
              OFFERINGS...........................................................................................14

          A.       BLOCKCHAINS .....................................................................................14

          B.       THE ONECOIN "IPO" / "ICO" ...............................................................14

    II.     BACKGROUND ON ONECOIN LTD.....................................................................15

          A.       THE CO-FOUNDER DEFENDANTS CREATED ONECOIN TO
                DEFRAUD INVESTORS........................................................................15

      B.     FORMATION AND CREATION OF ONECOIN CURRENCY ............17

      C.     RUJA'S DISAPPEARANCE AND KONSTANTIN'S RISE TO AUTHORITY ........................................................................24

      D.     ONECOIN PROMOTIONS IN THE UNITED STATES ........................25

III.    THE ONECOIN INVESTMENT PROGRAMS WERE PONZI SCHEMES.......29

IV.    DEFENDANTS LAUNDERED THEIR ILL-GOTTEN INVESTMENT FUNDS ........................................................................30

V.    DEFENDANTS LED CLASS MEMBERS TO INCUR SUBSTANTIAL LOSSES ........................................................................34

VI.    NECESSITY FOR JUDICIAL INTERVENTION ................................................35

COUNT I - VIOLATION OF SECTION 10(b) OF THE EXCHANGE ACT AND SEC RULE 10b-5(a)-(c) ........................................................................35

COUNT II - VIOLATION OF SECTION 20(a) OF THE EXCHANGE ACT ............................37

COUNT III - FRAUD ........................................................................38

COUNT IV – AIDING & ABETTING FRAUD ........................................................40

COUNT V - FRAUDULENT MISREPRESENTATION ................................................40

COUNT VI - NEGLIGENT MISREPRESENTATION ................................................42

COUNT VII - BREACH OF CONTRACT ........................................................43

COUNT VIII- UNJUST ENRICHMENT ........................................................45

COUNT IX - CONVERSION ........................................................................45

COUNT X - CIVIL CONSPIRACY ........................................................................46

PRAYER FOR RELIEF ........................................................................53

DEMAND FOR TRIAL BY JURY ........................................................................54

## INTRODUCTION

Lead Plaintiff Donald Berdeaux ("Lead Plaintiff" or "Berdeaux") and plaintiff Christine Grablis ("Grablis" and together with Berdeaux, "Plaintiffs") allege in this First Amended Class Action Complaint (the "Amended Complaint") claims under the federal securities laws and common law against key operators of OneCoin Ltd. ("OC" or the "Company") and certain of their enabling co-conspirators arising from a massive fraud perpetrated on millions of individual investors throughout the world causing injuries in excess of $4 billion through a densely-packed multi-level-marketing system.

Specifically, Plaintiffs allege claims for: (i) violation of Sections 10(b), 15 U.S.C. § 78j(b), of the Securities Exchange Act of 1934 ("Exchange Act") and Rule 10b-5(a)-(c), 17 C.F.R. § 240.10b-5(a)-(c), promulgated thereunder against Defendants OC, Ruja Ignatova ("Ruja"), Sebastian Greenwood ("Greenwood" and together with Ruja, the "Founder Defendants"), Konstantin Ignatov ("Konstantin"), and Irina Andreeva Dilinska ("Dilinska" and together with Konstantin and the Founder Defendants, the "Executive Defendants") (collectively, the "OneCoin Defendants"); (ii) control person liability under Section 20(a), 15 U.S.C. § 78t(a), of the Exchange Act against the Executive Defendants; (iii) fraud against the OneCoin Defendants; (iv) aiding and abetting fraud against Defendants Mark Scott ("Scott"), David Pike ("Pike"), and Nicole J. Huesmann ("Huesmann") (collectively, the "Scott Group"); (v) fraudulent misrepresentation against the OneCoin Defendants; (vi) negligent misrepresentation against the OneCoin Defendants; (vii) breach of contract against OneCoin Ltd; (viii) unjust enrichment against the Scott Group Defendants; (ix) conversion against the OneCoin Defendants; and (x) civil conspiracy against all Defendants.  These claims are pled based upon personal knowledge with respect to Plaintiffs' own acts, and upon facts obtained through investigation conducted by their counsel,

which included, *inter alia*: (a) documents and solicitation materials disseminated by Defendants in connection with the OneCoin trader packages/memberships and OneCoins; (b) public statements made by the OneCoin Defendants concerning OC, the OneCoin trader packages/memberships, and OneCoins; (c) media publications concerning OC, the OneCoin trader packages/memberships, and OneCoins; and (d) information revealed in connection with the criminal actions pending against Defendants Scott, Ruja, and Konstantin in this District before the Honorable Eduardo Ramos, *United States v. Mark S. Scott*, 1:17-cr-630-ER (S.D.N.Y).

Plaintiffs believe that further substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery. Many of the facts supporting the allegations contained herein are known only to Defendants or are exclusively within their control.

## NATURE OF THE ACTION

1. This is a class action on behalf of a class of investors consisting of all individuals and entities who transferred to the OneCoin Defendants, directly or indirectly, any fiat currency or cryptocurrency to invest in a OneCoin trader/membership package ("OC Trader Package") and/or a purported digital cryptocurrency called "OneCoin" and who suffered financial injury as a result thereof (the "Class"). Upon information and belief, the financial harm caused by the fraudulent OC Investment Programs[1] exceeds four billion dollars ($4,000,000,000.00).

2. Lest anyone be deceived that the OC Investment Programs were ever anything other than an outright Ponzi/Pyramid multi-level marketing ("MLM") fraudulent scheme, these words written by OneCoin founder Ruja and shared with her co-founder—Defendant Greenwood—at the origin of the OneCoin scheme reveal not only why she was dubbed the "CryptoQueen" and

---

[1] The term "OC Investment Program" refers to both the OC Trader Packages and the OneCoins offered and sold by the OneCoin Defendants.

referred to by many in the OneCoin family as "Her Royal Highness," but also why she fancied for herself another infamous moniker:

> It might not be [something] really clean or that I normally work on or even can be proud of (except with you in private when we make the money) – but … I am especially good in this very borderline cases [sic], where the things become gray – and you as the magic sales machine – and me as someone who really can work with numbers, legal and back you up in a good and professional way.

> We could really make it big – like MLM meets "B[*]tch of Wall Street." 😉

3.      Despite being cloaked in technological sophistication and jargon, Defendants operated a well-worn form of fraud that was simple at its core — victims would invest in the OC Investment Programs after they were driven to OC by promoters; and the OneCoin Defendants would then pay existing investors with new money from new investors, who were in turn expected and incentivized to get more new investors to produce more new money for the Company.

4.      In short, the OneCoin operation was nothing more than an old-fashioned Ponzi scheme cloaked in a thin façade of new technology.

5.      As stated by FBI Assistant Director-in-Charge William Sweeney, Jr.:

> OneCoin was a cryptocurrency existing only in the minds of its creators and their co-conspirators. Unlike authentic cryptocurrencies, which maintain records of their investors' transaction history, OneCoin had no real value. It offered investors no method of tracing their money, and it could not be used to purchase anything. In fact, the only ones who stood to benefit from its existence were its founders and co-conspirators.

6.      The OneCoin Defendants were able to sustain their massive fraud for years, in large part, because Defendants Scott and his partners—Pike and Huesmann—laundered the criminal proceeds OC obtained from selling the fraudulent OC Investment Programs to Plaintiffs and the proposed Class. From 2016 through in or about 2018, the Scott Defendants provided substantial assistance to the OneCoin Defendants' fraudulent scheme by laundering in excess of $400 million

of OC's criminal proceeds, thereby affirmatively assisting the OneCoin Defendants in defrauding OneCoin investors, and evading regulatory scrutiny and international law enforcement efforts by concealing the OneCoin Defendants' unlawful and fraudulent conduct which has caused, and is continuing to cause, significant financial harm to Plaintiffs and the Class.  The Scott Defendants provided affirmative assistance to the OneCoin Defendants, enabling their fraudulent conduct to proceed unimpeded for years, thereby proximately causing billions of dollars of financial injuries to the Class.

7.     The Scott Defendants received in excess of $60 million in exchange for their enabling of, and assistance in, the OneCoin Defendants' fraudulent operations.   The Scott Defendants receipt of such was at the direct expense of Plaintiffs and the Class.  Accordingly, equity and good conscience require restitution.

8.     Absent judicial intervention, Plaintiffs and the Class are unlikely to ever recover their investments.  Consequently, judicial intervention is required and requested to rectify the existing and future harm facing Plaintiffs and the Class — harm that is highly unlikely to be fully reparable.

9.     Investors in OC Investment Programs have little to show for their investments other than broken promises and mounting financial burdens.

10.     For these reasons, Plaintiffs, on behalf of themselves and all similarly situated individuals and entities that participated in the OC Investment Programs, seek compensatory, exemplary, punitive, injunctive, and rescissory relief, providing rescission and repayment of all investments paid, directly or indirectly, to the OneCoin Defendants and the Scott Group, and securing and conserving such funds until repayment.

## JURISDICTION AND VENUE

11.     This Court has subject matter jurisdiction under 28 U.S.C. § 1331 (federal question jurisdiction) and Section 27 of the Exchange Act [15 U.S.C. § 78aa] because Plaintiffs allege violations of Sections 10(b) and 20(a) of the Exchange Act [15 U.S.C. §§ 78(b) and 78t(a)].

12.     The Court has personal jurisdiction over each of the Defendants because each either conducts business in and maintains operations in this District, or is an individual who either is present in this District for jurisdictional purposes or has sufficient minimum contacts with this District as to render the exercise of jurisdiction by this Court permissible under traditional notions of fair play and substantial justice.

13.     Venue is proper in this District under Section 27 of the Exchange Act, 15 U.S.C. § 78aa, as well as under 28 U.S.C. § 1391, because: (a) the conduct at issue took place and had an effect in this District; (b) a substantial portion of the transactions and wrongs complained of herein occurred here; and (c) Defendants have received substantial compensation and other transfers of money here by doing business here and engaging in activities having an effect in this District.

## PARTIES AND RELEVANT NON-PARTIES

### I.     Plaintiffs

14.     Lead Plaintiff Berdeaux is an individual domiciled in Great Falls, Montana and is *sui juris*.  Beginning on or about August 31, 2015, Lead Plaintiff purchased his first OC Trader Package by investing $14,576.25.  From August 2015 through May 2016, Berdeaux invested a sum total of approximately $756,000.00 in the OC Investment Programs.  As of the date of this filing, Lead Plaintiff Berdeaux out-of-pocket investment loss from participating in the fraudulent OC Investment Programs totals approximately $755,918.92.

15.     Lead Plaintiff actively researched the OC Investment Programs prior to making his purchases of OC Trader Packages and OneCoins and throughout the periods in which he invested in the OC Investment Programs.  Accordingly, Berdeaux personally relied upon each of the various false statements and misrepresentations concerning the programs issued by the OneCoin Defendants described herein.

16.     Plaintiff Grablis is an individual domiciled in Murfreesboro, Tennessee and is *sui juris*.  Beginning on or about August 10, 2015, Plaintiff Grablis purchased her first OC Trader Package by investing $15,800.00.  From August 2015 through August 2016, Plaintiff Grablis invested a sum total of approximately $103,500.00 in OneCoin trader packages/memberships and/or OneCoin.  As of the date of this filing, Plaintiff Grablis' out-of-pocket investment loss from participating in the fraudulent OC Investment Programs totals approximately $130,000.00.

17.     Plaintiff Grablis actively researched the OC Investment Programs and OneCoin prior to making her purchases of OC Trader Packages and OneCoins and throughout the periods in which she invested in the OC Investment Programs.  Accordingly, Grablis personally relied upon each of the various false statements and misrepresentations concerning the programs issued by the OneCoin Defendants described herein.

## II.     Defendants

### A.     The OneCoin Defendants

#### 1.     OneCoin Ltd.

18.     OneCoin Ltd. ("OC" or the "Company"), founded in or about April 2014, is a foreign corporation based in Sophia, Bulgaria, and markets a purported digital cryptocurrency called "OneCoin" through a global multi-level marketing ("MLM") network of OneCoin members.

19.     OC operates using several corporate entities and d/b/a names, including OnePayments Ltd., OneNetwork Services Ltd., OneAcademy, and OneLife.  OneCoin maintains offices in various countries, including Bulgaria, the United Arab Emirates ("UAE"), and Hong Kong.  Upon information and belief, those entities were all created for the same fraudulent purpose, were each operated by the same group of principals, and stand as "alter egos" of one another.  As used herein, those entities and d/b/a names shall collectively be referred to as OneCoin.

20.     OC launched its OneCoin "currency" in or about September 2014 under the OneLife Network company after being registered in Dubai and Belize.  Initially, the Company branded itself as a company selling packages of educational material with cryptocurrency tokens as a membership reward.

21.     OneCoin "members" receive commissions for recruiting others to purchase OC Trader Packages.  This multi-level marketing structure appears to have influenced rapid growth of the OneCoin member network.  Between the fourth quarter of 2014 and the third quarter of 2016 alone, OneCoin Ltd. generated €3.353 billion in sales revenue and earned "profits" of €2.232 billion.

### 2.     Ruja Ignatova

22.     Ruja Ignatova ("Ruja") is an individual believed to be domiciled in Bulgaria and is *sui juris*.

23.     Ruja, known by many as the "CryptoQueen," co-founded OC in April 2014.

24.     Ruja was integral to all aspects of the Company's operations, including its structure, marketing, overall business strategies, and its offerings in the United States -- including in this District -- of the OC Investment Programs.

25.     To promote OC, Ruja organized glamorous parties, funded international company events in Dubai, Macao, Singapore, and the UK; and, according to some sources, even invited Tom Jones to perform at her birthday party in London.

26.     In the year following the creation of OC and its OneCoin currency, RUJA and her peers purchased millions of dollars' worth of real estate across the world.

27.     Despite being a central figure to all aspects of OC and the OC Investment Programs, Ruja has made no appearances at any public OC events since in or about October 2017 and has made no public statement regarding her whereabouts.  Her disappearance was purposefully aimed at avoiding being apprehended by law enforcement officials and bearing the consequences of her wrongful acts, as she had in the past maintained a persistent online presence, using video portals such as YouTube, social media websites, and OC's own website.

28.     Ruja is presently a wanted fugitive in the United States for her crimes involving OC and the OC Investment Programs.

### 3.     Sebastian Greenwood

29.     Sebastian Greenwood ("Greenwood") is an individual believed to be domiciled in Sweden and is *sui juris.*  Greenwood is a co-founder of OC, has been described as the "public face of OneCoin," served as an affiliate/recruiter for the OC Investment Programs, and successfully solicited hundreds if not thousands of OneCoin investors in the United States -- including Plaintiffs, those in this District, and those abroad through social media sites and public appearances.

30.     Defendant Greenwood, along with Defendant Ruja, had previously created BigCoin in early-2014, the predecessor of OneCoin.

31.     Upon information and belief, Defendant Greenwood's expertise was in the area of marketing, and he was integral in devising the     multi-level  marketing  structure  of  the  OC

Investment Programs as well as organizing its worldwide army of recruiters/promoters and preparing the sales materials they used to lure investors to deposit funds with OC.

32.     Defendant Greenwood was arrested by the Federal Bureau of Investigation and the Crime Suppression Division in Thailand in November 2018 and later extradited to the United States, where he is awaiting trial on criminal charges related to his involvement with the OC Investment Programs.

### 4.     Konstantin Ignatov

33.     Konstantin Ignatov ("Konstantin") is an individual believed to be domiciled in Bulgaria and is *sui juris*.

34.     Konstantin is the younger brother of Ruja, OC's co-founder and leader until her disappearance from public view in or about October 2017.  Upon information and belief based on publicly-available materials, Konstantin, beginning in late-2017, assumed high-level positions at OC, rising to the top leadership position in mid-2018.  Before ascending to OC's leadership in late-2017, Konstantin served as Ruja's personal assistant and, according to some, her bodyguard.

35.     Since December 2017, Konstantin has functioned as a high-level executive, promoter, and spokesperson for the OC organization, appearing at OC-OneLife events worldwide, including in Thailand, Singapore, Colombia, Argentina, Brazil, Paraguay, Bulgaria, France, Spain, and the United States.  In this role, Konstantin has made fraudulent representations to investors -- including those in this District -- about OC's structure, value, usability, and future public offerings.

36.     On or about March 6, 2019, Konstantin was arrested at Los Angeles International Airport and transferred by law enforcement authorities to a federal prison in New York, where he is believed to be housed and awaiting trial in this District on criminal charges related to his involvement with OC.

- 9 -

### 5.      Irina Andreeva Dilinska

37.      Defendant Irina Andreeva Dilinska ("Dilinska") served as the head of OC's legal and compliance department throughout the Class Period.  Dilinska functioned as a high-level executive, promoter, and spokesperson for the OC organization on all matters relating to investigations into OC's operations by various countries and enforcement bodies throughout her tenure.

38.      Additionally, Defendant Dilinska served on the board alongside Defendant Scott of at least two investment funds used to launder proceeds obtained from the OneCoin Defendants' fraudulent OC Investment Programs.

39.      It is presently unknown whether criminal charges have been filed against Defendant Dilinska; however, she been named as a co-conspirator in the criminal actions against Scott, Ruja, and Konstantin.

### B.      The Scott Group

### 1.      Mark S. Scott

40.      Defendant Mark S. Scott ("Scott") is an individual believed to be domiciled in Coral Gables, Florida and is *sui juris*.  Scott is an attorney who was a Partner at the international law firm Locke Lord.  Using his law license and legal knowledge, Scott formed foreign hedge funds through which he, Pike, Huesmann and the OneCoin Defendants laundered the proceeds of the fraudulent OC Investment Programs.

41.      More specifically, Scott assisted Ruja and others in laundering more than $400 million through a series of purported investment funds holding bank accounts at financial institutions in the Cayman Islands and the Republic of Ireland, among other locations.

42.      Defendant Scott was arrested in September 2018 by law enforcement authorities and, upon information and belief, was released from a federal prison in New York on bond and is

presently under supervised house arrest with curfew restrictions while he is awaiting trial in this District on criminal charges related to his involvement with OC.

### 2.   David Pike

43.    Defendant David Pike ("Pike") is an individual believed to be domiciled in Coral Gables, Florida and is *sui juris*.  Pike served alongside Defendant Scott as a director of MSS International Consultant (BVI) ("MSSI")—the company that controlled, directly or indirectly, over a dozen investment funds used to launder hundreds of millions of the OneCoin Defendants' criminal proceeds.

44.    Defendant Pike has yet to be named as a co-conspirator in the criminal actions. However, Pike has been subpoenaed, produced "a substantial number of hard-copy documents" relating to MSSI's operations and the government continues to investigate the level of Pike's involvement with laundering OC's criminal proceeds.

### 3.   Nicole J. Huesmann

45.    Defendant Nicole J. Huesmann ("Huesmann") is an individual believed to be domiciled in Coral Gables, Florida and is *sui juris*.  Huesmann is an attorney that assisted Scott laundering the OneCoin Defendants' fraud proceeds.

46.    Specifically, Huesmann assisted in laundering the OC fraud proceeds by: (i) participating in deals structured to launder funds between OC-controlled entities across borders; (ii) repatriating laundered proceeds and facilitating Scott's use of such to invest in real estate; and (iii) facilitating Scott's used of laundered OC fraud proceeds on luxury boats and cars.

### C.   Other Liable Persons/Entities

47.    In addition to those persons and entities set forth as Defendants herein, there are likely other parties who are properly liable to Plaintiffs and the Class, but about whom Plaintiffs currently lack specific facts to allow them to be named as party defendants at this time.  By not

naming such persons or entities at this time, Plaintiffs are not waiving their rights to amend this pleading to add such parties, should the facts warrant adding such parties.

## PLAINTIFFS' CLASS ACTION ALLEGATIONS

48.     Plaintiffs bring this action for themselves and as a class action on behalf of all individuals and entities who transferred to the OneCoin Defendants, directly or indirectly, any fiat currency or cryptocurrency to invest in OC Trader Packages or OneCoins from April 2014 through to and including March 2018 (the "Class Period") and who suffered financial injury as a result thereof.  Excluded from the Class are Defendants herein and any person, firm, trust, corporation, or other entity related to, controlled by, or affiliated with, any Defendant, including the immediate family members of the individual Defendants.

49.     This action is properly maintainable as a class action under Federal Rule of Civil Procedure 23.

50.     While the exact number of Class members is presently unknown to Plaintiffs and can only be ascertained through discovery, Plaintiffs believes that there are millions of members in this Class.  All members of the Class may be identified by records maintained by Defendants and may be notified of the pendency of this action by mail and publication, and by using forms of notice similar to that customarily used in securities class actions.

51.     There are questions of law and fact which are common to the Class and which predominate over questions affecting any individual Class member. The common questions include, *inter alia*, the following: (i) whether the OneCoin Defendants issued material false statements of fact in their promotions of the OC Investment Programs; (ii) whether the OC Investment Programs constitute an unlawful Ponzi and/or Pyramid Scheme; (iii) whether the OneCoin Defendants committed fraud in their creation, promotion, and operation of the OC

Investment Programs; (iv) whether the Scott Group aided and abetted the OneCoin Defendants' fraud on the Class; (v) whether OC breached its contracts with Plaintiffs and the Class; (vi) whether the Scott Group has been unjustly enriched at the expense of the Class; (vii) whether Plaintiffs and the Class will suffer irreparable harm if such unlawful activities are not remedied; and (viii) whether Plaintiffs and the Class are entitled to compensatory, exemplary, punitive, injunctive, or rescissory relief as a result of Defendants' wrongful conduct alleged herein, and the measure of such damages;

52.     Plaintiffs' claims are typical of the claims of the other members of the Class, and Plaintiffs do not have any interests adverse to the Class.  Additionally, Plaintiffs and the other members of the Class have all sustained harm in a substantially identical manner as a result of Defendants' wrongful conduct as alleged herein.

53.     Plaintiffs will fairly and adequately protect the interests of the Class and has retained competent counsel experienced in litigation of this nature.

54.     Separate actions prosecuted by individual members of the Class would create a risk of inconsistent or varying adjudications with respect to individual members of the Class, which could establish incompatible standards of conduct for Defendants.

55.     Plaintiffs anticipate that there will be no difficulty in managing this litigation.  A class action is superior to other available methods for the fair and efficient adjudication of this controversy.

56.     Defendants have acted on grounds generally applicable to the Class with respect to the matters complained of herein, thereby making appropriate the relief sought herein with respect to the Class as a whole.

57.     Accordingly, Plaintiffs seeks compensatory, exemplary, punitive, rescissory, injunctive and other equitable relief on behalf of themselves and the Class to prevent the irreparable injury they will continue to suffer absent judicial intervention.

## SUBSTANTIVE ALLEGATIONS

I.     **Background on Blockchain Technology and Initial Coin Offerings**

A.     **Blockchains**

58.     A "blockchain" is essentially a digitized, decentralized, public ledger that cryptographically records, preserves, and presents information.  The general idea is that each "block" contains information, such as details on transactions that are made.  After a "block" is created (with cryptography to verify its contents), the information inside of it cannot be changed. The "block" then becomes part of the "blockchain," and an encrypted version of the information contained therein becomes publicly available along with all the previous "blocks" in the chain. After this process is complete, another block is created with additional information, and so on.

59.     To date, most "blockchains" are used to record transactions involving virtual currencies, *e.g.*, bitcoin (BTC) and Ether (ETH).  However, a "blockchain" could be used to record all types of information.  For example, a blockchain could be used for deed recordation/transfers or even transfers of stock certificates.

B.     **The OneCoin "IPO" / "ICO"**

60.     An ICO is a capital raising event in which an entity offers investors a unique "coin" or "token" in exchange for consideration -- most commonly in the form of established virtual currencies (typically BTC and ETH) or fiat currency.  These tokens are issued on a blockchain and are oftentimes listed on online platforms, called virtual currency exchanges, where they are tradable for virtual or fiat currencies.

- 14 -

61.     To participate in an ICO, investors are typically required to transfer virtual currencies to the issuer's address, online wallet, or other account.  During an ICO, or after its completion, the issuer will typically distribute its unique "tokens" to the participants' unique address on the blockchain.  Similar to stockholders in an IPO, holders of these tokens are then entitled to certain rights related to a venture underlying the ICO, such as profits, shares of assets, use of certain services provided by the issuer, and/or voting rights.

62.     From the outset of the project, the OneCoin Defendants claimed OC was going to list its OneCoins on a public exchange in Asia by preparing an Initial Public Offering ("IPO"). Users were presented with the opportunity to invest in OFCs, virtual shares in the post-IPO company.  The strategy was later changed to a never-ending Initial Coin Offering ("ICO").

## II.     **Background on OneCoin Ltd.**

### A.     **The Co-Founder Defendants Created OneCoin to Defraud Investors**

63.     OC was founded in or about April 2014 by Defendants Ruja and Greenwood.

64.     In summer-2014, Defendants Ruja and Greenwood exchanged numerous emails discussing and planning their development of "trashy coin"—the Founder Defendants' nickname at the time for OneCoins.  In these emails Ruja explained the planned compensation structure for "trashy coin" as follows:

> It might not be [something] really clean or that I normally work on or even can be proud of(except with you in private when we make the money) — but. . . I am especially good in this very borderline cases [sic], where the things become gray — and you as the magic sales machine — and me as someone who really can work with numbers, legal and back you up in a good and professional way — we could really make it big — like MLM meets bitch of wall street ; - )
>
> * * *
>
> Your main sales argument is: **after 2 splits a member makes out of 5.000 USD 25.000 USD. You should be able to sell this** :) . . . **I also added an Extra Bonus for all members joining the Presales** • . they can do actually 3 splits. Which means

- 15 -

that they will actually **have l0x their investment**. 2 splits is 5x your money. So of course, everybody who is greedy will go in with 5.000 USD.

(emphasis in original).

65. OneCoin's core-pitch was that investments in its ecosystem provided economic empowerment through financial literacy "courses" and served a variety of altruistic purposes including education, charity, and community, *to wit*:



66. Contrary to the OneCoin Defendants' representations, the OC Investment Programs served no purpose other than to defraud the investing public and enrich OC and its top-level executives. OneCoin has at all relevant times simply been a multi-level-marketing scheme that marketed and sells a fake cryptocurrency named OneCoin ("OC").

67. Indeed, within months of OC's founding, the Founder Defendants were already discussing their plans for an "exit strategy" once the OC Investment Programs inevitably collapsed. For instance, on or about August 9, 2014, Defendant Ruja described one strategy as: "Take the money and run and blame someone else for this (standard approach, see Wenyard)." "Wenyard" refers to an MLM/Pyramid Scheme similar to OneCoin which offered an "internal

WFO virtual currency" began in September 2013 and collapsed throughout 2014 with defrauded investors unable to obtain recourse from its founders.

       **B.**      **Formation and Creation of OneCoin Currency**

68.     Building on Wenyard's model and capitalizing on the investing public's growing interest in blockchain technologies and legitimate cryptocurrencies—such as Bitcoin—on or about June 3, 2014, Defendant Ruja sent an email to a blockchain developer, copying Greenwood, stating:

> We are building our own cryptocurrency – and would like to set up an internal exchange service for them.  We would like to be able to set the price manually and automatically and also control the traded volume.

69.     Stated otherwise, Ruja was asking the developer to create a website that looked like a real exchange and blockchain for OneCoin but wasn't actually a legitimate exchange or blockchain.  As Ruja later explained in an email to Greenwood, a fake exchange and blockchain would enable the OneCoin Defendants to "**manipulate the exchange** by simulating some volatility and intraday pricing." (emphasis in original).

70.     The OneCoin Defendants routinely claimed that all transactions made in OneCoins were purportedly maintained on a "private blockchain" maintained by the Company.  For example, during a OneCoin promotional event on or about May 15, 2015, Defendant Ruja touted that the Company had hired an "auditor to audit" the OneCoin blockchain, that the "first audit" was complete, and subsequently introduced a purported "auditor" who attested that "all transactions are included in the blockchain."

71.     OC promoted various OC Trader Packages priced at, for example, €110 and €118,100 euros, including "Starter" packages and "Tycoon Trader," "Premium Trader," "Infinity

Trader," and "Ultimate Trader" packages.  Purchase of a trader package provided access to "educational materials" and "tokens."



72.     These "tokens" could be used to "mine" for "OneCoins" and eventually would be exchangeable for more "OneCoins" following OC's IPO or ICO and ultimate listing on a national exchange.  The more expensive the OC Trader Package, the more OneCoin investors were promised they'd have following OC's public listing of the coins—which never came to pass nor was it a legitimate goal of the OneCoin Defendants.

73.     The "educational materials," as it turned out, consisted mostly of information copied from Wikipedia and other free informational sources.

74.     In fact, from its inception, OC's goal was to deceive its investors with false representations of "mining" that were never intended to occur, as these e-mail exchanged between Ruja and Greenwood reveal:

> [RUJA]: Get members to think that they are mining their OneCoin via crunching (exchanging) tokens for OneCoin.
>
> This storey [sic] is good as ppl will then not go super crazy and just try to sell tokens all the time.

&ast;   &ast;   &ast;

[GREENWOOD]: The concept of converting tokens into OneCoin is an important phase for validity and truth behind the OneCoin.

The so called 'mining' of coins is a concept that is very familiar in the industry and a story we can sell to the members.

&ast;   &ast;   &ast;

[RUJA]: We are not mining actually – but telling people sh[*]t.

75.     Moreover, an investor who purchased the educational materials and "tokens" did not directly receive OneCoins; rather, the investor had to submit his/her "tokens" for mining of OneCoins.[2]



76.     According to OC's promotional materials, "tokens" are used to secure positions in OC's "mining pools," depicted in promotional materials as computer hardware used to "mine" OneCoins.

---

[2] In the context of a legitimate cryptocurrency, "mining" refers to the process of adding carefully reviewed transaction records to the cryptocurrency's ledger of past transactions, *i.e.,* the "blockchain." The primary purpose of mining is to allow the cryptocurrency's nodes to reach a secure, tamper-resistant consensus. Mining is also the mechanism used to introduce cryptocurrency "coins" into the system. "Miners" are paid any transaction fees as well as a subsidy of newly created coins. This both serves the purpose of disseminating new coins in a decentralized manner, as well as motivating miners to provide security for the system.



77.    Promotional materials also have claimed that OC "ensures" these mining resources,

that two mining servers are located in Bulgaria, and that a third mining server is located in Hong

Kong.

78.    At a promotional event in Dubai on or about May 15, 2015, Ruja represented that

the OneCoin blockchain was audited, stating, in part:

> We all know it is a very bad world outside.  So many people making
> promises.  So many people lying.  So many people doing things and
> not delivering.  So, what we did in the last months is we hired an
> auditor to audit our blockchain.  And, ah, I am very proud to say that
> the result of the first audit is here.

Ruja then introduced the alleged auditor of the OneCoin blockchain. The auditor subsequently

provided an opinion that "all transactions are included in the blockchain (no coins are mined

outside the blockchain)."

79.    Consistent with other cryptocurrencies such as bitcoin, OC's promotional materials

claimed that the mining difficulty of OneCoin increases over time, as additional computer

resources, and thus more tokens, are needed to mine a single OneCoin -- thus also increasing the

value of each OneCoin.



80.     Once a OneCoin member "mines" OneCoins using his or her tokens, the newly "mined" OneCoins are thereafter deposited into the member's account and may be accessed by logging in through a website operated by the OneCoin Defendants.

81.     In reality, however, **there were no mining farms, and no real mining of OneCoins ever occurred**.  The OneCoin Defendants simply created new OneCoins at will through a spreadsheet masquerading as a blockchain.

82.     The OneCoin Defendants further claimed that the value of OneCoin is based on market supply and demand.  In or about June 2016, in a OneCoin promotional video posted on YouTube, Ruja stated:

> We discussed several times how the value of cryptocurrency comes. Cryptocurrency is not backed up.  It is an asset where demand and supply drive the price.  Now, one of the drivers of the coin is, of course, the brand.  Brand, of course, is how many people know about OneCoin?  How many people use OneCoin?  How spread are we worldwide?

83.     An official press release issued by OC on or about October 1, 2016, announcing a so-called OneCoin "split," stated in part: "Cryptocurrency value is driven by supply and demand - and demand is driven by brand and usability.  By doubling the coins, we will be able to bring the

coin to more people and places and strengthen the brand."  Another press release, issued by OC

on or about December 2, 2016, stated, in relevant part: "The value of each cryptocurrency depends

on its usability, supply and demand.  With over 2.7 million users, OneCoin has one of the biggest

user bases."

84.     The purported value of a OneCoin steadily grew from €0.50 ($0.56 USD) to

approximately €29.95 ($33.60 USD) per coin, as of in or about January 2019.

85.     Contrary **to** those allegations, though, **OC had no such blockchain**.  Instead, OC

simply used a basic computer SQL script to generate coins.

86.     As Greenwood himself confessed in an e-mail he sent to Ruja:

> [GREENWOOD]: How can this be investigated and found out?

> Can any member (trying to be clever) find out that we actually are
> not investing in machines to mine but it is merely a piece of software
> doing this for us?

87.     Moreover, OC's principals themselves **pre-determined what the value of**

**OneCoins would be, without regard to "market supply and demand."**

88.     Again, e-mails exchanged in 2015 between Ruja and Greenwood reveal the truth

behind the OneCoin Defendants' lies:

> [RUJA]: Goals:

> 6. Trading coin, stable exchange, always close on a high price end
> of day open day with high price, build confidence – better
> manipulation so they (investors) are happy.

> *               *               *

> [RUJA]: We can manipulate the exchange by simulating some
> volatility and intraday pricing [sic].

89.     As noted above, OC operates a multi-level marketing structure through which

individuals are compensated for recruiting new members who purchase OneCoin trader packages.

90.     OneCoin members receive a commission of between 10% and 25% of the value of the trader packages purchased by individuals they recruit to OneCoin.  However, only 60% of commissions paid to members are withdrawable in cash; the remaining 40% are deposited in a "trading account" which may only be used to purchase either OneCoins or more tokens.

91.     OC's multi-level marketing structure appears to have influenced rapid growth in the number of OneCoin members.  Throughout the course of its operation, OC is believed to have defrauded **millions of investors** worldwide.  These victims include individuals living and/or working within the Southern District of New York who have purchased OC Trader Packages and, at least one of whom sent an interstate wire payment to make such a purchase.

92.     Throughout the years, there were many ways to profit from OneCoin, as per OC's official announcements and company events.  Some of them included the OneCoin asset platform called xCoinx, which was meant to be used as an exchange where users could buy and sell their coins for assets and eventually cash out.

93.     The xCoinx platform was abandoned in 2017 and was followed by a purported merchant platform called "Dealshaker," which OC asserted could be used by members to buy and sell real-life assets using OneCoins.

94.     As represented by OC, OneCoin members visiting Dealshaker may use OneCoins, generally in combination with fiat currency, to purchase goods and services on the Dealshaker platform.

95.     According to a Dealshaker webinar video, posted on YouTube in or about November 2018, a Dealshaker representative announced the unveiling of a "new Dealshaker" and stated, among other things, that: (i) Dealshaker merchants would be allowed to accept as little as 10% of payment for goods and services in OneCoin (and thus, as much as 90% in fiat currency),

- 23 -

as opposed to the previous minimum of 50%; and (ii) buyers on the new Dealshaker may use PayPal to transmit fiat currency for purchases from Dealshaker merchants.

96.    The Dealshaker platform, much like the rest of OC's operation, was merely another tool used by the OneCoin Defendants to reap ill-gotten gains from unsuspecting investors.

97.    Despite having been banned in numerous countries, OC continues to operate to this day, as described further below.

C.    **Ruja's Disappearance and Konstantin's Rise to Authority**

98.    As noted above, Konstantin is the brother of OC co-founder and "CryptoQueen" Ruja Ignatova.

99.    In a publicly-available video published on YouTube on or about December 17, 2016, Konstantin is introduced as the "Head of Administration of OneLife."

100.    Upon Ruja's disappearance from public view in or about late-2017, Konstantin took on a larger, high-level role managing OC's affairs.

101.    Since December 2017, Konstantin has appeared at OneCoin-OneLife events worldwide, including in Thailand, Singapore, Colombia, Argentina, Brazil, Paraguay, Bulgaria, France, Spain, and the United States.  During this time, he has functioned as a high-level executive and spokesperson for the OneCoin organization.

102.    Based on social media platform postings, Konstantin appears to be using a Facebook account under the profile name "Konsti Keks" and an Instagram account under the profile name "Konstantin.Ignatov_".  The Konsti Keks Facebook account and the Konstantin.Ignatov_ Instagram account contain photographs of Ignatov and references to OneCoin-OneLife events.

103.    During his appearances at OneCoin-OneLife events, and in publicly-posted online videos connected to those events, Konstantin presents himself as the leader of and spokesperson for OneCoin and a proxy for his sister, Ruja.

104.    In those public appearances, Konstantin has routinely and repeatedly made misrepresentations to investors about OneCoin's structure, value, usability, and future public offering.

**D.    OneCoin Promotions in the United States**

105.    Upon information and belief, OC began actively soliciting investors in the United States in or about July 2015 with an "official launch party" in cities all across the country:



106. In connection with OC's operations, the company operated a referral program pursuant to which "affiliates"/promoters would earn additional income for referring additional investors to invest in the OC Investment Programs.  The referral program was a run-of-the-mill pyramid scheme.

107. Upon information and belief, the following individuals are/were among the top OC "affiliates"/promoters in the United States:

(a)    Tom McMurrain

(b)   Denis Murdock
(c)   Sal Leto
(d)   Bob Byrum
(e)   Carl Wilt
(f)   Greg Knox
(g)   Margie Scott
(h)   Maurice Katz
(i)   Steve Gotberg
(j)   Kevin Foster
(k)   Sarah McGee
(l)   Glenn Smith
(m)   Ken Labine – Canada – recruits in USA
(n)   Sheri Hilliard-Pearce
(o)   Jason Richard Mangan
(p)   Charlotte Mangan
(q)   Joseph W. Piper
(r)   Jodi Tressler Greene
(s)   Keith Bliss
(t)   Stan Harris
(u)   Mike DiGaetano
(v)   Michael & Latasha DeArmond
(w)   Jeff Shofner
(x)   John Reilly
(y)   Ray Lopez
(z)   Willie Tubbs
(aa)   Mary Spicer
(bb)   Kaytee Godiva
(cc)   Brent Patrick
(dd)   Beverly Washington
(ee)   Sandy Davis
(ff)   Tory Bailey
(gg)   Mark Halbig
(hh)   Erik Enriquez
(ii)   Jack Palis
(jj)   Patricia Ann
(kk)   Jeff Litzenberger
(ll)   Barbara Lloyd
(mm)   Lucille Bolton Shannon
(nn)   Alan C. Delaney
(oo)   Andy McCormack
(pp)   Joseph A Mitchell
(qq)   Rick Harris
(rr)   Katherine Clement
(ss)   Erick Brent
(tt)   Ellis Vernon
(uu)   Dean Hackney

(vv)   Tom Cao
(ww)  Robert Townsend
(xx)   Crystal Marie Spath
(yy)   Belinda Aquino
(zz)   Susan Bayerle
(aaa)  Jennifer Vloggity-Korol
(bbb)  Wayne Bailey
(ccc)  Shanna McCarty
(ddd)  Robin 'Robertson' Keith
(eee)  Steve Stucke
(fff)   John Reilly
(ggg)  Richard Marks

108.    Plaintiff Grablis herself met on multiple occasions with Sal Leto, Bob Byrum, Carl Wilt, Greg Knox, and Margie Scott, who each acted as representatives of OC in brokering the purchase/sale to Plaintiff Grablis of the OC Trader Packages in which she invested.

109.    Among the ways OC promoted its investments, the "affiliates"/promoters used social media channels such as YouTube, Facebook, and Twitter to raise awareness and interest in the OC Investment Programs.

110.    Additionally, OC's top U.S.-based recruiters frequently held conference calls to discuss OC's plans and efforts to obtain a public listing of OneCoin. For example, from late-2015 throughout 2016, Bob Byrum, Sal Leto and Maurice Katz hosted conference calls for investors every Monday and Thursday to further promote the OC Investment Programs and discuss OC's business plans.

111.    The top U.S.-based promoters/affiliates also hosted numerous promotional and organizational events in the United States to further expand the reach of the OC Investment Program. For example, OC hosted a 2-day meeting in January 2016 at a hotel in Nashville, Tennessee for over 100 people.

112.    On or about February 27, 2019, Konstantin arrived at San Francisco International Airport ("SFO") on an international flight from Istanbul, Turkey. While being detained at the

airport by law enforcement officials, it was determined that Konstantin was in the United States to attend a OneCoin event in Las Vegas, Nevada.

113.    According to law enforcement officials who investigated Konstantin's cellphone and laptop computer, Konstantin-- in the lead-up to his trip to the United States -- had discussed with a OneCoin affiliate promoter the logistics of his trip.

114.    Specifically, the OC promoter wrote to Konstantin:

> [I]n Las Vegas, 14:00 - 18:00h .. at least 20+ top selected leaders ([from many] cities in USA) there for the meeting/DS training and love to have you with us 30-60 minutes.  Will be inside our Bellagio Hotel-Suite or Pen[t]house. .  If you can meet any time between 17:00-20:00h on either 4 or 5 of March, I will arrange another group.

Konstantin responded, "Yes let's do this!"

115.    In that same exchange, the OneCoin promoter wrote to Konstantin:

> Send you again the proposed meeting schedule for next 02 days. Also, do not need mention dr. Ruja.

Upon information and belief, the reference to "Dr. Ruja" was a reference to Defendant Ruja.

116.    In the days immediately following Konstantin's arrival in San Francisco, California, several social media messages were posted suggesting that his trip to the United States was for the purpose of conducting OC business, including the following:

> (a) On or about March 5, 2019, Konstantin posted a photo of himself in front of a sign that appears to be in Las Vegas on his Instagram account page ("Ignatov' s Instagram Account").  In a comment on that Instagram post, Konstantin wrote: "[I] am here for work reasons not holiday";
>
> (b) Between on or about March 1, 2019, and March 3, 2019, three videos were posted on YouTube that all appear to be from a OneCoin promotional/networking event that took place in Las Vegas, Nevada (the "OneCoin Event");
>
> (c) One YouTube video is titled "Meeting in Las Vegas with Mr. Konstantin."  The description of the video details a meeting in Las Vegas with Konstantin, three OneCoin affiliates, and key American-based OneLife Network leaders consisting of Black, Blue, and Diamond

- 28 -

members discussing future possible Dealshaker development in the United States;

(d) Another YouTube video shows a series of photographs captured during the OneCoin Event in Las Vegas, Nevada, including:

1. An image of Konstantin wearing a blue shirt with the name "OneCoin" written on the front of the shirt;

2. Several photographs of Konstantin with U.S.-based OneCoin affiliates; and

3. An image of a whiteboard titled "OneLife Network/Dealshaker" and which includes, among other things, a schedule listing OneCoin/OneLife Network events.

(e) A third YouTube video showing a series of photographs captured during the OneCoin Event in Las Vegas, Nevada, including a photo of Konstantin holding up two framed portraits: one of himself, and one of RUJA; and

(f) A Facebook post dated March 5, 2019 in which the Facebook user wrote: "During a meeting that just took place in Las Vegas, one of the first questions was, when can people monetize their coins (cash out). Konstantin said immediately '[I]f you are here to cash out, leave this room now; because you don't understand what this project is about.'"

117.    On March 6, 2019, as Konstantin was seeking to exit the United States, he was arrested by the U.S. Federal Bureau of Investigation at Los Angeles International Airport, taken into custody, and charged by the U.S. Attorney's Office for the Southern District of New York with wire fraud, securities fraud, and money laundering offenses for his management of, and involvement with OC's fraudulent Ponzi Scheme.

**III.    The OneCoin Investment Programs Were Ponzi Schemes**

118.    Contrary to the allegations of fantastic investment returns through the power of OC's mining processes and the "market demand" for OneCoins, the OneCoin Defendants were operating a Ponzi scheme.

- 29 -

119.    Any investment returns provided to participants in the OC Investment Programs were not legitimately generated.  Rather, in classic Ponzi scheme style, the OC Defendants simply used new investors' money to pay a portion of the promised returns on prior investors' investments.

120.    In addition, the OneCoin Defendants used new investors' funds to pay themselves as well as pay for the money laundering services provided by, *inter alia*, the Scott Group.

121.    In reality, OC was not offering a revolutionary technology, but was instead selling a new take on a century-old scam.  Specifically, OC used cryptocurrency to coat its Ponzi scheme with a thin patina of legitimacy.  Despite such efforts, it is abundantly clear that the OneCoin Defendants were conducting and/or supporting a Ponzi scheme.  Indeed, the OC Investment Programs exhibit numerous characteristics of such schemes, including:

> (a) promising exorbitant returns on an investment that had no income other than new investor money;
>
> (b) artificially increasing the value of its fictional cryptocurrency by having new investors in the Ponzi scheme purchase OC Trading Packages to invest;
>
> (c) self-ascribing value to the Ponzi scheme investments rather than having those investment values dictated by actual market demand; and
>
> (d) expanding the amount of people in this Ponzi scheme by implementing a Pyramid scheme that paid a commission several levels deep for recruits.

## IV.    **Defendants Laundered Their Ill-Gotten Investment Funds**

122.    While defrauding investors out of their investment funds, the OneCoin Defendants engaged Defendant Scott to launder OC's ill-gotten investments.

123.    Defendants acted together through an intricate web of shell companies to launder OC investor funds and to conceal and disguise the nature, location, source, ownership, and control of the proceeds they had obtained through their illegal activities.

124.   Defendant Scott was first introduced to Ruja on or about September 30, 2015.  On January 31, 2016, Defendant Ruja emailed Scott urging him to meet to clearly discuss the process for laundering OC's fraudulent proceeds:  "As time is ticking, what are the next steps and how can we move pls?  If we want to meet—I am in London from [2/5/2016–2/15/2016] . . . Cindy has sent you the phone—contact me when you have it."  As explained by one of the special agents in charge of investigating the criminal action against Scott, "the phone sent to Scott by Cindy referenced in this e-mail was an encrypted telephone used to communicate with [Ruja]."

125.   On February 29, 2016, Defendant Scott registered MSS International Consultants Limited ("MSSI")[3] in the British Virgin Islands with Defendant Pike and Scott as the sole two directors.  Shortly thereafter, through MSSI, Scott and Pike registered numerous investment funds to launder Plaintiffs and the Class' stolen investments—which OC claimed were being used to fund the non-existent "mining" of new OneCoins.  These investment funds included:

(a) three funds regulated in the British Virgin Islands:

(i) Fenero Equity Investments L.P. ("Fenero I") (incorporated Mar. 1, 2016);

(ii) Fenero Equity Investments II, L.P. ("Fenero II") (incorporated May 5, 2016); and

(iii) Fenero Financial Switzerland L.P. ("Fenero Switzerland") (incorporated June 8, 2016).

---

[3] "MSS" are the initials of Mark S. Scott.

(b) one fund incorporated in the Cayman Islands—Fenero Equity Investments (Cayman) I, L.P. ("Fenero Cayman" and together with Fenero I, Fenero II, and Fenero Switzerland, the "Fenero Hedge Fund Accounts") (incorporated April 27, 2016).[4]

126.    Between approximately August 2016 and February 2017, the Fenero Hedge Funds wired approximately €273 to three separate accounts held by "Fenero Equity Investments Ireland" at the Bank of Ireland in the Republic of Ireland.

127.    In April 2016, Scott, on behalf of Fenero I, Fenero Switzerland and MSSI, engaged Apex Fund Services ("Apex") to provide administration services over Fenero I and Fenero Switzerland.

128.    Apex then created bank accounts for Fenero I and Fenero Switzerland which received approximately €155 million in wire transfers from OC-related bank accounts in Singapore, Germany and Bulgaria.  When questioned as to the nature of these transactions by Apex, Scott claimed that such transfers were merely deposits to accounts held at Fenero's hedge funds by a company named "B and N Consult Ltd" ("B&N") and that Defendant Dilinska was the beneficial owner of B&N.

129.    Shortly thereafter, Defendant Scott inadvertently forwarded an e-mail chain to Apex that revealed Defendant Dilinska's e-mail address was hosted on the domain "onecoin.eu." Within days, Apex e-mailed Defendant Scott requesting a clear trail explaining where the monies

---

[4] Additionally, MSSI organized multiple Fenero entities to launder OC's fraud proceeds in the Republic of Ireland, including: (i) Fenero Equity Investments (Ireland), Limited ("Fenero Ireland"); (ii) Fenero Tradenext Holding Limited ("Fenero Tradenext");[4] (iii) Fenero Pct Holdings Limited ("Fenero Holdings");[4] (iv) Fenero Equity Acquisition 2 Limited; and (v) Fenero Equity Acquisition 3 Limited.  Defendant Dilinska served alongside Defendant Scott as one of the only two board members of both Fenero Tradenext and Fenero Holdings.

deposited into Fenero I and Fenero Switzerland's bank accounts originated.  Less than one-week

later, Scott terminated Fenero I and Fenero Switzerland's relationship with Apex and thereafter

130.    Between June 2016 and February 2017, the Fenero Hedge Fund Accounts

collectively received approximately €364 million and $10 million originating from approximately

10 different bank accounts.  The funds received from 8 of these different bank accounts received

investments, either directly or indirectly, from Class members' investments in the OC Investment

Programs.

131.    Following the termination of Fenero's relationship with Apex, Scott personally

directed bankers at various banks to authorize the transfer of OC's fraud proceeds using various

fictional scenarios to circumvent anti-money laundering procedures across various financial

institutions.  Ultimately, the Scott Group facilitated the laundering of over $400 million of the

Class' investments in the OC Investment Programs, including at least $15.5 million to himself, all

directly traceable to defrauded OC investors.

132.    Defendant Huesmann provided significant assistance in facilitating various

transactions to launder the OC fraud proceeds.  For example, on October 3, 2016, Fenero Tradenext

sent $250,000 to an account controlled by Defendant Huesmann in connection with "escrow

property partial payout of BN loan facility"

133.    Additionally, Huesmann aided Scott in obtaining and expending OC fraud proceeds

for his personal benefit.  Indeed, most of the fraud proceeds repatriated for Scott's benefit were to

accounts either controlled by Scott and Huesmann or to accounts held by Huesmann.  For instance,

between October 2016 and June 2017, Huesmann received 11 wire transfers from Fenero related

accounts totaling $5,600,000.

134.     Such funds were thereafter directed to entities such as 133 Sunset Lane Acquisition Limited, which Scott used to purchase a $2.85 million Massachusetts mansion in which Scott and his wife lived.

135.     Another of the entities that received OC fraud proceeds, through Huesmann, was 31 Dale Avenue Property Group LLC which Scott then used to purchase himself a $3.7 million mansion in Hyannis Port, Massachusetts using the Class' investments.

136.     According to public records, Scott and his team worked with the OneCoin Defendants to launder more than $400 million through a series of purported investment funds holding bank accounts at financial institutions in the Cayman Islands and the Republic of Ireland, among other locations.

137.     Upon information and belief, several hundred million more dollars -- if not billions more -- have likewise been laundered by Defendants.

**V.      Defendants Led Class Members to Incur Substantial Losses**

138.     By late-2017, it was becoming apparent that OC's investment program was a Ponzi scheme.

139.     Regulatory and law enforcement authorities in China, the United Kingdom, Ireland, Canada, Italy, Germany, India, the Ukraine, Bulgaria, Austria, Belgium, Thailand, Vietnam, Samoa, and Uganda have either barred OC from offering its investments in their territories or have issued warnings to its residents that OC is a fraudulent investment scam to be avoided.

140.     Moreover, as noted above, Ruja, Konstantin, and Scott have each been indicted by grand juries in this District, and Konstantin and Scott are awaiting trial on charges related to their involvement while Ruja is presently a wanted fugitive.  Defendant Greenwood has also been arrested and extradited to the United States, though the status of criminal prosecution against him is presently unknown.

141.    As a result of Defendants' fraudulent and unlawful actions, Plaintiffs and the Class have suffered damages believed to be greater than $4 billion.

## VI.    <u>Necessity for Judicial Intervention</u>

142.    In 2013, the SEC issued an investor alert on "Ponzi Schemes Using Virtual Currencies," warning investors to be wary of investment opportunities offering "high investment returns with little or no risk" and explaining that "Ponzi schemes typically involve investments that have not been registered with the SEC or with state securities regulators." Here, the OneCoin Defendants have conducted and profited from precisely such a scheme.

143.    Virtual currencies are a relatively new phenomenon, and numerous individuals and entities -- by engaging in unlawful conduct with near impunity -- are taking advantage of the time it takes for regulatory agencies to address new investment developments, as the OneCoin Defendants have here by raising billions of dollars with promises of profits to be made from investing in the OC Investment Programs.

144.    Plaintiffs have duly performed all of their duties and obligations, and any conditions precedent to Plaintiffs bringing this action have occurred, have been performed, or else have been excused or waived.

## <u>COUNT I - VIOLATION OF SECTION 10(b) OF THE EXCHANGE ACT AND SEC RULE 10b-5(a)-(c)</u>
### [AGAINST THE ONECOIN DEFENDANTS]

145.    Plaintiffs re-allege, and adopt by reference herein, Paragraphs 1 – 144 above, and further allege:

146.    This Count is asserted by Plaintiffs on behalf of themselves and the Class against the OneCoin Defendants and is based upon Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)], and Rule 10b-5 promulgated thereunder by the SEC [17 C.F.R. § 240.10b-5].

- 35 -

147.    During the Class Period, Defendants engaged in a plan, scheme, conspiracy and course of conduct that was intended to, and did: (i) deceive the investing public, including Plaintiffs and other Class members, as alleged herein; (ii) operate a fraudulent Ponzi and pyramid scheme; and (iii) cause Plaintiffs and other members of the Class to purchase or otherwise acquire patently worthless OC Trader Packages and OneCoins at artificially created, and inflated, prices. In furtherance of this unlawful scheme, plan, and course of conduct, the OneCoin Defendants took the actions set forth herein.

148.    The OneCoin Defendants, by the use of means and instrumentalities of interstate commerce: (i) employed devices, schemes and artifices to defraud; (ii) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements made not misleading; and (iii) engaged in acts, practices, and a course of business that operated as a fraud and deceit upon Plaintiffs and the other members of the Class.

149.    Pursuant to the above plan, scheme, conspiracy and course of conduct, each of OneCoin Defendants participated directly or indirectly in the preparation and/or publication of the promotional materials, press releases and other statements and documents described above, including statements made to the media that were designed to tout the fictional market for non-existent and worthless "OneCoins."  Such promotional materials, releases and statements were materially false and misleading in that they failed to disclose material adverse information and misrepresented the truth about the true nature of OC's fraudulent scheme.

150.    By virtue of their positions at, and relationships or interactions with, OC, the OneCoin Defendants had actual knowledge of the materially false and misleading statements and material omissions alleged herein and intended thereby to deceive Plaintiffs and the other members of the Class, or, in the alternative, the OneCoin Defendants acted with reckless disregard for the truth in that they failed or refused to ascertain and disclose such facts as would reveal the materially false and misleading

nature of the statements made, although such facts were readily available to the OneCoin Defendants. Said acts and omissions were committed willfully or with reckless disregard for the truth. In addition, each OneCoin Defendant knew or recklessly disregarded that material facts were being misrepresented or omitted as described above.

151.    Had Plaintiffs and the other members of the Class known the truth, they would not have purchased or otherwise invested in the OC Investment Programs. At the time of the purchases and/or acquisitions by Plaintiffs and the Class, the OC Trader Packages and OneCoins had no true value and thus Plaintiffs and the other members of the Class purchased worthless securities.

152.    By reason of the conduct alleged herein, the OneCoin Defendants knowingly or recklessly, directly or indirectly, have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

153.    As a direct and proximate result of the OneCoin Defendants' wrongful conduct, Plaintiffs and the other members of the Class suffered damages in connection with their respective investments in the OC Trader Packages and OneCoins during the Class Period.

### COUNT II - VIOLATION OF SECTION 20(a) OF THE EXCHANGE ACT
#### [AGAINST THE FOUNDER DEFENDANTS]

154.    Plaintiffs re-allege, and adopt by reference herein, Paragraphs 1 – 144 above, and further allege:

155.    Due to their ownership in and/or control over OneCoin Ltd.'s organization, the Founder Defendants each acted as controlling person of ONECOIN LTD. within the meaning of Section 20(a) of the Exchange Act as alleged herein.

156.    During the Class Period, the Founder Defendants participated in the operation and management of OneCoin Ltd., and conducted and participated, directly and indirectly, in the conduct of OneCoin Ltd.'s business affairs. Because of their senior positions and the fact that they created

OneCoin Ltd. to be a fraudulent operation, each Founder Defendant knew that OneCoin was as all relevant times a fraudulent Ponzi and pyramid scheme. .

157.     By virtue of their top-level executive and controlling positions as behind the scenes owners/developers and/or based on their awareness of Defendant OneCoin Ltd.'s operations, Defendant Ruja had the power to influence and control and did influence and control, directly or indirectly, the decision making relating to the OC Trader Packages and/or OneCoins, including the decision to engage in the sale of unregistered securities in furtherance thereof.

158.     As officers and/or directors of a company raising investments from the investing public, the Founder Defendants had a duty to disseminate accurate and truthful information with respect to OneCoin Ltd.'s operations.

159.     The Founder Defendants are culpable participants in the fraudulent scheme described herein and caused OneCoin Ltd. to engage in the acts and omissions described herein.

160.     Accordingly, Defendant RUJA is liable to Plaintiffs and the Class as a control person of Defendant OneCoin Ltd. under Section 20(a) of the Exchange Act.

## COUNT III - FRAUD
### [AGAINST THE ONECOIN DEFENDANTS]

161.     Plaintiffs re-alleges, and adopt by reference herein, Paragraphs 1 – 144 above, and further allege:

162.     The OneCoin Defendants, by acts of both omission and commission, made to Plaintiffs and the Class Members false statements of material facts about the services Plaintiffs and the Class Members would receive from OneCoin Ltd. upon investing in the OneCoin Trader Packages and/or OneCoins.

163.     Specifically, the OneCoin Defendants' representations to Plaintiffs and the Class Members that, among other things:

    (a)     OneCoins were actual cryptocurrencies;

    (b)     OneCoin Ltd. utilized mining equipment that would provide OneCoin trader package owners/memberships valuable mined OneCoins that helped its investors generate far-greater-than-average returns on their investments;

    (c)     The value of OneCoin trader packages/memberships and/or OneCoins were based on market demand, not an arbitrarily-ascribed value internally determined by ONECOIN LTD. itself;

    (d)     Investment returns were legitimately generated and were not simply a reallocation of new OneCoin Ltd. investors' money used to pay the promised returns on outstanding OneCoin Ltd. investors' investments in classic Ponzi scheme fashion;

    (e)     The OneCoin trader packages/memberships complied with all applicable securities laws; and

    (f)     The OneCoin Ltd. affiliates who were paid commissions for their sale of OneCoin trader packages/memberships and/or OneCoins were properly registered to procure those sales were false, and the OneCoin Defendants knew at the time the statements were made that the statements were false.

164.    The OneCoin Defendants intended that Plaintiffs and the Class Members would be induced into action by relying upon the statements of fact made to them by and on behalf of the OneCoin Defendants.

165.    In considering whether to invest in OneCoin trader packages/memberships and/or OneCoins and entrust to OneCoin Ltd. their valuable assets; Plaintiffs and the Class Members reasonably and justifiably relied on the statements of fact made to them by and on behalf of the OneCoin Defendants.

166.    As a direct and proximate result of Plaintiffs' and the Class Members' reliance on the statements made to them by the OneCoin Defendants, Plaintiffs and the Class Members have suffered damage.

## COUNT IV – AIDING & ABETTING FRAUD
### [AGAINST DEFENDANT ONECOIN LTD.]

167.    Plaintiffs re-allege, and adopt by reference herein, Paragraphs 1 – 144 above, and further allege:

168.    The OneCoin Defendants were able to accomplish their fraud due, in large part, to Defendants Scott and his partners—Pike and Huesmann—laundering of OC's fraud proceeds obtained from selling the OC Investment Programs to Plaintiffs and the proposed Class.

169.    From 2016 through in or about 2018, the Scott Defendants provided substantial assistance to the OneCoin Defendants' fraudulent scheme by laundering in excess of $400 million of OC's fraud proceeds thereby affirmatively assisting the OneCoin Defendants in defrauding OneCoin investors and evading regulatory scrutiny and international law enforcement efforts by concealing the OneCoin Defendants unlawful, immoral and fraudulent conduct which has caused, and is continuing to cause, significant financial harm to Plaintiffs and the Class.

170.    The Scott Defendants provided affirmative assistance to the OneCoin Defendants enabling their fraudulent conduct to persist unimpeded proximately causing the Class financial injuries of hundreds of millions, if not billions, of dollars.

## COUNT V - FRAUDULENT MISREPRESENTATION
### [AGAINST THE ONECOIN DEFENDANTS]

171.    Plaintiffs re-allege, and adopt by reference herein, Paragraphs 1 – 144 above, and further allege:

172.    The OneCoin Defendants, by acts of both omission and commission, made to Plaintiffs and the Class Members false     statements of material facts about the services

Plaintiffs and the Class Members would receive from OneCoin Ltd. upon opening OneCoin Ltd. memberships and investing in the OneCoin trader packages/memberships and/or OneCoins.

173.    Specifically, the OneCoin Defendants' representations to Plaintiffs and the Class Members that, among other things:

(a)    OneCoins were actual cryptocurrencies;

(b)    OneCoin Ltd. utilized mining equipment that would provide OneCoin trader package owners/memberships valuable mined OneCoins that helped its investors generate far-greater-than-average returns on their investments;

(c)    The value of OneCoin trader packages/memberships and/or OneCoins were based on market demand, not an arbitrarily-ascribed value internally determined by OneCoin Ltd. itself;

(d)    Investment returns were legitimately generated and were not simply a reallocation of new OneCoin Ltd. investors' money used to pay the promised returns on outstanding OneCoin Ltd. investors' investments in classic Ponzi scheme fashion;

(e)    The OneCoin trader packages/memberships complied with all applicable securities laws; and

(f)    The OneCoin Ltd. affiliates who were paid commissions for their sale of OneCoin trader packages/memberships and/or OneCoins were properly registered to procure those sales

were false, and the OneCoin Defendants knew at the time the statements were made that the statements were false.

174.    The OneCoin Defendants' misrepresentations were made with reckless disregard for the truth.

175.    The OneCoin Defendants intended that Plaintiffs and the Class Members would be induced into action by relying upon the statements of fact made to them by and on behalf of the OneCoin Defendants.

176.    In considering whether to invest in OneCoin trader packages/memberships and/or OneCoins and entrust to OneCoin Ltd. their valuable assets; Plaintiffs and the Class Members

- 41 -

reasonably and justifiably relied on the statements of fact made to them by and on behalf of the OneCoin Defendants.

177.    As a direct and proximate result of Plaintiffs' and the Class Members' reliance on the statements made to them by the OneCoin Defendants, Plaintiffs and the Class Members have suffered damage.

## COUNT VI - NEGLIGENT MISREPRESENTATION
### [AGAINST THE ONECOIN DEFENDANTS]

178.    Plaintiffs re-allege, and adopt by reference herein, Paragraphs 1 – 144 above, and further allege:

179.    The OneCoin Defendants, by acts of both omission and commission, made to Plaintiffs and the Class Members false statements of material facts about the services Plaintiffs and the Class Members would receive from OneCoin Ltd. upon opening a OneCoin Ltd. membership and investing in the OneCoin trader packages/memberships and/or OneCoins in exchange for the fees they were compelled to pay to maintain membership accounts at ONECOIN LTD.

180.    Specifically, the OneCoin Defendants' representations to Plaintiffs and the Class Members that, among other things:

(a)    OneCoins were actual cryptocurrencies;

(b)    OneCoin Ltd. utilized mining equipment that would provide OneCoin trader package owners/memberships valuable mined OneCoins that helped its investors generate far-greater-than-average returns on their investments;

(c)    The value of OneCoin trader packages/memberships and/or OneCoins were based on market demand, not an arbitrarily-ascribed value internally determined by OneCoin Ltd. itself;

(d)    Investment returns were legitimately generated and were not simply a reallocation of new OneCoin Ltd. investors' money used to pay the promised returns on outstanding OneCoin Ltd. investors' investments in classic Ponzi scheme fashion;

(e)     The OneCoin trader packages/memberships complied with all applicable securities laws; and

(f)     The OneCoin Ltd. affiliates who were paid commissions for their sale of OneCoin trader packages/memberships and/or OneCoins were properly registered to procure those sales were false, and the OneCoin Defendants knew at the time the statements were made that the statements were false.

181.    The OneCoin Defendants had no reasonable grounds upon which to believe the statements were true when made to Plaintiffs and the Class Members.

182.    The OneCoin Defendants intended that Plaintiffs and the Class Members would be induced into action by relying upon the statements of fact made to them by and on behalf of the OneCoin Defendants.

183.    In considering whether to invest in OneCoin trader packages/memberships and/or OneCoins and entrust to OneCoin Ltd. their valuable assets, Plaintiffs and the Class Members reasonably and relied on the statements of fact made to them by and on behalf of the OneCoin Defendants.

184.    Plaintiffs' and the Class Members' reliance on the OneCoin Defendants' statements of fact were justifiable given the OneCoin Defendants' supplemented their false claims with, *inter alia*: (i) a fake OneCoin exchange; (ii) a fake blockchain for OneCoins; and (iii) and a purported blockchain "auditor" who publicly attested that the OneCoin blockchain was legitimate.

185.    As a direct and proximate result of Plaintiffs' and the Class Members' reliance on the statements made to them by the OneCoin Defendants, Plaintiffs and the Class Members have suffered damage.

## COUNT VII - BREACH OF CONTRACT
### [AGAINST DEFENDANT ONECOIN LTD.]

186.    Plaintiffs re-allege, and adopt by reference herein, Paragraphs 1 – 144 above, and further allege:

187.    The terms of the OneCoin trader packages/memberships constitute a contract between: (1) Plaintiffs and the Class Members, and (2) OneCoin Ltd.

188.    The contract was entered into by and between OneCoin Ltd. and each Class Member between April 2014 and May 6, 2019.

189.    The terms of the OneCoin trader packages/memberships called for an investment of fiat currency or cryptocurrency by Plaintiffs and the Class Members.

190.    The funds paid by Plaintiffs and the Class Members pursuant to the OneCoin trader packages/memberships were pooled by OneCoin Ltd. in an effort by OneCoin Ltd. to secure a profit for itself and the investors.  As a result, the investors, including Plaintiffs and the Class, shared in the risks and benefits of the investment.

191.    Plaintiffs and the Class Members relied on, and are dependent upon, the expertise and efforts of OneCoin Ltd. for their investment returns.

192.    The terms of the OneCoin trader packages/memberships constitute an investment contract and are therefore subject to federal and state securities laws, including the registration requirements promulgated thereunder.

193.    OneCoin Ltd. breached its contracts with Plaintiffs and the Class by failing to provide any actual mining efforts, cryptocurrency, and returns on the initial investments pursuant to the terms of the OneCoin trader packages/memberships.  Rather than adhere to the express, unequivocal terms of the contracts, OneCoin Ltd. converted Plaintiffs' and the Class' investments into near worthless OneCoin trader packages/memberships and/or OneCoins.

194.    Moreover, no registration statement was filed or in effect with any federal or state regulatory body, and no exemption from registration exists with respect to the OneCoin trader packages/memberships.

195.    By virtue of the foregoing, OneCoin Ltd. is liable to Plaintiffs and the Class for damages resulting from OneCoin Ltd.'s breaches of contract.

196.    To the extent that Plaintiffs have received from OneCoin Ltd. any benefits through the contract -- though none are known to them at this time -- Plaintiffs hereby offers to restore to OneCoin Ltd. those benefits, once they are identified and can be quantified.

## COUNT VIII- UNJUST ENRICHMENT
### [AGAINST THE SCOTT GROUP DEFENDANTS]

197.    Plaintiffs re-allege, and adopt by reference herein, Paragraphs 1 – 144 above, and further allege:

198.    The Scott Group Defendants have each reaped the benefits of laundering proceeds from OneCoin's fraud on Plaintiffs and the Class and personally benefited at the expend of the Class.

199.    It would be unconscionable and against the fundamental principles of justice, equity, and good conscience for the Scott Group Defendants to retain the substantial monetary benefits they have received as a result of their misconduct.

200.    To remedy the Scott Defendants' unjust enrichment, the Court should order the each to disgorge any amounts received as a result of their participation in assisting the OneCoin's fraud by laundering OneCoin's fraud proceeds.

## COUNT IX - CONVERSION
### [AGAINST THE ONECOIN DEFENDANTS]

201.    Plaintiffs re-allege, and adopt by reference herein, Paragraphs 1 – 144 above, and further allege:

202.    Plaintiffs transferred funds and assets to OneCoin Ltd. for investment to obtain OneCoin trader packages/memberships and/or OneCoins.

- 45 -

203.    OneCoin Ltd. has kept Plaintiffs' and the Class Members' funds and assets after Plaintiffs and the Class Members requested their return, despite OneCoin Ltd.'s lack of any ownership interest in the assets.

204.    By refusing to return to Plaintiffs and the Class Members their assets, OneCoin Ltd. intended to interfere with, and indeed has interfered with, Plaintiffs' and the Class Members' ownership and interest in those holdings and has deprived Plaintiffs and the Class Members of their property, permanently or temporarily.

205.    Upon information and belief, OneCoin Ltd. has utilized Plaintiffs' and the Class Members' funds and assets to cover OneCoin Ltd.'s own business expenses and to enrich its directors, shareholders, and affiliates, including Defendants Ruja, Konstantin, Greenwood, and Dilinska.

206.    As a result of OneCoin Ltd.'s conversion of Plaintiffs' and the Class Members' funds and assets to its own corporate uses and the personal use of its directors, shareholders, and affiliates; Plaintiffs and the Class Members have suffered damage.

## COUNT X - CIVIL CONSPIRACY
### [AGAINST ALL DEFENDANTS]

207.    Plaintiffs re-allege, and adopt by reference herein, Paragraphs 1 – 144 above, and further allege:

208.    Defendants have conspired with one another, willfully and knowingly, to devise a scheme and artifice to defraud and to obtain money and property by means of false and fraudulent pretenses, representations, and promises.   As such, Defendants did willfully and knowingly combine, conspire, confederate, and agree together and with each other to commit, *inter alia*, securities fraud, wire fraud, and money laundering.

209. More specifically, Defendants conspired with one another to perpetrate an unlawful act upon Plaintiffs and the Class Members or to perpetrate a lawful act by unlawful means, *to wit*: they made multiple misrepresentations of fact to Plaintiffs and the Class Members in an effort to extract from Plaintiffs and the Class Members funds, assets, and cryptocurrency to fund OneCoin Ltd.'s own business expenses and to enrich its directors, shareholders, and affiliates, not to fund the purportedly legitimate purpose to which Plaintiffs and the Class Members were told by Defendants that their investment assets were being applied – all of which put Defendants' own pecuniary interest ahead of Plaintiffs' and the Class Members' welfare and economic safety.

210. Defendants solicited and/or accepted from Plaintiffs and the Class Members large sums of funds, assets, and cryptocurrency while withholding from Plaintiffs and the Class Members certain material facts.

211. Each of the Defendants agreed to the illicit purpose for garnering investment monies from Plaintiffs and the Class Members so that OneCoin Ltd.'s directors, shareholders, and affiliates could enjoy lavish lifestyles with Plaintiffs' and the Class Members' funds, assets, and cryptocurrency.

212. Defendants were each aware of, and consented to, the misrepresentations detailed above and knew that the efforts to garner funds, assets, and cryptocurrency from Plaintiffs and the Class Members was all part of a fraud aimed solely at enriching OneCoin Ltd.'s directors, shareholders, and affiliates without any intent to remunerate Plaintiffs and the Class Members in any legitimate way purported by OneCoin Ltd.

213. In furtherance of their conspiracy, Defendants made to Plaintiffs and the Class Members, or agreed to have someone make on their behalf, the false statements of fact detailed above and purposefully withheld from Plaintiffs and the Class Members certain material facts

detailed above in a concerted effort to obtain Plaintiffs' and the Class Members' funds, assets, and cryptocurrency.

214.   To fulfill its role in the conspiracy, OneCoin Ltd. operated its website, disseminated an army of promoters and equipped them with false information about the OneCoin trader packages/memberships and/or OneCoins, and pretended to be operating a legitimate, legally-compliant investment platform.

215.   To fulfill her role in the conspiracy, Defendant Ruja:

(a)   willfully and knowingly, directly and indirectly, by the use of the means and instrumentalities of interstate commerce, and of the mails, and of facilities of national securities exchanges, would and did use and employ, in connection with the purchase and sale of securities, manipulative and deceptive devices and contrivances by: (a) employing devices, schemes and artifices to defraud; (b) making untrue statements of material fact and omitting to state material facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; and (c) engaging in acts, practices and courses of business which operated and would operate as a fraud and deceit upon persons, *to wit*: RUJA, and others working on her behalf, made and caused to be made false statements and misrepresentations soliciting individuals throughout the world, including in the Southern District of New York, to invest in "OneCoin," a purported cryptocurrency, and thereby caused individuals in the United States and elsewhere to purchase OneCoin packages -- resulting in the receipt of over $1 billion of investor funds into OneCoin-related bank accounts.

(b)   willfully and knowingly, having devised and intending to devise a scheme and artifice to defraud and for obtaining money and property by means of false and fraudulent pretenses, representations, and promises, would and did transmit and cause to be transmitted by means of wire, radio, and television communication in interstate and foreign commerce, writings, signs, signals, pictures, and sounds for the purpose of executing such scheme and artifice, *to wit*: RUJA, and others working on her behalf, made and caused to be made false statements and misrepresentations soliciting individuals throughout the world, including in the Southern District of New York, to invest in "OneCoin," a purported cryptocurrency, and instructed individuals to transmit investment funds to OneCoin depository accounts in order to purchase OneCoin packages, thereby causing individuals to send interstate and international wires

representing their OneCoin investments, and resulting in the receipt of over $1 billion of investor funds into OneCoin-related bank accounts

(c)     knowing that the property involved in certain financial transactions represented the proceeds of some form of unlawful activity -- conducted and attempted to conduct such financial transactions which in fact involved the proceeds of specified unlawful activity, *to wit*: approximately $400 million in proceeds of a pyramid scheme involving a purported cryptocurrency known as "OneCoin," knowing that the transactions were designed, in whole or in part, to conceal and disguise the nature, location, source, ownership, and control of the proceeds of such specified unlawful activity; and

(d)     transported, transmitted, and transferred, and attempted to transport, transmit, and transfer a monetary instrument and funds from a place in the United States to and through a place outside the United States, and to a place in the United States from and through a place outside the United States -- knowing that the monetary instrument and funds involved in the transportation, transmission, and transfer represented the proceeds of some form of unlawful activity, and knowing that such transportation, transmission, and transfer was designed in whole and in part to conceal and disguise the nature, location, source, ownership, and control of the proceeds of specified unlawful activity, *to wit*: approximately $400 million in proceeds of a pyramid scheme involving a purported cryptocurrency known as "OneCoin."

216.   To fulfill his role in the conspiracy, Defendant Konstantin:

(a)     willfully and knowingly, directly and indirectly, by the use of the means and instrumentalities of interstate commerce, and of the mails, and of facilities of national securities exchanges, would and did use and employ, in connection with the purchase and sale of securities, manipulative and deceptive devices and contrivances by: (a) employing devices, schemes and artifices to defraud; (b) making untrue statements of material fact and omitting to state material facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; and (c) engaging in acts, practices and courses of business which operated and would operate as a fraud and deceit upon persons, *to wit*: IGNATOV, and others working on her behalf, made and caused to be made false statements and misrepresentations soliciting individuals throughout the world, including in the Southern District of New York, to invest in "OneCoin," a purported cryptocurrency, and thereby caused individuals in the United States and elsewhere

to purchase OneCoin packages -- resulting in the receipt of over $1 billion of investor funds into OneCoin-related bank accounts.

(b) willfully and knowingly, having devised and intending to devise a scheme and artifice to defraud and for obtaining money and property by means of false and fraudulent pretenses, representations, and promises, would and did transmit and cause to be transmitted by means of wire, radio, and television communication in interstate and foreign commerce, writings, signs, signals, pictures, and sounds for the purpose of executing such scheme and artifice, *to wit*: IGNATOV, and others working on her behalf, made and caused to be made false statements and misrepresentations soliciting individuals throughout the world, including in the Southern District of New York, to invest in "OneCoin," a purported cryptocurrency, and instructed individuals to transmit investment funds to OneCoin depository accounts in order to purchase OneCoin packages, thereby causing individuals to send interstate and international wires representing their OneCoin investments, and resulting in the receipt of over $1 billion of investor funds into OneCoin-related bank accounts

(c) knowing that the property involved in certain financial transactions represented the proceeds of some form of unlawful activity -- conducted and attempted to conduct such financial transactions which in fact involved the proceeds of specified unlawful activity, *to wit*: approximately $400 million in proceeds of a pyramid scheme involving a purported cryptocurrency known as "OneCoin," knowing that the transactions were designed, in whole or in part, to conceal and disguise the nature, location, source, ownership, and control of the proceeds of such specified unlawful activity; and

(d) transported, transmitted, and transferred, and attempted to transport, transmit, and transfer a monetary instrument and funds from a place in the United States to and through a place outside the United States, and to a place in the United States from and through a place outside the United States -- knowing that the monetary instrument and funds involved in the transportation, transmission, and transfer represented the proceeds of some form of unlawful activity, and knowing that such transportation, transmission, and transfer was designed in whole and in part to conceal and disguise the nature, location, source, ownership, and control of the proceeds of specified unlawful activity, *to wit*: approximately $400 million in proceeds of a pyramid scheme involving a purported cryptocurrency known as "OneCoin."

217. To fulfill his role in the conspiracy, Defendant Greenwood:

(a)     willfully and knowingly, directly and indirectly, by the use of the means and instrumentalities of interstate commerce, and of the mails, and of facilities of national securities exchanges, would and did use and employ, in connection with the purchase and sale of securities, manipulative and deceptive devices and contrivances by: (a) employing devices, schemes and artifices to defraud; (b) making untrue statements of material fact and omitting to state material facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; and (c) engaging in acts, practices and courses of business which operated and would operate as a fraud and deceit upon persons, *to wit*: GREENWOOD, and others working on her behalf, made and caused to be made false statements and misrepresentations soliciting individuals throughout the world, including in the Southern District of New York, to invest in "OneCoin," a purported cryptocurrency, and thereby caused individuals in the United States and elsewhere to purchase OneCoin packages -- resulting in the receipt of over $1 billion of investor funds into OneCoin-related bank accounts.

(b)     willfully and knowingly, having devised and intending to devise a scheme and artifice to defraud and for obtaining money and property by means of false and fraudulent pretenses, representations, and promises, would and did transmit and cause to be transmitted by means of wire, radio, and television communication in interstate and foreign commerce, writings, signs, signals, pictures, and sounds for the purpose of executing such scheme and artifice, *to wit*: GREENWOOD, and others working on her behalf, made and caused to be made false statements and misrepresentations soliciting individuals throughout the world, including in the Southern District of New York, to invest in "OneCoin," a purported cryptocurrency, and instructed individuals to transmit investment funds to OneCoin depository accounts in order to purchase OneCoin packages, thereby causing individuals to send interstate and international wires representing their OneCoin investments, and resulting in the receipt of over $1 billion of investor funds into OneCoin-related bank accounts

(c)     knowing that the property involved in certain financial transactions represented the proceeds of some form of unlawful activity -- conducted and attempted to conduct such financial transactions which in fact involved the proceeds of specified unlawful activity, *to wit*: approximately $400 million in proceeds of a pyramid scheme involving a purported cryptocurrency known as "OneCoin," knowing that the transactions were designed, in whole or in part, to conceal and disguise the nature, location, source, ownership, and control of the proceeds of such specified unlawful activity; and

- 51 -

    (d)    transported, transmitted, and transferred, and attempted to transport, transmit, and transfer a monetary instrument and funds from a place in the United States to and through a place outside the United States, and to a place in the United States from and through a place outside the United States -- knowing that the monetary instrument and funds involved in the transportation, transmission, and transfer represented the proceeds of some form of unlawful activity, and knowing that such transportation, transmission, and transfer was designed in whole and in part to conceal and disguise the nature, location, source, ownership, and control of the proceeds of specified unlawful activity, *to wit*: approximately $400 million in proceeds of a pyramid scheme involving a purported cryptocurrency known as "OneCoin."

218.    To fulfill his role in the conspiracy, Defendant Scott, Pike and Huesmann:

    (a)    knowing that the property involved in certain financial transactions represented the proceeds of some form of unlawful activity -- conducted and attempted to conduct such financial transactions which in fact involved the proceeds of specified unlawful activity, *to wit*: approximately $400 million in proceeds of a pyramid scheme involving a purported cryptocurrency known as OneCoin, knowing that the transactions were designed, in whole or in part, to conceal and disguise the nature, location, source, ownership, and control of the proceeds of such specified unlawful activity;

    (b)    transported, transmitted, and transferred, and attempted to transport, transmit, and transfer a monetary instrument and funds from a place in the United States to and through a place outside the United States, and to a place in the United States from and through a place outside the United States -- knowing that the monetary instrument and funds involved in the transportation, transmission, and transfer represented the proceeds of some form of unlawful activity, and knowing that such transportation, transmission, and transfer was designed in whole and in part to conceal and disguise the nature, location, source, ownership, and control of the proceeds of specified unlawful activity, *to wit*: approximately $400 million in proceeds of a pyramid scheme involving a purported cryptocurrency known as "OneCoin."

219.    OneCoin Ltd. conducted no legitimate business -- something of which each of the Defendants were aware and which they accepted as part of the scheme to defraud OneCoin Ltd. investors and accountholders, including Plaintiffs and the Class Members.

220.     As a direct and proximate result of Defendants' conspiracy, Plaintiffs and the Class

Members have suffered damage.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs, individually and on behalf of all others similarly situated,

respectfully prays for relief as follows:

(a) Declaring that this action is properly maintainable as a class action and certifying Plaintiffs as the Class representative and her counsel as Class counsel;

(b) Declaring the OneCoin Defendants are liable to Plaintiffs and the Class under Sections 10(b) and/or 20(a) of the Exchange Act;

(c) Declaring the Scott Group Defendants liable to Plaintiffs and the Class for their aiding and abetting of the OneCoin Defendants' fraud on the Class;

(d) Declaring that Defendants are liable to Plaintiffs and the Class due to their breach of contract, fraudulent inducement, fraudulent misrepresentation, negligent misrepresentation, conversion, and civil conspiracy;

(e) Preliminarily enjoining Defendants from making further transfers or dissipations of the investments raised from the offer and sale of OneCoins and in connection with the OneCoin trader packages/memberships, or using such funds in any further purchases or transactions;

(f) Requiring an accounting of the remaining funds and assets raised from Plaintiffs and the Class in connection with the offer and sale of OneCoins and the OneCoin trader packages/memberships;

(g) Imposing a constructive trust over the funds and assets rightfully belonging to Plaintiffs and the Class;

(h) Ordering rescission of the investments made by Plaintiffs and the Class relating to the offer and sale of OneCoins and the OneCoin trader packages/memberships and/or compensatory damages;

(i) Awarding Plaintiffs the costs of this action, including reasonable allowance for Plaintiffs' attorneys' and experts' fees; and

(j) Granting such other and further relief as this Court may deem just and proper.

## DEMAND FOR TRIAL BY JURY

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Plaintiffs demand trial by jury in this action of all issues so triable.

Dated: August 2, 2019

Respectfully Submitted

**LEVI & KORSINSKY, LLP**

By: */s/ William J. Fields*
William J. Fields (5054952)
55 Broadway, 10th Floor
New York, NY 10006
Tel: (212) 363-7500
Fax: (212) 363-7171
E-mail: wfields@zlk.com

**LEVI & KORSINSKY, LLP**
Donald J. Enright (*pro hac vice* forthcoming)
John A. Carriel (*pro hac vice* forthcoming)
1101 30th Street, N.W., Suite 115
Washington, DC 20007
Telephone: (202) 524-4290
Facsimile: (202) 333-2121
E-mail: denright@zlk.com
E-mail: jcarriel@zlk.com

**SILVER MILLER**
David C. Silver (*pro hac vice* forthcoming)
Jason S. Miller (*pro hac vice* forthcoming)
11780 W. Sample Road
Coral Springs, FL 33065
Tel: (954) 516-6000
E-mail: DSilver@SilverMillerLaw.com
E-Mail: JMiller@SilverMillerLaw.com

*Attorneys for Lead Plaintiff Donald Berdeaux and Co-Lead Counsel for the Class*