# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

|  |  |
|---|---|
| DONALD BERDEAUX and CHRISTINE GRABLIS, Individually and on Behalf of All Others Similarly Situated, <br><br> Plaintiffs, <br><br> -against- <br><br> ONECOIN LTD.; RUJA IGNATOVA; SEBASTIAN GREENWOOD; MARK SCOTT; DAVID PIKE; NICOLE J. HUESMANN; GILBERT ARMENTA; and THE BANK OF NEW YORK MELLON CORPORATION <br><br> Defendants. | Case No.: 1:19-cv-04074-VEC <br><br> CLASS ACTION <br><br> JURY TRIAL DEMANDED |

## SECOND AMENDED CLASS ACTION COMPLAINT

## TABLE OF CONTENTS

Page

INTRODUCTION ..................................................................................................................1

NATURE OF THE ACTION ................................................................................................2

JURISDICTION AND VENUE ...........................................................................................5

PARTIES AND RELEVANT NON-PARTIES ....................................................................6

    I.      PLAINTIFFS .........................................................................................................6

    II.     DEFENDANTS ......................................................................................................7

         A.      THE ONECOIN DEFENDANTS.................................................................7

            1.     ONECOIN LTD...............................................................................7

            2.     RUJA IGNATOVA ..........................................................................8

            3.     SEBASTIAN GREENWOOD.........................................................9

         B.      THE SCOTT GROUP ...................................................................11

            1.     MARK S. SCOTT............................................................................11

            2.     DAVID PIKE...................................................................................12

            3.     NICOLE J. HUESMANN................................................................12

            4.     GILBERT ARMENTA....................................................................15

         C.      BNY MELLON ............................................................................14

          D.      OTHER LIABLE PERSONS/ENTITIES.................................................15

    III.    RELATED THIRD PARTIES ................................................................................15

         A.      KONSTANTIN IGNATOV..........................................................................15

         B.      IRINA ANDREEVA DILKINSKA.......................................................16

         C.      SIMON LE ...................................................................................17

PLAINTIFFS' CLASS ACTION ALLEGATIONS.................................................................18

SUBSTANTIVE ALLEGATIONS .......................................................................................21

    I.      BACKGROUND ON BLOCKCHAIN TECHNOLOGY AND INITIAL COIN
         OFFERINGS.................................................................................................21

i

A. BLOCKCHAINS ....................................................................................21

B. THE ONECOIN "IPO" / "ICO" ...............................................................21

II. BACKGROUND ON ONECOIN LTD. .................................................................22

A. THE CO-FOUNDER DEFENDANTS CREATED ONECOIN TO DEFRAUD INVESTORS .................................................................22

B. FORMATION AND CREATION OF ONECOIN CURRENCY ............24

C. ONECOIN PROMOTIONS IN THE UNITED STATES ........................31

III. THE ONECOIN INVESTMENT PROGRAMS WERE PONZI SCHEMES .......37

IV. DEFENDANTS LAUNDERED THEIR ILL-GOTTEN INVESTMENT FUNDS ..........................................................................................................38

V. DEFENDANTS LED CLASS MEMBERS TO INCUR SUBSTANTIAL LOSSES ..........................................................................................................46

VI. NECESSITY FOR JUDICIAL INTERVENTION ...............................................46

COUNT I - VIOLATION OF SECTION 10(b) OF THE EXCHANGE ACT AND SEC RULE 10b-5(a)-(c) ................................................................................................47

COUNT II - VIOLATION OF SECTION 20(a) OF THE EXCHANGE ACT ...........................49

COUNT III - FRAUD ........................................................................................................50

COUNT IV – AIDING & ABETTING FRAUD ....................................................................51

COUNT V - FRAUDULENT MISREPRESENTATION ........................................................53

COUNT VI - NEGLIGENT MISREPRESENTATION ..........................................................54

COUNT VII - BREACH OF CONTRACT ...........................................................................56

COUNT VIII -- UNJUST ENRICHMENT ...........................................................................57

COUNT IX -- CONVERSION ...........................................................................................58

COUNT X - CIVIL CONSPIRACY ....................................................................................59

COUNT XI – COMMERCIAL BAD FAITH ........................................................................64

PRAYER FOR RELIEF ....................................................................................................64

DEMAND FOR TRIAL BY JURY .....................................................................................65

## INTRODUCTION

Lead Plaintiff Donald Berdeaux ("Lead Plaintiff" or "Berdeaux") and Plaintiff Christine Grablis ("Grablis" and together with Berdeaux, "Plaintiffs") allege in this Second Amended Class Action Complaint (the "SAC") claims under the federal securities laws and common law against key operators of OneCoin Ltd. ("OC" or the "Company") and certain of their enabling co-conspirators arising from a massive fraud perpetrated on millions of individual investors throughout the world causing injuries in excess of $4 billion through a densely-packed multi-level-marketing system.

Specifically, Plaintiffs allege claims for: (i) violation of Sections 10(b), 15 U.S.C. § 78j(b), of the Securities Exchange Act of 1934 ("Exchange Act") and Rule 10b-5(a)-(c), 17 C.F.R. § 240.10b-5(a)-(c), promulgated thereunder against Defendants OC, Ruja Ignatova ("Ruja"), and Sebastian Greenwood ("Greenwood" and together with Ruja, the "Founder Defendants") (collectively, the "OneCoin Defendants");  (ii) control person liability under Section 20(a), 15 U.S.C. § 78t(a), of the Exchange Act against the Founder Defendants; (iii) fraud against the OneCoin Defendants; (iv) aiding and abetting fraud against Defendants Mark Scott ("Scott"), David Pike ("Pike"), Nicole J. Huesmann ("Huesmann"), Gilbert Armenta ("Armenta") (collectively, the "Scott Group"), and The Bank of New York Mellon ("BNY Mellon"); (v) fraudulent misrepresentation against the OneCoin Defendants; (vi) negligent misrepresentation against the OneCoin Defendants; (vii) breach of contract against OneCoin Ltd; (viii) unjust enrichment against the Scott Group Defendants; (ix) conversion against the OneCoin Defendants; (x) civil conspiracy against the OneCoin Defendants and the Scott Group Defendants; and (xi) commercial bad faith against Defendant BNY Mellon, based upon personal knowledge with respect to Plaintiffs' own acts, and upon facts obtained through an investigation conducted by their

counsel, which included review of, *inter alia*: (a) documents and solicitation materials released by Defendants, in connection with the OneCoin trader packages/memberships and OneCoins; (b) public statements made by the OneCoin Defendants concerning OC's, the OneCoin trader packages/memberships and OneCoins; (c) media publications concerning OC, the OneCoin trader packages/memberships and OneCoins; and (d) information revealed in connection with the criminal actions brought against, *inter alia*, Defendants Scott, Ruja, and Armenta in this District before the Honorable Eduardo Ramos, *United States v. Mark S. Scott*, 1:17-cr-630-ER (S.D.N.Y) and *United States v. Gilbert Armenta*, 1:17-cr-00556-ER (S.D.N.Y).

Plaintiffs believe that further substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.  Many of the facts supporting the allegations contained herein are known only to Defendants or are exclusively within their control.

## <u>NATURE OF THE ACTION</u>

1.      This is a class action on behalf of a class of investors consisting of all individuals and entities who transferred to the OneCoin Defendants, directly or indirectly, any fiat currency or cryptocurrency to invest in a OneCoin trader/membership package ("OC Trader Package") and/or a purported digital cryptocurrency called "OneCoin" and who suffered financial injury as a result thereof (the "Class").  Upon information and belief, the financial harm caused by the fraudulent OC Investment Programs[1] exceeds Four Billion Dollars ($4,000,000,000.00).

2.      Lest anyone be further fooled into thinking that the OC Investment Programs were ever anything other than an outright Ponzi/Pyramid multi-level marketing ("MLM") fraudulent scheme, these words written by OneCoin founder Ruja and shared with her co-founder Defendant

---

[1] The term "OC Investment Program" refers to both the OC Trader Packages and the OneCoins offered and sold by the OneCoin Defendants.

Greenwood at the origin of the OneCoin scheme reveal not only why she was dubbed the "CryptoQueen" and referred to by many in the OneCoin family as "Her Royal Highness," but also why she fancied for herself another infamous moniker:

> It might not be [something] really clean or that I normally work on or even can be proud of (except with you in private when we make the money) – but ... I am especially good in this very borderline cases [sic], where the things become gray – and you as the magic sales machine – and me as someone who really can work with numbers, legal and back you up in a good and professional way.
>
> We could really make it big – like MLM meets "B[*]tch of Wall Street."

3.      Despite being cloaked in technological sophistication and jargon, Defendants operated a century-old fraud that was simple at its core — victims would invest in the OC Investment Programs after they were driven to OC by promoters; and the OneCoin Defendants would then pay existing investors with new money from new investors, who were in turn expected and incentivized to get more new investors to produce more new money for the Company.

4.      In short, the OneCoin operation was nothing more than an old-fashioned Ponzi scheme cloaked in a thin façade of new technology.

5.      As stated by FBI Assistant Director-in-Charge William Sweeney, Jr.:

> OneCoin was a cryptocurrency existing only in the minds of its creators and their co-conspirators. Unlike authentic cryptocurrencies, which maintain records of their investors' transaction history, OneCoin had no real value. It offered investors no method of tracing their money, and it could not be used to purchase anything. In fact, the only ones who stood to benefit from its existence were its founders and co-conspirators.

6.      The OneCoin Defendants were able to sustain their massive fraud for years due, in large part, because Defendants Scott and his partners — Pike, Huesmann, and Armenta — knowingly laundered criminal proceeds OC obtained from soliciting Plaintiffs' and the proposed

Class' investments in the fraudulent OC Investment Programs.  From 2015 through in or about 2018, the Scott Group Defendants provided substantial assistance to the OneCoin Defendants' fraudulent scheme by laundering in excess of $400 million of OC's criminal proceeds, thereby affirmatively assisting the OneCoin Defendants in defrauding OneCoin investors and knowingly evading regulatory scrutiny and international law enforcement efforts by concealing the OneCoin Defendants unlawful and fraudulent conduct which has caused, and is continuing to cause, significant financial harm to Plaintiffs and the Class.

7.     The Scott Group Defendants provided affirmative assistance to the OneCoin Defendants, enabling their fraudulent conduct to proceed unimpeded for years, thereby proximately causing billions of dollars of financial injuries to the Class.

8.     The Scott Group Defendants received in excess of $60 million in exchange for their enabling of, and assistance in, the OneCoin Defendants' fraudulent operations. The Scott Defendants receipt of such was at the direct expense of Plaintiffs and the Class, as the funds received by the Scott Group Defendants derived, at least in part, from the funds invested by Plaintiffs and the Class.  Accordingly, equity and good conscience require restitution.

9.     Similarly, Defendant BNY Mellon played a central role in enabling the Scott Group Defendants' laundering of in excess of $300 million worth of OC's criminal proceeds through its organization by: (i) blindly processing transactions with clear hallmarks of money laundering without conducting cursory due diligence to determine the identities of the persons on behalf of whom such transfers were made;  (ii) permitting the Scott Group to process more than $300 million worth of OC's criminal proceeds through its organization over the course of more than 220 transactions and six months before bothering to conduct a minimal internal review into the nature of, and parties involved in, such transactions; (iii) after BNY Mellon's compliance team's

December 2016 "internet research" into the Scott Group's numerous transactions (i.e., visiting the website for one of the OneCoin shell companies used to move criminal proceeds through BNY Mellon (International Marketing Services Pte Ltd. ("IMS")) indicated the entity was involved with OneCoin and that OneCoin "appears to be operating a pyramid/Ponzi scheme", declining to impose *any* restrictions on transactions involving funds originating from OneCoin or its related entities; and (iv) in March 2017, rather than create filters that would flag and prevent transactions involving funds originating from OneCoin or its related entities, opting to "prevent" such transactions by merely including a filter that would flag future transactions involving only IMS.

10.     Absent judicial intervention, Plaintiffs and the Class are unlikely to ever recover their investments. Consequently, judicial intervention is required and requested to rectify the existing and future harm facing Plaintiffs and the Class — harm that is highly unlikely to be fully reparable.

11.     Investors in OC Investment Programs have little to show for their investments other than broken promises and mounting financial burdens.

12.     For these reasons, Plaintiffs, on behalf of themselves and all similarly situated individuals and entities that participated in the OC Investment Programs, seek compensatory, exemplary, punitive, injunctive, and rescissory relief, providing rescission and repayment of all investments paid, directly or indirectly, to the OneCoin Defendants and the Scott Group, and securing and conserving such funds until repayment.

### JURISDICTION AND VENUE

13.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332(a) and 1332(d)(2)(A) because this is a class action in which the matter or controversy exceeds

the sum of $5,000,000.00, exclusive of interest and costs, and in which some members of the Class are citizens of a state different from Defendants.

14.     This Court has subject matter jurisdiction under 28 U.S.C. § 1331 (federal question jurisdiction) and Section 27 of the Exchange Act [15 U.S.C. § 78aa] because Plaintiffs allege violations of Sections 10(b) and 20(a) of the Exchange Act [15 U.S.C. §§ 78(b) and 78t(a)]. Plaintiff's federal claims further provide this Court with supplemental jurisdiction over their state and common law claims under 28 U.S.C. § 1367.

15.     The Court has personal jurisdiction over each of the Defendants because each either conducts business in and maintains operations in this District or is an individual who either is present in this District for jurisdictional purposes or has sufficient minimum contacts with this District as to render the exercise of jurisdiction by this Court permissible under traditional notions of fair play and substantial justice.

16.     Venue is proper in this District under Section 27 of the Exchange Act, 15 U.S.C. § 78aa, as well as under 28 U.S.C. § 1391, because: (a) the conduct at issue took place and had an effect in this District; (b) a substantial portion of the transactions and wrongs complained of herein occurred here; and (c) Defendants have received substantial compensation and other transfers of money here by doing business here and engaging in activities having an effect in this District.

## PARTIES AND RELEVANT NON-PARTIES

### I.     Plaintiffs

17.     Lead Plaintiff Berdeaux is an individual domiciled in Great Falls, Montana and is *sui juris*. Beginning on or about August 31, 2015, Lead Plaintiff purchased his first OC Trader Package by investing $14,576.25. From August 2015 through May 2016, Berdeaux invested a sum total of approximately $756,000.00 in the OC Investment Programs. As of the date of this filing,

Lead Plaintiff Berdeaux out-of-pocket investment loss from participating in the fraudulent OC Investment Programs totals approximately $755,918.92.

18.     Lead Plaintiff actively researched the OC Investment Programs prior to making his purchases of OC Trader Packages and OneCoins and throughout the periods in which he invested in the OC Investment Programs. Accordingly, Berdeaux personally relied upon each of the various false statements and misrepresentations concerning the programs issued by the OneCoin Defendants described herein.

19.     Plaintiff Grablis is an individual domiciled in Murfreesboro, Tennessee and is *sui juris*. Beginning on or about August 10, 2015, Plaintiff Grablis purchased her first OC Trader Package by investing $15,800.00. From August 2015 through August 2016, Plaintiff Grablis invested a sum total of approximately $103,500.00 in OneCoin trader packages/memberships and/or OneCoin. As of the date of this filing, Plaintiff Grablis' out-of-pocket investment loss from participating in the fraudulent OC Investment Programs totals approximately $130,000.00.

20.     Plaintiff Grablis actively researched the OC Investment Programs and OneCoin prior to making her purchases of OC Trader Packages and OneCoins and throughout the periods in which she invested in the OC Investment Programs.  Accordingly, Grablis personally relied upon each of the various false statements and misrepresentations concerning the programs issued by the OneCoin Defendants described herein.

## II.     Defendants

### A.     The OneCoin Defendants

#### 1.     OneCoin Ltd.

21.     OneCoin Ltd. ("OC" or the "Company"), founded in or about April 2014, is a foreign corporation headquartered in Dubai, United Arab Emirates, and markets a purported digital

cryptocurrency called "OneCoin" through a global multi-level marketing ("MLM") network of OneCoin members.

22.      Throughout the Class Period (defined below), OC is believed to have been based in Sofia, Bulgaria.

23.      OC operates using several corporate entities and d/b/a names, including OnePayments Ltd., OneNetwork Services Ltd., OneAcademy, and OneLife. OneCoin maintains offices in various countries, including Bulgaria, the United Arab Emirates ("UAE"), and Hong Kong. Upon information and belief, those entities were all created for the same fraudulent purpose, were each operated by the same group of principals, and stand as "alter egos" of one another. As used herein, those entities and d/b/a names shall collectively be referred to as OneCoin.

24.      OC launched its OneCoin "currency" in or about September 2014 under the OneLife Network company after being registered in Dubai and Belize. Initially, the Company branded itself as a company selling packages of educational material with cryptocurrency tokens as a membership reward.

25.      OneCoin "members" receive commissions for recruiting others to purchase OC Trader Packages. This multi-level marketing structure appears to have influenced rapid growth of the OneCoin member network. Between the fourth quarter of 2014 and the third quarter of 2016 alone, OneCoin Ltd. generated €3.353 billion in sales revenue and earned "profits" of €2.232 billion.

### 2.      Ruja Ignatova

26.      Ruja Ignatova ("Ruja") is an individual believed to be domiciled in Bulgaria and is *sui juris*.

27.      Ruja, known by many as the "CryptoQueen," co-founded OC in April 2014.

28.     Ruja was integral to all aspects of the Company's operations, including its structure, marketing, overall business strategies, and its offerings in the United States -- including in this District -- of the OC Investment Programs.

29.     To promote OC, Ruja organized glamorous parties, funded international company events in Dubai, Macao, Singapore, and the UK; and, according to some sources, even invited Tom Jones to perform at her birthday party in London.

30.     In the year following the creation of OC and its OneCoin currency, Ruja and her peers purchased millions of dollars' worth of real estate across the world.

31.     Despite being a central figure to all aspects of OC and the OC Investment Programs, Ruja -- since in or about October 2017 -- has made no appearances at any public OC events and has made no public statement regarding her whereabouts.  Her disappearance was purposefully aimed at avoiding being apprehended by law enforcement officials and bearing the burden of her wrongful acts; as she had in the past maintained a persistent online presence, using video portals such as YouTube, social media websites, and OC's own website.

32.     Ruja is presently a wanted fugitive in the United States for her crimes involving OC and the OC Investment Programs.

### 3.     Sebastian Greenwood

33.     Sebastian Greenwood ("Greenwood") is a co-founder of OC, has been described as the "public face of OneCoin," served as an affiliate/recruiter for the OC Investment Programs, and his efforts at OneCoin successfully solicited hundreds if not thousands of OneCoin investors in the United States -- including Plaintiffs, those in this District, and those abroad through social media sites and public appearances.

34.     Mr. Greenwood is *sui juris* and is currently being held in federal custody in New York pending trial of the criminal charges brought against him in connection with his involvement with the OneCoin scheme, as described below.

35.     Defendant Greenwood, along with Defendant Ruja, had previously created BigCoin in early-2014, the predecessor of OneCoin.

36.     Defendant Greenwood and Defendant Ruja ran OneCoin together. Defendant Greenwood created the OneCoin network and the OneCoin network marketing scheme and promotion opportunities, and Defendant Greenwood held the title Global Master Distributor of OneCoin.

37.     Upon information and belief, Defendant Greenwood's expertise lied in the area of marketing; and he was integral in devising the multi-level marketing structure of the OC Investment Programs as well as organizing its worldwide army of recruiters/promoters and preparing the sales materials they used to lure investors to deposit funds with OC.

38.     Greenwood oversaw all promotional activities of OneCoin.

39.     Defendant Greenwood was also the generator of a large portion of the OneCoin code. With this control, Defendant Greenwood could and did create and sell as many OneCoin codes as he liked, on demand (and thus the creation and sale of OneCoin tokens themselves).

40.     Greenwood performed his roles at OneCoin all over the world, including in San Diego, California, where he is believed to have resided at times relevant hereto.

41.     Greenwood also directly oversaw and supervised the sales efforts of OneCoin marketing associates, including Simon Le (with whom he had direct communications on a routine basis), and was aware that OneCoin was being unlawfully marketed in the United States, and in New York City in particular by Simon Le.

42.     Defendant Greenwood was arrested by the Federal Bureau of Investigation and the Crime Suppression Division in Thailand in November 2018 and later extradited to the United States, where he is awaiting trial on criminal charges related to his involvement with the OC Investment Programs.

43.     Per the indictment recently unsealed on April 6, 2020 (the "Greenwood Indictment"), Defendant Greenwood was criminally indicted on February 6, 2018 in the Southern District of New York for actions relating to and including those described.  Defendant Greenwood was indicted for conspiracy to commit wire fraud, wire fraud, conspiracy to commit money laundering, conspiracy to commit securities fraud, and securities fraud. He is currently believed to be held and located at the Metropolitan Correctional Center in New York, New York.

B.     **The Scott Group**

1.     **Mark S. Scott**

44.     Defendant Mark S. Scott ("Scott") is an individual believed to have been domiciled in Coral Gables, Florida and is *sui juris.*  Scott is an attorney who, at times relevant hereto, was a Partner at the international law firm Locke Lord, LLP.  Using his law license and legal knowledge, Scott formed foreign hedge funds through which he, Pike, Huesmann, Armenta, and the OneCoin Defendants laundered the proceeds of the fraudulent OC Investment Programs.

45.     More specifically, Scott assisted Ruja and others in knowingly laundering more than $400 million through a series of purported investment funds holding bank accounts at financial institutions in the Cayman Islands and the Republic of Ireland, among other locations.

46.     At all times material hereto, Defendant Scott was licensed to practice law in the states of New York and Florida.

47.     Defendant Scott was arrested in September 2018 by law enforcement authorities and was summarily tried in the Southern District of New York.  On November 21, 2019, Defendant

Scott was found guilty of conspiracy to commit money laundering and conspiracy to commit bank fraud. He has been ordered to home incarceration at his residence in Coral Gables, Florida pending his upcoming sentencing in December 2020.

48.     In February 2020, following his criminal conviction, Defendant Scott's law license in Florida was suspended by the Florida Supreme Court.  However, as of the date of this filing, Defendant Scott's law license in New York is believed to still be in good standing; and he remains licensed to practice (and subject to discipline) in New York.

### 2.     David Pike

49.     Defendant David Pike ("Pike") is an individual believed to be domiciled in Coral Gables, Florida and is *sui juris*.  Pike served alongside Defendant Scott as a director of MSS International Consultant (BVI) ("MSSI")—the company that controlled, directly or indirectly, over a dozen investment funds used to launder hundreds of millions of dollars of the OneCoin Defendants' criminal proceeds, including funds derived, at least in part, from the investments made by Plaintiffs and the Class.

50.     Defendant Pike played a pivotal role in moving those funds, which he was or should have been aware were proceeds of a wide-ranging criminal enterprise.

51.     A criminal complaint for conspiracy to commit wire fraud and for false statements was filed in the U.S. District Court - Southern District of New York against Defendant Pike and was unsealed August 29, 2019.  On February 6, 2020, Defendant Pike was indicted in the Southern District of New York for the actions described herein, including for conspiracy to commit bank fraud.  Defendant Scott was named in the indictment as Pike's co-conspirator.

### 3.     Nicole J. Huesmann

52.     Defendant Nicole J. Huesmann ("Huesmann") is an individual believed to be domiciled in Coral Gables, Florida and is *sui juris*.  Huesmann is an attorney who assisted Scott

laundering the OneCoin Defendants' fraud proceeds -- using her law license and numerous bank accounts to funnel the fraudulently-obtained OneCoin funds under the guise of providing ordinary legal services to Defendant Scott and others with whom she/they coordinated their efforts.

53. Specifically, Huesmann assisted in laundering the OC fraud proceeds by: (i) participating in deals structured to launder funds between OC-controlled entities across borders; (ii) repatriating laundered proceeds and facilitating Scott's use of such to invest in real estate; and (iii) facilitating Scott's used of laundered OC fraud proceeds on luxury boats, cars, and jewelry.

### 4. Gilbert Armenta

54. Defendant Gilbert Armenta ("Armenta") is an individual believed to be domiciled in Lauderdale by the Sea, Florida and is *sui juris*.

55. Armenta was a key figure in OneCoin's money laundering operations.

56. Specifically, Armenta assisted in executing the OneCoin scheme by, among other things:

    (a)    coordinating the opening of OneCoin Ltd. depository bank accounts at banks located in Mexico and South America;

    (b)    establishing and administering OneCoin "pool accounts" at various international banks;

    (c)    introducing one or more principals of the OneCoin scheme to an online reputation company for the purpose of removing from the internet negative information about OneCoin Ltd.;

    (d)    transmitting OneCoin Ltd. funds to pay recruitment commissions to OneCoin members who recruited new OneCoin members, as well as to pay refunds to dissatisfied OneCoin members; and

    (e)    transmitting OneCoin scheme proceeds through bank accounts located in the United States and abroad, and making various misrepresentations to banks regarding the source of the funds, for the purpose of laundering the OneCoin scheme proceeds.

57.     In September 2017, Armenta was indicted by a grand jury on three counts of extortion: conspiracy to commit extortion, attempted extortion, and Travel Act extortion.

58.     In January 2018, the U.S. Department of Justice filed against Armenta a Superseding Information, adding additional criminal charges.  Under the Superseding Indictment, Armenta was charged with: conspiracy to commit wire fraud, conspiracy to commit money laundering (three counts), and conspiracy to commit extortion.

59.     In January 2018 -- on the same day the Superseding Information was filed -- Armenta pleaded guilty to all five counts asserted against him.

60.     In pleading guilty to the charges against him the Superseding Information, Armenta conceded, *inter alia*, his knowing participation in the OneCoin scheme to defraud with knowledge of its fraudulent nature and specific intent to defraud.

61.     Following his guilty plea, Armenta is believed to be serving home incarceration in one of his multi-million-dollar South Florida waterfront residences pending his upcoming sentencing in October 2020.

**C.     BNY Mellon**

62.     The Bank of New York Mellon Corporation ("BNY Mellon") is a multinational investment banking services holding company headquartered in New York, NY.

63.     From approximately May 2016 through April 2017, BNY Mellon enabled the Scott Group to launder in excess of $300 million worth of OC's criminal proceeds through its organization by turning a blind eye to clear red flags and serving as a "correspondent bank" for hundreds of transactions involving funds fraudulently obtained from OneCoin investors. Accordingly, BNY Mellon knowingly participated in, or was complicit in, laundering OneCoin's criminal proceeds.

D.     **Other Liable Persons/Entities**

64.     In addition to those persons and entities set forth as Defendants herein, there are likely other parties who may well be liable to Plaintiffs and the Class, but respecting whom Plaintiffs currently lack specific facts to permit them to name such person or persons as a party defendant.  By not naming such persons or entities at this time, Plaintiffs are not waiving their rights to amend this pleading to add such parties, should the facts warrant adding such parties.

III.   **Related Third Parties**

A.     **Konstantin Ignatov**

65.     Konstantin Ignatov ("Konstantin") is the younger brother of Ruja, OC's co-founder and leader until her disappearance from public view in or about October 2017.  Upon information and belief based on publicly-available materials, Konstantin, beginning in late-2017, assumed high-level positions at OC, rising to the top leadership position in mid-2018.  Before ascending to OC's leadership in late-2017, Konstantin served as Ruja's personal assistant and, according to some, her bodyguard.

66.     Commencing in or about December 2017, Konstantin functioned as a high-level executive, promoter, and spokesperson for the OC organization, appearing at OC-OneLife events worldwide, including in Thailand, Singapore, Colombia, Argentina, Brazil, Paraguay, Bulgaria, France, Spain, and the United States.

67.     On or about March 6, 2019, Konstantin was arrested at Los Angeles International Airport and transferred by law enforcement authorities to a federal prison in New York.

68.     After being charged by federal law enforcement officials in this District for his involvement in the OneCoin scam, Konstantin pleaded guilty in September 2019 to those charges (wire fraud, conspiracy to commit wire fraud, conspiracy to commit money laundering, and

conspiracy to commit bank fraud) "because he is in fact guilty."  Following his guilty plea, Konstantin has been cooperating with law enforcement officials and providing inside information that exposes the inner-workings of the OneCoin scam as well as identifies those high-level operatives who were vital in the OneCoin scheme's success, including some of the defendants named herein.

69.     On August 20, 2020, Plaintiffs dismissed Konstantin without prejudice as a Defendant in this Action on the condition of cooperation with Plaintiffs. If not stated otherwise, information from Konstantin in this complaint is the result of cooperation and interviews between Konstantin and Plaintiffs. Though no longer a Defendant in this Action, Konstantin is a member of the "OneCoin Defendants" group-name for purposes of this SAC.

**B.     Irina Andreeva Dilkinska**

70.     Irina Andreeva Dilkinska ("Dilkinska") served as the head of OC's legal and compliance department throughout the Class Period.  Dilkinska functioned as a high-level executive, promoter, and spokesperson for the OC organization on all matters relating to investigations into OC's operations by various countries and enforcement bodies throughout her tenure.

71.     Additionally, Dilkinska served alongside Defendant Scott on the board of at least two investment funds that were used to launder proceeds obtained from the OneCoin Defendants' fraudulent OC Investment Programs.

72.     It is presently unknown whether criminal charges have been filed against Dilkinska; however, she been named as a co-conspirator in the criminal actions against Defendants Scott, Ruja, and Konstantin.

73.     On February 28, 2020, Dilkinska was dismissed without prejudice from this Action, as Plaintiffs were unable to effectuate service upon her.

74.     For purposes of this SAC, Dilkinska is a member of the "OneCoin Defendants" Group.

### C.   Simon Le

75.     Simon Le a/k/a Le Quoc-Hung is an individual believed to be domiciled in California though currently hiding in either Vietnam or Dubai.

76.     Simon Le -- who is believed to have joined OneCoin at or around the company's launch -- was a head promotor (a "Captain") and Master Distributor of OneCoin who recruited investors in Asia and specifically targeted Asian-American investors in the United States, including those in New York.

77.     Mr. Le's overall power in the OneCoin operation was similar to Greenwood's. Greenwood would provide direct oversight to Le at least on a weekly basis.

78.     Le was the individual who introduced Konstantin Ignatov to Dennis Murdoch, the individual who ensured Konstantin that the DealShaker model described herein was legitimate and legal in the United States to promote further United States marketing.

79.     As was later discovered by Konstantin and described herein, DealShaker was far from a legitimate marketing scheme. Instead, it was designed to provide the appearance of dedicated marketplaces for OneCoin where OneCoin would be accepted with the goal of legitimizing OneCoin on the world stage.

80.     Through and including December 2019, Mr. Le continued to solicit

investors into OneCoin, as he (or someone on his behalf) was publishing YouTube OneCoin promotional videos in which he appeared as the primary spokesperson as recently as mid-December 2019.

81.     In early-April 2020, numerous online publications reported that Mr. Le had submitted to OneCoin management his "resignation letter" in which he stated, in part:

> *With many sleepless nights over past 3 months, I have come to a difficult decision to stop my IMA work/actively participation in/with OneLife/DealShaker from April 1st, 2020.*
> *Again, I am greatly appreciated for the last five and half years relationship with OneLife.  I am happy to able to support if there is anything that I can assist to the success of the OneLife network and OneCoin.*

In explaining the reasons for his purported resignation, Mr. Le cited his "*critical concerns and disappointments*" with the OneLife/OneCoin network and investment programs and his frustration with his inability to be paid "*deserving bonuses earned through hard work in promoting and selling [OneCoin's] product,*" despite OneCoin still having a "*Cash Account liability of approximately 650 million Euro.*"

82.     In or about late-April 2020, though, public reports emerged warning that Mr. Le had created his own OneCoin spinoff dubbed "OneLink," which essentially mirrors the OneCoin scheme in all material respects.  Upon information and belief, Mr. Le is presently promoting OneLink to investors around the world.

## **PLAINTIFFS' CLASS ACTION ALLEGATIONS**

83.     Plaintiffs bring this action for themselves and as a class action on behalf of all individuals and entities who transferred to the OneCoin Defendants, directly or indirectly, any fiat currency or cryptocurrency to invest in OC Trader Packages or OneCoins from April 2014 through to and including March 2018 (the "Class Period") and who suffered financial injury as a result thereof. Excluded from the Class are Defendants herein and any person, firm, trust, corporation,

or other entity related to, controlled by, or affiliated with, any Defendant, including the immediate family members of the individual Defendants..

84.     This action is properly maintainable as a class action under Federal Rule of Civil Procedure 23.

85.     While the exact number of Class members is presently unknown to Plaintiffs and can only be ascertained through discovery, Plaintiffs believe that there are millions of members in this Class.

86.     All members of the Class may be identified by records maintained by Defendants and/or held by U.S. law enforcement officials who have prosecuted criminal charges against Konstantin, Defendants Greenwood, Scott, Pike, Armenta, and others; and those class members may be notified of the pendency of this action by mail and publication, and by using forms of notice similar to that customarily used in securities class actions.

87.     There are questions of law and fact which are common to the Class and which predominate over questions affecting any individual Class member. The common questions include, *inter alia*, the following: (i) whether the OneCoin Defendants issued material false statements of fact in their promotions of the OC Investment Programs; (ii) whether the OC Investment Programs constitute an unlawful Ponzi and/or Pyramid Scheme; (iii) whether the OneCoin Defendants committed fraud in their creation, promotion, and operation of the OC; Investment Programs; (iv) whether the Scott Group aided and abetted the OneCoin Defendants' fraud on the Class; (v) whether OC breached its contracts with Plaintiffs and the Class; (vi) whether the Scott Group has been unjustly enriched at the expense of the Class; (vii) whether Plaintiffs and the Class will suffer irreparable harm if such unlawful activities are not remedied; and (viii) whether Plaintiffs and the Class are entitled to compensatory, exemplary, punitive, injunctive, or

rescissory relief as a result of Defendants' wrongful conduct alleged herein, and the measure of such damages.

88.     Plaintiffs' claims are typical of the claims of the other members of the Class, and Plaintiffs do not have any interests adverse to the Class. Additionally, Plaintiffs and the other members of the Class have all sustained harm in a substantially identical manner as a result of Defendants' wrongful conduct as alleged herein.

89.     Plaintiffs will fairly and adequately protect the interests of the Class and have retained competent counsel experienced in litigation of this nature.

90.     Separate actions prosecuted by individual members of the Class would create a risk of inconsistent or varying adjudications with respect to individual members of the Class, which could establish incompatible standards of conduct for Defendants.

91.     Plaintiffs anticipate that there will be no difficulty in managing this litigation.  A class action is superior to other available methods for the fair and efficient adjudication of this controversy.

92.     Defendants have acted on grounds generally applicable to the Class with respect to the matters complained of herein, thereby making appropriate the relief sought herein with respect to the Class as a whole.

93.     Accordingly, Plaintiffs seeks compensatory, exemplary, punitive, rescissory, injunctive and other equitable relief on behalf of themselves and the Class to prevent the irreparable injury they will continue to suffer absent judicial intervention.

## SUBSTANTIVE ALLEGATIONS

### I.   Background on Blockchain Technology and Initial Coin Offerings

#### A.   Blockchains

94.     A "blockchain" is essentially a digitized, decentralized, public ledger that cryptographically records, preserves, and presents information. The general idea is that each "block" contains information, such as details on transactions that are made. After a "block" is created (with cryptography to verify its contents), the information inside of it cannot be changed. The "block" then becomes part of the "blockchain," and an encrypted version of the information contained therein becomes publicly available along with all the previous "blocks" in the chain. After this process is complete, another block is created with additional information, and so on.

95.     To date, most "blockchains" are used to record transactions involving virtual currencies, e.g., bitcoin (BTC) and Ether (ETH). However, a "blockchain" could be used to record all types of information. For example, a blockchain could be used for deed recordation/transfers or even transfers of stock certificates.

#### B.   The OneCoin "IPO" / "ICO"

96.     An ICO is a capital raising event in which an entity offers investors a unique "coin" or "token" in exchange for consideration -- most commonly in the form of established virtual currencies (typically BTC and ETH) or fiat currency. These tokens are issued on a blockchain and are oftentimes listed on online platforms, called virtual currency exchanges, where they are tradable for virtual or fiat currencies.

97.     To participate in an ICO, investors are typically required to transfer virtual currencies to the issuer's address, online wallet, or other account. During an ICO, or after its completion, the issuer will typically distribute its unique "tokens" to the participants' unique address on the blockchain. Similar to stockholders in an IPO, holders of these tokens are then

entitled to certain rights related to a venture underlying the ICO, such as profits, shares of assets, use of certain services provided by the issuer, and/or voting rights.

98.     From the outset of the project, the OneCoin Defendants claimed OC was going to list its OneCoins on a public exchange in Asia by preparing an Initial Public Offering ("IPO"). Users were presented with the opportunity to invest in virtual shares in the post-IPO. The strategy was later changed to a never-ending Initial Coin Offering ("ICO").

**II.      Background on OneCoin Ltd.**

   **A.      The Co-Founder Defendants Created OneCoin to Defraud Investors**

99.     OC was founded in or about April 2014 by Defendants Ruja and Greenwood.

100.     In summer-2014, Defendants Ruja and Greenwood exchanged numerous emails discussing and planning their development of "trashy coin"—the Founder Defendants' nickname at the time for OneCoins.  In these emails Ruja explained the planned compensation structure for "trashy coin" as follows:

> It might not be [something] really clean or that I normally work on or even can be proud of(except with you in private when we make the money) — but. . . I am especially good in this very borderline cases [sic], where the things become gray — and you as the magic sales machine — and me as someone who really can work with numbers, legal and back you up in a good and professional way — we could really make it big — like MLM meets bitch of wall street ; - )

> * * *

> Your main sales argument is: **after 2 splits a member makes out of 5.000 USD 25.000 USD. You should be able to sell this** :) . . . **I also added an Extra Bonus for all members joining the Presales** • . they can do actually 3 splits. Which means that they will actually **have l0x their investment**. 2 splits is 5x your money. So of course, everybody who is greedy will go in with 5.000 USD.

(emphasis in original).

101.    OneCoin's core-pitch was that investments in its ecosystem provided economic empowerment through financial literacy "courses" and served a variety of altruistic purposes including education, charity, and community, *to wit*:



102. Contrary to the OneCoin Defendants' representations, the OC Investment Program served no purpose other than to defraud the investing public and enrich OC and its top-level executives.  The OC Investment Program has at all relevant times simply been a multi-level-marketing scheme that marketed and sells a fake cryptocurrency named OneCoin.

103.    Indeed, within months of OC's founding, the Founder Defendants were already discussing their plans for an "exit strategy" once the OC Investment Program inevitably collapsed. For instance, on or about August 9, 2014, Defendant Ruja described one strategy as: "Take the money and run and blame someone else for this (standard approach, see Wenyard)." "Wenyard" refers to an MLM/Pyramid Scheme similar to OneCoin which offered an "internal WFO virtual currency" began in September 2013 and collapsed throughout 2014 with defrauded investors unable to obtain recourse from its founders.

- 23 -

B.     **Formation and Creation of OneCoin Currency**

104.    Building on Wenyard's model and capitalizing on the investing public's growing interest in blockchain technologies and legitimate cryptocurrencies—such as bitcoin—on or about June 3, 2014, Defendant Ruja sent an email to a blockchain developer, copying Greenwood, stating:

> We are building our own cryptocurrency – and would like to set up an internal exchange service for them.  We would like to be able to set the price manually and automatically and also control the traded volume.

105.    Stated otherwise, Ruja was asking the developer to create a website that looked like a real exchange and blockchain for OneCoin but wasn't actually a legitimate exchange or blockchain.  As Ruja later explained in an email to Greenwood, a fake exchange and blockchain would enable the OneCoin Defendants to "**manipulate the exchange** by simulating some volatility and intraday pricing." (emphasis in original).

106.    The OneCoin Defendants routinely claimed that all transactions made in OneCoins were purportedly maintained on a "private blockchain" maintained by the Company.  For example, during a OneCoin promotional event on or about May 15, 2015, Defendant Ruja touted that the Company had hired an "auditor to audit" the OneCoin blockchain, that the "first audit" was complete, and subsequently introduced a purported "auditor" who attested that "all transactions are included in the blockchain."

107.    OC promoted various OC Trader Packages priced at, for example, €110 and €118,100 euros, including "Starter" packages and "Tycoon Trader," "Premium Trader," "Infinity Trader," and "Ultimate Trader" packages.  Purchase of a trader package provided access to "educational materials" and "tokens."



108.     These "tokens" could be used to "mine" for "OneCoins" and eventually would be exchangeable for more "OneCoins" following OC's IPO or ICO and ultimate listing on a national exchange.   The more expensive the OC Trader Package, the more OneCoins investors were promised they'd have following OC's public listing of the coins—which never came to pass nor was it a legitimate goal of the OneCoin Defendants.

109.     The "educational materials," as it turned out, consisted mostly of information copied from Wikipedia and other free informational sources.

110.     In fact, from its inception, OC's goal was to deceive its investors with false representations of "mining" that were never intended to occur, as these e-mail exchanged between Ruja and Greenwood reveal:

> *[RUJA]: Get members to think that they are mining their OneCoin via crunching (exchanging) tokens for OneCoin.*
>
> *This storey [sic] is good as ppl will then not go super crazy and just try to sell tokens all the time.*
>
> <div align="center">*         *            *</div>
>
> *[GREENWOOD]: The concept of converting tokens into OneCoin is an important phase for validity and truth behind the OneCoin.*

*The so called 'mining' of coins is a concept that is very familiar in the industry and a story we can sell to the members.*

*   *   *

*[RUJA]: We are not mining actually – but telling people sh[*]t.*

111.     Moreover, an investor who purchased the educational materials and "tokens" did not directly receive OneCoins; rather, the investor had to submit his/her "tokens" for mining of OneCoins.[2]



112.     According to OC's promotional materials, "tokens" are used to secure positions in OC's "mining pools," depicted in promotional materials as computer hardware used to "mine" OneCoins.

---

[2] In the context of a legitimate cryptocurrency, "mining" refers to the process of adding carefully reviewed transaction records to the cryptocurrency's ledger of past transactions, *i.e.,* the "blockchain."  The primary purpose of mining is to allow the cryptocurrency's nodes to reach a secure, tamper-resistant consensus.   Mining is also the mechanism used to introduce cryptocurrency "coins" into the system.  "Miners" are paid any transaction fees as well as a subsidy of newly created coins.  This both serves the purpose of disseminating new coins in a decentralized manner, as well as motivating miners to provide security for the system.



113.    Promotional materials also have claimed that OC "ensures" these mining resources, that two mining servers are located in Bulgaria, and that a third mining server is located in Hong Kong.

114.    At a promotional event in Dubai on or about May 15, 2015, Ruja represented that the OneCoin blockchain was audited, stating, in part:

> We all know it is a very bad world outside.  So many people making promises.  So many people lying.  So many people doing things and not delivering.  So, what we did in the last months is we hired an auditor to audit our blockchain.  And, ah, I am very proud to say that the result of the first audit is here.

Ruja then introduced the alleged auditor of the OneCoin blockchain. The auditor subsequently provided an opinion that "all transactions are included in the blockchain (no coins are mined outside the blockchain)."

115.    Consistent with other cryptocurrencies such as bitcoin, OC's promotional materials claimed that the mining difficulty of OneCoin increases over time, as additional computer resources, and thus more tokens, are needed to mine a single OneCoin -- thus also increasing the value of each OneCoin.



116.    Once a OneCoin member "mines" OneCoins using his or her tokens, the newly "mined" OneCoins are thereafter deposited into the member's account and may be accessed by logging in through a website operated by the OneCoin Defendants.

117.    **In reality, however, there were no mining farms; and no mining of OneCoins ever occurred.**   The OneCoin Defendants simply created new OneCoins at will through, in essence, an Excel worksheet masquerading as a blockchain.

118.    The OneCoin Defendants further claimed that the value of OneCoin is based on market supply and demand.   In or about June 2016, in a OneCoin promotional video posted on YouTube, Ruja stated:

> We discussed several times how the value of cryptocurrency comes. Cryptocurrency is not backed up.   It is an asset where demand and supply drive the price.   Now, one of the drivers of the coin is, of course, the brand.   Brand, of course, is how many people know about OneCoin?   How many people use OneCoin?   How spread are we worldwide?

119.    An official press release issued by OC on or about October 1, 2016, announcing a so-called OneCoin "split," stated in part: "Cryptocurrency value is driven by supply and demand - and demand is driven by brand and usability.   By doubling the coins, we will be able to bring the

coin to more people and places and strengthen the brand."  Another press release, issued by OC

on or about December 2, 2016, stated, in relevant part: "The value of each cryptocurrency depends

on its usability, supply and demand.  With over 2.7 million users, OneCoin has one of the biggest

user bases."

120.   The purported value of a OneCoin steadily grew from €0.50 ($0.56 USD) to

approximately €29.95 ($33.60 USD) per coin, as of in or about January 2019.

121.   Contrary to those allegations, though, **OC had no such blockchain.**  Instead, OC

simply used a basic computer SQL script to generate coins.

122.   As Greenwood himself confessed in an e-mail he sent to Ruja:

> [GREENWOOD]: *How can this be investigated and found out?*
>
> *Can any member (trying to be clever) find out that we actually are
> not investing in machines to mine but it is merely a piece of software
> doing this for us?*

123.   Moreover, OC's principals themselves **pre-determined what the value of**

**OneCoins would be, without regard to "market supply and demand."**

124.   Again, e-mails exchanged in 2015 between Ruja and Greenwood reveal the truth

behind the OneCoin Defendants' lies:

> *[RUJA]: Goals:*
>
> *6. Trading coin, stable exchange, always close on a high price end
> of day open day with high price, build confidence – better
> manipulation so they (investors) are happy.*
>
> <div align="center">*         *         **
>
> *[RUJA]: We can manipulate the exchange by simulating some
> volatility and intraday pricing [sic].*

125.   As noted above, OC operates a multi-level marketing structure through which

individuals are compensated for recruiting new members who purchase OneCoin trader packages

or OneCoins.

126.     Participants in the OC Investment Program receive a commission of between 10% and 25% of the value of the trader packages purchased by individuals they recruit to OneCoin. However, only 60% of commissions paid to members are withdrawable in cash; the remaining 40% are deposited in a "trading account" which may only be used to purchase either OneCoins or more tokens.

127.     OC's multi-level marketing structure appears to have influenced rapid growth in the number of OneCoin members.  Throughout the course of its operation, OC is believed to have defrauded **millions of investors worldwide**.  These victims include individuals living and/or working within the Southern District of New York who have purchased OC Trader Packages and, at least one of whom sent an interstate wire payment to make such a purchase at the solicitation of Simon Le and those Simon Le worked for and reported directly to, such as Greenwood.

128.     Moreover, according to Konstantin, Greenwood paid bribes to Japanese ministers and a small Asian island group for the purposes of legitimizing OneCoin as a currency in those locations.

129.     Throughout the years, there were many ways to profit from OneCoin, as per OC's official announcements and company events.  Some of them included the OneCoin asset platform called xCoinx, which was meant to be used as an exchange where users could buy and sell their coins for assets and eventually cash out.

130.     The xCoinx platform was abandoned in 2017 and was followed by a purported merchant platform called "Dealshaker," which OC asserted could be used by members to buy and sell real-life assets using OneCoins.

131.   As represented by OC, OneCoin members visiting Dealshaker may use OneCoins, generally in combination with fiat currency, to purchase goods and services on the Dealshaker platform.

132.   According to a Dealshaker webinar video, posted on YouTube in or about November 2018, a Dealshaker representative announced the unveiling of a "new Dealshaker" and stated, among other things, that: (i) Dealshaker merchants would be allowed to accept as little as 10% of payment for goods and services in OneCoin (and thus, as much as 90% in fiat currency), as opposed to the previous minimum of 50%; and (ii) buyers on the new Dealshaker may use PayPal to transmit fiat currency for purchases from Dealshaker merchants.

133.   The Dealshaker platform, much like the rest of OC's operation, was merely another tool used by the OneCoin Defendants to reap fiat currency from unsuspecting investors.

134.   Despite having been banned in numerous countries, OC continues to operate to this day; and as described further below.

**C.   <u>OneCoin Promotions in the United States</u>**

135.   Upon information and belief, OC began soliciting investors in the United States in or about July 2015 with an "official launch party" in cities all across the country:



136.    In connection with OC's operations, the company operated a referral program pursuant to which "affiliates"/promoters would earn additional income for referring additional investors to invest in the OC Investment Programs.  The referral program was a run-of-the-mill pyramid scheme.

137.    Upon information and belief, the following individuals are/were among the top OC "affiliates"/promoters in the United States:

(a)    Simon Le
(b)    Tom McMurrain
(c)    Denis Murdock
(d)    Sal Leto
(e)    Bob Byrum
(f)    Carl Wilt
(g)    Greg Knox
(h)    Margie Scott
(i)    Maurice Katz
(j)    Steve Gotberg
(k)    Kevin Foster
(l)    Sarah McGee
(m)    Glenn Smith
(n)    Ken Labine – Canada – recruits in USA
(o)    Sheri Hilliard-Pearce
(p)    Jason Richard Mangan
(q)    Charlotte Mangan
(r)    Joseph W. Piper
(s)    Jodi Tressler Greene
(t)    Keith Bliss
(u)    Stan Harris
(v)    Mike DiGaetano
(w)    Michael & Latasha DeArmond
(x)    Jeff Shofner
(y)    John Reilly
(z)    Ray Lopez
(aa)    Willie Tubbs
(bb)    Mary Spicer
(cc)    Kaytee Godiva
(dd)    Brent Patrick
(ee)    Beverly Washington
(ff)    Sandy Davis
(gg)    Tory Bailey
(hh)    Mark Halbig

(ii)    Erik Enriquez
(jj)    Jack Palis
(kk)    Patricia Ann
(ll)    Jeff Litzenberger
(mm)   Barbara Lloyd
(nn)    Lucille Bolton Shannon
(oo)    Alan C. Delaney
(pp)    Andy McCormack
(qq)    Joseph A Mitchell
(rr)    Rick Harris
(ss)    Katherine Clement
(tt)    Erick Brent
(uu)    Ellis Vernon
(vv)    Dean Hackney
(ww)   Tom Cao
(xx)    Robert Townsend
(yy)    Crystal Marie Spath
(zz)    Belinda Aquino
(aaa)   Susan Bayerle
(bbb)   Jennifer Vloggity-Korol
(ccc)   Wayne Bailey
(ddd)   Shanna McCarty
(eee)   Robin 'Robertson' Keith
(fff)   Steve Stucke
(ggg)   John Reilly
(hhh)   Richard Marks

138.    Plaintiff Grablis herself met on multiple occasions with Sal Leto, Bob Byrum, Carl Wilt, Greg Knox, and Margie Scott, who each acted as representatives of OC in brokering the purchase/sale to Plaintiff Grablis of the OC Trader Packages in which she invested.

139.    Among the ways OC promoted its investments, the "affiliates"/promoters used social media channels such as YouTube, Facebook, and Twitter to raise awareness and interest in the OC Investment Programs.

140.    Additionally, OC's top U.S.-based recruiters frequently held conference calls to discuss OC's plans and efforts to obtain a public listing of OneCoin.  For example, from late-2015 throughout 2016, Bob Byrum, Sal Leto and Maurice Katz hosted conference calls for investors

every Monday and Thursday to further promote the OC Investment Programs and discuss OC's business plans.

141.    Communication between promotors and leaders at OneCoin took place primarily through encrypted messaging services such as WhatsApp and through dedicated encrypted "crypto phones," used to evade investigation into the OneCoin operation. Greenwood was an active participant in all of these groups.

142.    The top U.S.-based promoters/affiliates also hosted numerous promotional and organizational events in the United States to further expand the reach of the OC Investment Program.   For example, OC hosted a 2-day meeting in January 2016 at a hotel in Nashville, Tennessee for over 100 people.

143.    On or about February 27, 2019, Konstantin arrived at San Francisco International Airport on an international flight from Istanbul, Turkey.   While being detained at the airport by law enforcement officials, it was determined that Konstantin was in the United States to attend a OneCoin event in Las Vegas, Nevada arranged by Simon Le.

144.    According to law enforcement officials who investigated Konstantin's cellphone and laptop computer, Konstantin -- in the lead-up to his trip to the United States -- had discussed with a OneCoin affiliate promoter the logistics of his trip.

145.    Specifically, the OC promoter wrote to Konstantin:

> [I]n Las Vegas, 14:00 - 18:00h .. at least 20+ top selected leaders ([from many] cities in USA) there for the meeting/DS training and love to have you with us 30-60 minutes.  Will be inside our Bellagio Hotel-Suite or Pen[t]house. .   If you can meet any time between 17:00-20:00h on either 4 or 5 of March, I will arrange another group.

Konstantin responded, "*Yes let's do this!*"

146.    In that same exchange, the OneCoin promoter wrote to Konstantin:

> *Send you again the proposed meeting schedule for next 02 days.*
> *Also, do not need mention dr. Ruja.*

The reference to "Dr. Ruja" was a reference to Defendant Ruja.

147.    In the days immediately following Konstantin's arrival in San Francisco, California, several social media messages were posted suggesting that his trip to the United States was for the purpose of conducting OC business, including the following:

(a) On or about March 5, 2019, Konstantin posted a photo of himself in front of a sign that appears to be in Las Vegas on his Instagram account page ("Ignatov' s Instagram Account").  In a comment on that Instagram post, Konstantin wrote: "[I] am here for work reasons not holiday";

(b) Between on or about March 1, 2019, and March 3, 2019, three videos were posted on YouTube that all appear to be from a OneCoin promotional/networking event that took place in Las Vegas, Nevada (the "OneCoin Event");

(c) One YouTube video is titled "Meeting in Las Vegas with Mr. Konstantin."  The description of the video details a meeting in Las Vegas with Konstantin, three OneCoin affiliates, and key American-based OneLife Network leaders consisting of Black, Blue, and Diamond members discussing future possible Dealshaker development in the United States;

(d) Another YouTube video shows a series of photographs captured during the OneCoin Event in Las Vegas, Nevada, including:

1. An image of Konstantin wearing a blue shirt with the name "OneCoin" written on the front of the shirt;

2. Several photographs of Konstantin with U.S.-based OneCoin affiliates; and

3. An image of a whiteboard titled "OneLife Network/Dealshaker" and which includes, among other things, a schedule listing OneCoin/OneLife Network events.

(e) A third YouTube video showing a series of photographs captured during the OneCoin Event in Las Vegas, Nevada, including a photo of Konstantin holding up two framed portraits: one of himself, and one of RUJA; and

(f) A Facebook post dated March 5, 2019 in which the Facebook user wrote: "During a meeting that just took place in Las Vegas, one of the first questions was, when can people monetize their coins (cash out). Konstantin said immediately '[I]f you are here to cash out, leave this room now; because you don't understand what this project is about.'"

148.    Promotion of OneCoin was specifically targeted to investors in New York as well. According to Konstantin, Defendant Greenwood and Simon Le worked to target Asian communities in New York to join the OneCoin scheme, with Greenwood providing oversight and direction to Simon Le on a weekly basis.

149.    For example, to market to United States investors while avoiding scrutiny from law enforcement, Simon Le would target United States residents with Asian passports that could be used to spoof IP addresses in Asia, and particularly Vietnam -- creating the impression that investments were not coming from the United States or New York, but instead from abroad.

150.    Specifically, Mr. Le would instruct United States residents with Asian passports to use Virtual Private Networks (VPNs) to mask their internet protocol (IP) addresses as a way of deceiving web servers into believing that the users are located in Asia and thus not subject to certain restrictions imposed upon users in the United States.

151.    Among the investors successfully solicited by Simon Le was a wealthy Asian-American man in New York who worked in real estate and construction businesses.  Greenwood oversaw and supervised these activities.

152.    In fact, as head of Global Marketing at OneCoin, Greenwood supervised and oversaw, and was keenly aware of, all marketing efforts for OneCoin -- both in the United States and worldwide.  According to information provided by Konstantin, Greenwood facilitated and approved of all higher-level marketing decisions at OneCoin and had a strategy for every market targeted.

**III.**      **The OneCoin Investment Programs Were Ponzi Schemes**

153.      Contrary to the allegations of fantastic investment returns through the power of OC's mining processes and the "market demand" for OneCoins, the OneCoin Defendants were operating a Ponzi scheme.

154.      Any investment returns provided to participants in the OC Investment Programs were not legitimately generated. Rather, in classic Ponzi scheme style, the OC Defendants simply used new investors' money to pay a portion of the promised returns on prior investors' investments.

155.      In addition, the OneCoin Defendants used new investors' funds to pay themselves as well as pay for the money laundering services provided by, *inter alia*, the Scott Group.

156.      In reality, OC was not offering a revolutionary technology, but was instead selling a new take on a century-old scam.  Specifically, OC used cryptocurrency to coat its Ponzi/pyramid scheme with the thinnest veneer of legitimacy.  Despite such efforts, it is abundantly clear that the OneCoin Defendants were conducting and/or supporting a Ponzi/pyramid scheme.  Indeed, the OC Investment Programs exhibit numerous characteristics of such schemes, including:

> (a) providing exorbitant returns on an investment that had no income other than new investor money;

> (b) artificially increasing the value of its fictional cryptocurrency by having new investors in the Ponzi scheme purchase OC Trading Packages to invest;

> (c) self-ascribing value to the Ponzi scheme investments rather than having those investment values dictated by actual market demand; and

> (d) expanding the amount of people in this Ponzi scheme by implementing a Pyramid scheme that paid a commission several levels deep for recruits.

**IV.**     **Defendants Laundered Their Ill-Gotten Investment Funds**

157.    While defrauding investors out of their investment funds, the OneCoin Defendants

engaged Defendant Scott and fellow Scott Group Defendants to launder OC's ill-gotten

investments.

158.    Defendants acted together through an intricate web of shell companies and bank

accounts in New York, elsewhere in the United States, and abroad to launder OC investor funds

and to conceal and disguise the nature, location, source, ownership, and control of the proceeds

they had obtained through their illegal activities.

159.    For example, when he testified before this Court in pleading guilty to the criminal

charges brought against him, Defendant Armenta summarized his active participation in the

OneCoin scheme and the Scott Group Defendants' efforts to launder the proceeds of that scheme

thusly in part:

> *"[I]n 2015, I began doing business with OneCoin, through my company.  I
> came to understand that OneCoin was making false statements in order to
> get people to purchase OneCoin packages or prevent people who had
> purchased these packages to seek their money back.*
>
> *    After knowing this, I continued to do things to assist OneCoin's business,
> such as by coordinating the opening up of new accounts for OneCoin to
> receive customers' funds, international wires were used in connection with
> this activity, and including the transfer of money through corresponding
> bank accounts in New York."*

<div align="center">

\*              \*              \*

</div>

> *"[W]ith knowledge of the fraud discussed [above], I caused international
> wire transfers to be transferred -- I'm sorry, to be made of money that was
> proceeds from unlawful activity, concealed the ownership of the funds, and
> promote the continuation of the fraud.  International wires were used in
> connection with this activity, including the transfer of money to and through
> a corresponding bank in New York."*

160.    Defendant Armenta's testimony has confirmed that: (i) when he was engaging in

the above-described acts from approximately 2015 through 2017, Armenta agreed with others --

believed to be OneCoin and the Scott Group Defendants -- to engage in that money laundering; and he understood that what he was doing was wrong and illegal; (ii) to promote the continuation of the OneCoin fraud, Armenta facilitated payment of commission payments to other agents of the scheme; and (iii) at least one of the bank accounts used by Defendants Armenta to engage in this illegal conduct was maintained at a bank in Manhattan (New York City).

161.    Defendant Scott was likewise deeply entwined in the efforts to launder OneCoin's illegally-obtained funds.

162.    Defendant Scott was first introduced to Ruja on or about September 30, 2015.  On January 31, 2016, Defendant Ruja emailed Scott urging him to meet to clearly discuss the process for laundering OC's fraudulent proceeds:  "*As time is ticking, what are the next steps and how can we move pls?  If we want to meet—I am in London from [2/5/2016–2/15/2016] . . . Cindy has sent you the phone—contact me when you have it*."  As explained by one of the special agents in charge of investigating the criminal action against Scott, "*the phone sent to Scott by Cindy referenced in this e-mail was an encrypted telephone used to communicate with [Ruja]*."

163.    According to Konstantin, Defendant Scott avoided electronic communications and insisted on face-to-face communications whenever possible.  However, a cautious Defendant Scott also began to dodge requests to meet in person as well, leading to scheduling issues between Scott and the OneCoin Defendants.

164.    On February 29, 2016, Defendant Scott registered MSS International Consultants Limited ("MSSI")[3] in the British Virgin Islands with Defendant Pike and Scott as the sole two directors.  Shortly thereafter, through MSSI, Scott and Pike registered numerous investment funds

---

[3] "MSS" are the initials of Mark S. Scott.

to launder Plaintiffs and the Class' stolen investments—which OC claimed were being used to fund the non-existent "mining" of new OneCoins.  These investment funds included:

(a)    three funds regulated in the British Virgin Islands:

    (i)    Fenero Equity Investments L.P. ("Fenero I") (incorporated Mar. 1, 2016);

    (ii)   Fenero Equity Investments II, L.P. ("Fenero II") (incorporated May 5, 2016); and

    (iii)  Fenero Financial Switzerland L.P. ("Fenero Switzerland") (incorporated June 8, 2016); and

(b)    one fund incorporated in the Cayman Islands—Fenero Equity Investments (Cayman) I, L.P. ("Fenero Cayman" and together with Fenero I, Fenero II, and Fenero Switzerland, the "Fenero Hedge Fund Accounts") (incorporated April 27, 2016).[4]

165.    Between approximately August 2016 and February 2017, the Fenero Hedge Funds wired approximately €273 million to three separate accounts held by "Fenero Equity Investments Ireland" at the Bank of Ireland in the Republic of Ireland.

166.    In April 2016, Scott, on behalf of Fenero I, Fenero Switzerland and MSSI, engaged Apex Fund Services ("Apex") to provide administration services over Fenero I and Fenero Switzerland.

167.    Apex then created bank accounts for Fenero I and Fenero Switzerland which received approximately €155 million in wire transfers from OC-related bank accounts in Singapore, Germany and Bulgaria.  When questioned as to the nature of these transactions by Apex, Scott claimed that such transfers were merely deposits to accounts held at Fenero's hedge

---

[4] Additionally, MSSI organized multiple Fenero entities to launder OC's fraud proceeds in the Republic of Ireland, including: (i) Fenero Equity Investments (Ireland), Limited ("Fenero Ireland"); (ii) Fenero Tradenext Holding Limited ("Fenero Tradenext");[4] (iii) Fenero Pct Holdings Limited ("Fenero Holdings");[4] (iv) Fenero Equity Acquisition 2 Limited; and (v) Fenero Equity Acquisition 3 Limited.  Dilkinska served alongside Defendant Scott as one of the only two board members of both Fenero Tradenext and Fenero Holdings.

funds by a company named "B and N Consult Ltd" ("B&N") and that Dilkinska was the beneficial owner of B&N.

168.    Shortly thereafter, Defendant Scott inadvertently forwarded an e-mail chain to Apex that revealed Dilkinska's e-mail address was hosted on the domain "onecoin.eu."  Within days, Apex e-mailed Defendant Scott requesting a clear trail explaining where the monies deposited into Fenero I and Fenero Switzerland's bank accounts originated.  Less than one-week later, Scott terminated Fenero I and Fenero Switzerland's relationship with Apex.

169.    Between June 2016 and February 2017, the Fenero Hedge Fund Accounts collectively received approximately €364 million and $10 million originating from approximately 10 different bank accounts.  The funds received from 8 of these different bank accounts received investments, either directly or indirectly, from Plaintiffs' and Class members' investments in the OC Investment Programs.

170.    Following the termination of Fenero's relationship with Apex, Scott personally directed bankers at various banks -- including those which do extensive business in this jurisdiction -- to authorize the transfer of OC's fraud proceeds using various fictional scenarios to circumvent anti-money laundering procedures across various financial institutions.

171.    In exchange for taking the risk of laundering hundreds of millions of dollars for Ruja, the Scott Group was paid in excess of $60 million in proceeds of the OneCoin fraud scheme. Scott's purchases made with OneCoin fraud proceeds included, among others: a $2,850,000 home located at 133 Sunset Lane, Barnstable, MA; a $3,765,000 residence located at 31 Dale Avenue, Hyannis Port, MA; an ownership interest in another residence located at 105 Sunset Lane, Barnstable, MA; a $245,269 Ferrari; a $218,898 2018 Porsche 911 GTRS2; a $119,529 2017 Porsche 911 Turbo; a $332,248 2016 Porsche 911R; a $1,310,000 Sunseeker yacht; over One

Hundred Thousand Dollars ($100,000.00) in luxury watches; and over Two Hundred Thousand Dollars ($200,000.00) in jewelry and luxury bags. Scott also used OneCoin Scheme proceeds to pay off over $1,000,000 on a mortgage for a condo that he owned in Coral Gables, FL.

172.   Ultimately, the Scott Group facilitated the laundering of over $400 million of the Class' investments in the OC Investment Programs -- all of which was obtained from defrauded OC investors.

173.   Defendant Huesmann provided significant assistance in facilitating various transactions to knowingly launder the OC fraud proceeds.

174.   The following is a flowchart demonstrating one of the vital ways in which Defendant Huesmann assisted in laundering those fraudulently-obtained funds -- converting and redistributing to bank accounts and other destinations owned or controlled by her, Defendant Scott, and other individuals and entities tens of millions of dollars of OC fraud proceeds:



175.     Among the financial institutions through which Scott and Huesmann knowingly directed their money laundering efforts was Defendant BNY, which is headquartered in and does extensive business in this judicial district.

176.     Additionally, Huesmann aided Scott in obtaining and expending OC fraud proceeds for personal benefit.  Indeed, most of the fraud proceeds repatriated for his/their benefit were to accounts either controlled by Scott and Huesmann or to accounts held by Huesmann.

177.     Those fraudulently obtained funds were directed to entities such as 133 Sunset Lane Acquisition Limited, which Scott used to purchase a $2.85 million Massachusetts mansion in which Scott and his wife lived on a part-time/seasonal basis.

178.     Another of the entities that received OC fraud proceeds, through Huesmann, was 31 Dale Avenue Property Group LLC which Scott then used to purchase himself a $3.7 million mansion in Hyannis Port, Massachusetts using the Class' investments.

179.     According to public records, Scott and his team worked with the OneCoin Defendants to launder through a series of purported investment funds holding bank accounts at financial institutions in the Cayman Islands and the Republic of Ireland, among other locations more than $400 million derived from Plaintiffs' and the Class' investments.

180.     As noted in Defendant Pike's criminal indictment, on or about August 9, 2016, Pike sent an email to his co-conspirator Scott, stating: "*They are going to make a move too soon and send up flags that will disrupt the delicate process of attempting to scrub Ruja [Ignatova] i[f] they keep this up. You are playing a very delicate game quite well, I am impressed*."

181.     Much like Defendants Scott, Huesmann, and Armenta, Defendant Pike was fully aware of the illegal nature of the Scott Group Defendants' conduct, yet he put aside any concerns he might have had about that illegality and participated anyway.

182.    The Pike indictment further states that Defendant Pike was aware that the money being transferred nominally belonged to Ruja and that it was derived from the fraudulent OneCoin multi-level marketing scheme.

183.    Based on the Pike indictment, in or around June 2016, a co-conspirator (believed to be another member of the Scott Group Defendants) misrepresented material facts to an FDIC-insured bank in Manhattan, New York, and thereby caused the Manhattan Bank to transfer approximately $5 million into a purported investment fund operated by Defendant Pike.

184.    Similarly, in July 2016, Defendant Scott disguised the transfer of OneCoin proceeds on behalf of Ruja in the form of a fake $30 million "loan."  In reality, that transaction was not a real loan, but was being disguised as a loan so the banks and financial institutions would authorize the transfer, which was actually on Ruja's behalf using funds illegally obtained through the OneCoin scam.

185.    Defendant Scott was aware that the transaction was being conducted through a U.S. dollar correspondent bank: BNY Mellon, which is headquartered in and does extensive business in this judicial district.  Indeed, in May 2016, Defendant Scott emailed himself a copy of an incoming wire instruction sheet for DMS Bank, which indicated that incoming U.S. dollar wire transfers would be processed through a BNY Mellon correspondent bank account located in Manhattan, New York.

186.    Despite this transaction occurring in August 2016, and the fact that BNY Mellon's December 2016 internal "investigation" concluding the transfer involved OneCoin funds and that OneCoin appeared to be a "Ponzi/pyramid scheme", BNY Mellon did not submit a Suspicious Activity Report (SAR) related to the transaction until February 2017.  In that SAR, BNY Mellon wrote that Fenero "received wires from shell entities associated with OneCoin" and that the people

and entities involved in the transfers (which BNY Mellon calculated as totaling approximately $137,600,000.00) appeared to be engaged in "layering" -- a technique used to disguise the source of illicit funds by routing it through multiple transactions.

187.   In a separate incident report citing evidence of money laundering, BNY Mellon identified 275 concerning wires -- totaling approximately $222,000,467.62 in transfers -- that were filtered through BNY Mellon by entities affiliated with OneCoin.

188.   Despite being fully aware that transactions involving funds originating from OneCoin should have been flagged and halted, rather than impose filters that would prevent future transactions involving OneCoin or its related entities, BNY Mellon opted to merely include a filter that would flag future transactions involving only IMS.

189.   Upon information and belief, several hundred million more dollars -- if not billions of dollars -- have likewise been laundered by Defendants.

190.   As expressed by Konstantin, everyone involved in the higher operation of OneCoin—from the OneCoin Defendants to the Scott Group—knew that OneCoin was a fraudulent scheme – that OneCoin was not merely committing fraud, but was, itself, a fraud from top to bottom and from beginning to end.  All were involved in falsifying documents and taking intentional steps to attempt to evade law enforcement scrutiny.

191.   Additionally, according to Konstantin, Defendant Scott and the Scott Group would not have jointly set up fraudulent companies with fraudulent names to move OneCoin funds in a fraudulent manner—including hiding financial entities in the Cayman Islands—if not for knowing the existence and perpetuation of fraud.

192.   As reflected herein and as described by Konstantin, the Defendants used the funds directly obtained from the OneCoin scheme to grossly line their own pockets. These funds include

those incurred from United States investors (including those in New York) and flowing through financial institutions in the United States (including those in New York) and abroad.

## V.    Defendants Led Class Members to Incur Substantial Losses

193.    By late-2017, it was apparent that OC's investment program was a Ponzi scheme.

194.    Regulatory and law enforcement authorities in China, the United Kingdom, Ireland, Canada, Italy, Germany, India, the Ukraine, Bulgaria, Austria, Belgium, Thailand, Vietnam, Samoa, and Uganda have either barred OC from offering its investments in their territories or have issued warnings to its residents that OC is a fraudulent investment scam to be avoided.

195.    Moreover, as noted above, Ruja, Konstantin, Greenwood, Scott, Pike, and Armenta have each been indicted by grand juries or by criminal information in this District.  Konstantin and Armenta have each pleaded guilty and are cooperating with law enforcement, Scott has been criminally convicted, Greenwood and Pike's trials remain pending (with Pike offering to change his guilty plea), and Ruja is presently a wanted fugitive.

196.    As a result of Defendants' fraudulent and misleading activities -- as well as their violation of multiple securities laws -- Plaintiffs and the Class have suffered damages believed to be greater than $4 billion.

## VI.   Necessity for Judicial Intervention

197.    In 2013, the SEC issued an investor alert on "Ponzi Schemes Using Virtual Currencies," warning investors to be wary of investment opportunities offering "high investment returns with little or no risk" and explaining that "Ponzi schemes typically involve investments that have not been registered with the SEC or with state securities regulators."  Here, the OneCoin Defendants have conducted and propagated precisely such a scheme.

198.    Virtual currencies are a relatively new phenomenon, and numerous individuals and entities -- by engaging in unlawful conduct with near impunity -- are taking advantage of the time

it takes for regulatory agencies to address new investment developments, as the OneCoin Defendants have here by raising billions of dollars with promises of profits to be made from investing in the OC Investment Programs.

199.    It is clear from recent events that the rampant disregard of state and federal securities laws and consequently, abuse of investors, taking place in connection with OC's unlawful and fraudulent conduct has been noted by state and federal regulatory agencies.

200.    Moreover, as reported by numerous online news outlets, Mr. Le has recently launched his own OneCoin clone and is presently engaged in furthering the fraudulent path down which OneCoin has already deprived so many investors of their funds.

201.    Plaintiffs have duly performed all of their duties and obligations, and any conditions precedent to Plaintiffs bringing this action have occurred, have been performed, or else have been excused or waived.

## COUNT I - VIOLATION OF SECTION 10(b) OF THE EXCHANGE ACT AND SEC RULE 10b-5(a)-(c)
### [AGAINST THE ONECOIN DEFENDANTS]

202.    Plaintiffs re-allege, and adopt by reference herein, Paragraphs 1 – 201 above, and further allege:

203.    This Count is asserted by Plaintiffs on behalf of themselves and the Class against the OneCoin Defendants and is based upon Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)], and Rule 10b-5 promulgated thereunder by the SEC [17 C.F.R. § 240.10b-5].

204.    During the Class Period, Defendants engaged in a plan, scheme, conspiracy and course of conduct that was intended to, and did: (i) deceive the investing public, including Plaintiffs and other Class members, as alleged herein; (ii) operate a fraudulent Ponzi and pyramid scheme; and (iii) cause Plaintiffs and other members of the Class to purchase or otherwise acquire

patently worthless OC Trader Packages and OneCoins at artificially created, and inflated, prices. In furtherance of this unlawful scheme, plan, and course of conduct, the OneCoin Defendants took the actions set forth herein.

205.    The OneCoin Defendants, by the use of means and instrumentalities of interstate commerce: (i) employed devices, schemes and artifices to defraud; (ii) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements made not misleading; and (iii) engaged in acts, practices, and a course of business that operated as a fraud and deceit upon Plaintiffs and the other members of the Class.

206.    Pursuant to the above plan, scheme, conspiracy and course of conduct, each of OneCoin Defendants participated directly or indirectly in the preparation and/or publication of the promotional materials, press releases and other statements and documents described above, including statements made to the media that were designed to tout the fictional market for non-existent and worthless "OneCoins."  Such promotional materials, releases and statements were materially false and misleading in that they failed to disclose material adverse information and misrepresented the truth about the true nature of OC's fraudulent scheme.

207.    By virtue of their positions at, and relationships or interactions with, OC, the OneCoin Defendants had actual knowledge of the materially false and misleading statements and material omissions alleged herein and intended thereby to deceive Plaintiffs and the other members of the Class, or, in the alternative, the OneCoin Defendants acted with reckless disregard for the truth in that they failed or refused to ascertain and disclose such facts as would reveal the materially false and misleading nature of the statements made, although such facts were readily available to the OneCoin Defendants. Said acts and omissions were committed willfully or with reckless

disregard for the truth. In addition, each OneCoin Defendant knew or recklessly disregarded that material facts were being misrepresented or omitted as described above.

208.    Had Plaintiffs and the other members of the Class known the truth, they would not have purchased or otherwise invested in the OC Investment Programs. At the time of the purchases and/or acquisitions by Plaintiffs and the Class, the OC Trader Packages and OneCoins had no true value and thus Plaintiffs and the other members of the Class purchased worthless securities.

209.    By reason of the conduct alleged herein, the OneCoin Defendants knowingly or recklessly, directly or indirectly, have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

210.    As a direct and proximate result of the OneCoin Defendants' wrongful conduct, Plaintiffs and the other members of the Class suffered damages in connection with their respective investments in the OC Trader Packages and OneCoins during the Class Period.

## COUNT II - VIOLATION OF SECTION 20(a) OF THE EXCHANGE ACT
### [AGAINST THE FOUNDER DEFENDANTS]

211.    Plaintiffs re-allege, and adopt by reference herein, Paragraphs 1 – 210 above, and further allege:

212.    Due to their ownership in and/or control over OneCoin Ltd.'s organization, the Founder Defendants each acted as controlling person of ONECOIN LTD. within the meaning of Section 20(a) of the Exchange Act as alleged herein.

213.    During the Class Period, the Founder Defendants participated in the operation and management of OneCoin Ltd., and conducted and participated, directly and indirectly, in the conduct of OneCoin Ltd.'s business affairs. Because of their senior positions and the fact that they created OneCoin Ltd. to be a fraudulent operation, each Founder Defendant knew that OneCoin was as all relevant times a fraudulent Ponzi and pyramid scheme.

214.     By virtue of their top-level executive and controlling positions as behind the scenes owners/developers and/or based on their awareness of Defendant OneCoin Ltd.'s operations, the Founder Defendants had the power to influence and control and did influence and control, directly or indirectly, the decision making relating to the OC Trader Packages and/or OneCoins, including the decision to engage in the sale of unregistered securities in furtherance thereof.

215.     As officers and/or directors of a company raising investments from the investing public, the Founder Defendants had a duty to disseminate accurate and truthful information with respect to OneCoin Ltd.'s operations.

216.     The Founder Defendants are culpable participants in the fraudulent scheme described herein and caused OneCoin Ltd. to engage in the acts and omissions described herein.

217.     Accordingly, the Founder Defendants are liable to Plaintiffs and the Class as a control persons of Defendant OneCoin Ltd. under Section 20(a) of the Exchange Act.

<u>**COUNT III - FRAUD**</u>
**[AGAINST THE ONECOIN DEFENDANTS]**

Plaintiffs re-allege, and adopt by reference herein, Paragraphs 1 – 217 above, and further allege:

218.     The OneCoin Defendants, by acts of both omission and commission, made to Plaintiffs and the Class Members false statements of material facts about the services Plaintiffs and the Class Members would receive from OneCoin Ltd. upon investing in the OneCoin Trader Packages and/or OneCoins.

219.     Specifically, the OneCoin Defendants' representations to Plaintiffs and the Class Members that, among other things:

(a)     OneCoins were actual cryptocurrencies;

(b)     OneCoin Ltd. utilized mining equipment that would provide OneCoin trader package owners/memberships valuable mined

OneCoins that helped its investors generate far-greater-than-average returns on their investments;

(c)     The value of OneCoin trader packages/memberships and/or OneCoins were based on market demand, not an arbitrarily-ascribed value internally determined by ONECOIN LTD. itself;

(d)     Investment returns were legitimately generated and were not simply a reallocation of new ONECOIN LTD. investors' money used to pay the promised returns on outstanding ONECOIN LTD. investors' investments in classic Ponzi scheme fashion;

(e)     The OneCoin trader packages/memberships complied with all applicable securities laws; and

(f)     The ONECOIN LTD. affiliates who were paid commissions for their sale of OneCoin trader packages/memberships and/or OneCoins were properly registered to procure those sales were false, and the OneCoin Defendants knew at the time the statements were made that the statements were false.

220.     The OneCoin Defendants intended that Plaintiffs and the Class Members would be induced into action by relying upon the statements of fact made to them by and on behalf of the OneCoin Defendants.

221.     In considering whether to invest in OneCoin trader packages/memberships and/or OneCoins and entrust to ONECOIN LTD. their valuable assets; Plaintiffs and the Class Members reasonably and justifiably relied on the statements of fact made to them by and on behalf of the OneCoin Defendants.

222.     As a direct and proximate result of Plaintiff's and the Class Members' reliance on the statements made to them by the OneCoin Defendants, Plaintiffs and the Class Members have suffered damage.

### COUNT IV – AIDING & ABETTING FRAUD
[AGAINST THE SCOTT GROUP DEFENDANTS AND THE BANK OF NEW YORK MELLON]

223.     Plaintiffs re-allege, and adopt by reference herein, Paragraphs 1 – 222 above, and further allege:

224.    The OneCoin Defendants were able to accomplish their fraud due, in large part, to Defendants Scott and his partners—Pike, Huesmann, and Armenta —laundering of OC's fraud proceeds obtained from selling the OC Investment Programs to Plaintiffs and the proposed Class.

225.    From 2016 through in or about 2018, the Scott Group Defendants provided substantial assistance to the OneCoin Defendants' fraudulent scheme by laundering in excess of $400 million of OC's fraud proceeds thereby affirmatively assisting the OneCoin Defendants in defrauding OneCoin investors and evading regulatory scrutiny and international law enforcement efforts by concealing the OneCoin Defendants unlawful, immoral and fraudulent conduct which has caused, and is continuing to cause, significant financial harm to Plaintiffs and the Class.

226.    Similarly, from 2016 through in or about 2017, Defendant BNY Mellon provided substantial assistance to the OneCoin Defendants' fraudulent scheme by turning a blind eye and/or knowingly permitting in excess of $300 million of OC's fraud proceeds to be laundered through its organization thereby affirmatively assisting the OneCoin Defendants in defrauding OneCoin investors and evading regulatory scrutiny and international law enforcement efforts by concealing the OneCoin Defendants unlawful, immoral and fraudulent conduct which has caused, and is continuing to cause, significant financial harm to Plaintiffs and the Class.

227.    Knowing that the funds they were transferring and concealing were proceeds of a fraudulent scheme, the Scott Group Defendants provided affirmative assistance to the OneCoin Defendants enabling their fraudulent conduct to persist unimpeded -- proximately causing the Class financial injuries of hundreds of millions, if not billions, of dollars.  Likewise, Defendant BNY Mellon's complicity in permitting the Scott Group to effect such transactions enabled the OneCoin Defendants' fraudulent conduct to persist unimpeded -- proximately causing the Class financial injuries.

## COUNT V - FRAUDULENT MISREPRESENTATION
### [AGAINST THE ONECOIN DEFENDANTS]

228.   Plaintiffs re-allege, and adopt by reference herein, Paragraphs 1 – 227 above, and further allege:

229.   The OneCoin Defendants, by acts of both omission and commission, made to Plaintiff and the Class Members false statements of material facts about the services Plaintiffs and the Class Members would receive from ONECOIN LTD. upon opening ONECOIN LTD. memberships and investing in the OneCoin trader packages/memberships and/or OneCoins.

230.   Specifically, the OneCoin Defendants' representations to Plaintiffs and the Class Members that, among other things:

(a)   OneCoins were actual cryptocurrencies;

(b)   ONECOIN LTD. utilized mining equipment that would provide OneCoin trader package owners/memberships valuable mined OneCoins that helped its investors generate far-greater-than-average returns on their investments;

(c)   The value of OneCoin trader packages/memberships and/or OneCoins were based on market demand, not an arbitrarily-ascribed value internally determined by ONECOIN LTD. itself;

(d)   Investment returns were legitimately generated and were not simply a reallocation of new ONECOIN LTD. investors' money used to pay the promised returns on outstanding ONECOIN LTD. investors' investments in classic Ponzi scheme fashion;

(e)   The OneCoin trader packages/memberships complied with all applicable securities laws; and

(f)   The ONECOIN LTD. affiliates who were paid commissions for their sale of OneCoin trader packages/memberships and/or OneCoins were properly registered to procure those sales

were false, and the OneCoin Defendants knew at the time the statements were made that the statements were false.

231.    The OneCoin Defendants' misrepresentations were made with reckless disregard for the truth.

232.    The OneCoin Defendants intended that Plaintiffs and the Class Members would be induced into action by relying upon the statements of fact made to them by and on behalf of the OneCoin Defendants.

233.    In considering whether to invest in OneCoin trader packages/memberships and/or OneCoins and entrust to ONECOIN LTD. their valuable assets; Plaintiffs and the Class Members reasonably and justifiably relied on the statements of fact made to them by and on behalf of the OneCoin Defendants.

234.    As a direct and proximate result of Plaintiffs' and the Class Members' reliance on the statements made to them by the ONECOIN CORPORATE Defendants, Plaintiffs and the Class Members have suffered damage.

## COUNT VI - NEGLIGENT MISREPRESENTATION
### [AGAINST THE ONECOIN DEFENDANTS]

235.    Plaintiffs re-allege, and adopt by reference herein, Paragraphs 1 – 234 above, and further allege:

236.    The OneCoin Defendants, by acts of both omission and commission, made to Plaintiffs and the Class Members false statements of material facts about the services Plaintiffs and the Class Members would receive from ONECOIN LTD. upon opening a ONECOIN LTD. membership and investing in the OneCoin trader packages/memberships and/or OneCoins in exchange for the fees they were compelled to pay to maintain membership accounts at ONECOIN LTD.

237.    Specifically, the OneCoin Defendants' representations to Plaintiffs and the Class Members that, among other things:

(a)     OneCoins were actual cryptocurrencies;

(b)     ONECOIN LTD. utilized mining equipment that would provide OneCoin trader package owners/memberships valuable mined OneCoins that helped its investors generate far-greater-than-average returns on their investments;

(c)     The value of OneCoin trader packages/memberships and/or OneCoins were based on market demand, not an arbitrarily-ascribed value internally determined by ONECOIN LTD. itself;

(d)     Investment returns were legitimately generated and were not simply a reallocation of new ONECOIN LTD. investors' money used to pay the promised returns on outstanding ONECOIN LTD. investors' investments in classic Ponzi scheme fashion;

(e)     The OneCoin trader packages/memberships complied with all applicable securities laws; and

(f)     The ONECOIN LTD. affiliates who were paid commissions for their sale of OneCoin trader packages/memberships and/or OneCoins were properly registered to procure those sales

were false, and the OneCoin Defendants knew at the time the statements were made that the statements were false.

238.   The OneCoin Defendants had no reasonable grounds upon which to believe the statements were true when made to Plaintiffs and the Class Members.

239.   The OneCoin Defendants intended that Plaintiffs and the Class Members would be induced into action by relying upon the statements of fact made to them by and on behalf of the OneCoin Defendants.

240.   In considering whether to invest in OneCoin trader packages/memberships and/or OneCoins and entrust to ONECOIN LTD. their valuable assets; Plaintiffs and the Class Members reasonably and relied on the statements of fact made to them by and on behalf of the OneCoin Defendants

241.     Plaintiffs' and the Class Members' reliance on the OneCoin Defendants' statements of fact were justifiable given the OneCoin Defendants' supplemented their false claims with, *inter alia*: (i) a fake OneCoin exchange; (ii) a fake blockchain for OneCoins; and (iii) and a purported blockchain "auditor" who publicly attested that the OneCoin blockchain was legitimate.

242.     As a direct and proximate result of Plaintiffs' and the Class Members' reliance on the statements made to them by the OneCoin Defendants, Plaintiffs and the Class Members have suffered damage.

### COUNT VII - BREACH OF CONTRACT
### [AGAINST DEFENDANT ONECOIN LTD.]

243.     Plaintiffs re-allege, and adopt by reference herein, Paragraphs 1–242 above, and further allege:

244.     The terms of the OneCoin trader packages/memberships constitute a contract between: (1) Plaintiffs and the Class Members, and (2) ONECOIN LTD.

245.     The contract was entered into by and between ONECOIN LTD. and each Class Member between April 2014 and May 6, 2019.

246.     The terms of the OneCoin trader packages/memberships called for an investment of fiat currency or cryptocurrency by Plaintiffs and the Class Members.

247.     The funds paid by Plaintiffs and the Class Members pursuant to the OneCoin trader packages/memberships were pooled by ONECOIN LTD. in an effort by ONECOIN LTD. to secure a profit for itself and the investors.  As a result, the investors, including Plaintiffs and the Class, shared in the risks and benefits of the investment.

248.     Plaintiffs and the Class Members relied on, and are dependent upon, the expertise and efforts of ONECOIN LTD. for their investment returns.

249.    The terms of the OneCoin trader packages/memberships constitute an investment contract and are therefore subject to federal and state securities laws, including the registration requirements promulgated thereunder.

250.    ONECOIN LTD. breached its contracts with Plaintiffs and the Class by failing to provide any actual mining efforts, cryptocurrency, and returns on the initial investments pursuant to the terms of the OneCoin trader packages/memberships.  Rather than adhere to the express, unequivocal terms of the contracts, ONECOIN LTD. converted Plaintiffs' and the Class' investments into near worthless OneCoin trader packages/memberships and/or OneCoins.

251.    Moreover, no registration statement was filed or in effect with any federal or state regulatory body, and no exemption from registration exists with respect to the OneCoin trader packages/memberships.

252.    By virtue of the foregoing, ONECOIN LTD. is liable to Plaintiffs and the Class for damages resulting from ONECOIN LTD.'s breaches of contract.

253.    To the extent that Plaintiffs have received from ONECOIN LTD. any benefits through the contract -- though none are known to them at this time -- Plaintiffs hereby offer to restore to ONECOIN LTD. those benefits, once they are identified and can be quantified.

### COUNT VIII -- UNJUST ENRICHMENT
### [AGAINST THE SCOTT GROUP DEFENDANTS]

254.    Plaintiffs re-allege, and adopt by reference herein, Paragraphs 1 – 253 above, and further allege:

255.    The Scott Group Defendants have each reaped the benefits of laundering proceeds from OneCoin's fraud on Plaintiffs and the Class and personally benefited at the expend of the Class.

256.    The Scott Group Defendants receipt of those benefits was at the direct expense of Plaintiffs and the Class, as the funds received by the Scott Group Defendants derived, at least in part, from the funds invested by Plaintiffs and the Class.

257.    It would be unconscionable and against the fundamental principles of justice, equity, and good conscience for the Scott Group Defendants to retain the substantial monetary benefits they have received as a result of their misconduct.

258.    To remedy the Scott Group Defendants' unjust enrichment, the Court should order the each to disgorge any amounts received as a result of their participation in assisting the OneCoin's fraud by laundering OneCoin's fraud proceeds.

### COUNT IX -- CONVERSION
**[AGAINST THE ONECOIN DEFENDANTS]**

259.    Plaintiffs re-allege, and adopt by reference herein, Paragraphs 1 – 258 above, and further allege:

260.    Plaintiffs transferred funds and assets to OneCoin Ltd. for investment to obtain OneCoin trader packages/memberships and/or OneCoins.

261.    OneCoin Ltd. has kept Plaintiffs' and the Class Members' funds and assets after Plaintiffs and the Class Members requested their return, despite OneCoin Ltd.'s lack of any ownership interest in the assets.

262.    By refusing to return to Plaintiffs and the Class Members their assets, OneCoin Ltd. intended to interfere with, and indeed has interfered with, Plaintiffs' and the Class Members' ownership and interest in those holdings and has deprived Plaintiffs and the Class Members of their property, permanently or temporarily.

263.   Upon information and belief, OneCoin Ltd. has utilized Plaintiffs' and the Class Members' funds and assets to cover OneCoin Ltd.'s own business expenses and to enrich its directors, shareholders, and affiliates, including Defendants Ruja and Greenwood.

264.   As a result of ONECOIN LTD.'s conversion of Plaintiffs' and the Class Members' funds and assets to its own corporate uses and the personal use of its directors, shareholders, and affiliates; Plaintiffs and the Class Members have suffered damage.

### COUNT X - CIVIL CONSPIRACY
[AGAINST ALL DEFENDANTS]

265.   Plaintiffs re-allege, and adopt by reference herein, Paragraphs 1 – 264 above, and further allege:

266.   Defendants have conspired with one another, willfully and knowingly, to devise a scheme and artifice to defraud and to obtain money and property by means of false and fraudulent pretenses, representations, and promises.  As such, Defendants did willfully and knowingly combine, conspire, confederate, and agree together and with each other to commit, *inter alia*, securities fraud, wire fraud, and money laundering.

267.   More specifically, Defendants conspired with one another to perpetrate an unlawful act upon Plaintiffs and the Class Members or to perpetrate a lawful act by unlawful means, *to wit*: they made multiple misrepresentations of fact to Plaintiffs and the Class Members in an effort to extract from Plaintiffs and the Class Members funds, assets, and cryptocurrency to fund ONECOIN LTD.'s own business expenses and to enrich its directors, shareholders, and affiliates, not to fund the purportedly legitimate purpose to which Plaintiffs and the Class Members were told by Defendants that their investment assets were being applied – all of which put Defendants' own pecuniary interest ahead of Plaintiffs' and the Class Members' welfare and economic safety.

268.    Defendants solicited and/or accepted from Plaintiffs and the Class Members large sums of funds, assets, and cryptocurrency while withholding from Plaintiffs and the Class Members certain material facts.

269.    Each of the Defendants agreed to the illicit purpose for garnering investment monies from Plaintiffs and the Class Members so that ONECOIN LTD.'s directors, shareholders, and affiliates could enjoy lavish lifestyles with Plaintiffs' and the Class Members' funds, assets, and cryptocurrency.

270.    Defendants were each aware of, and consented to, the misrepresentations detailed above and knew that the efforts to garner funds, assets, and cryptocurrency from Plaintiffs and the Class Members was all part of a fraud aimed solely at enriching ONECOIN LTD.'s directors, shareholders, and affiliates without any intent to remunerate Plaintiffs and the Class Members in any legitimate way purported by ONECOIN LTD.

271.    In furtherance of their conspiracy, Defendants made to Plaintiffs and the Class Members, or agreed to have someone make on their behalf, the false statements of fact detailed above and purposefully withheld from Plaintiffs and the Class Members certain material facts detailed above in a concerted effort to obtain Plaintiffs' and the Class Members' funds, assets, and cryptocurrency.

272.    To fulfill its role in the conspiracy, ONECOIN LTD. operated its website, disseminated an army of promoters and equipped them with false information about the OneCoin trader packages/memberships and/or OneCoins, and pretended to be operating a legitimate, legally-compliant investment platform.

273.    To fulfill her role in the conspiracy, Defendant Ruja:

(a)    willfully and knowingly, directly and indirectly, by the use of the means and instrumentalities of interstate commerce, and of the

mails, and of facilities of national securities exchanges, would and did use and employ, in connection with the purchase and sale of securities, manipulative and deceptive devices and contrivances by: (a) employing devices, schemes and artifices to defraud; (b) making untrue statements of material fact and omitting to state material facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; and (c) engaging in acts, practices and courses of business which operated and would operate as a fraud and deceit upon persons, *to wit*: Ruja, and others working on her behalf, made and caused to be made false statements and misrepresentations soliciting individuals throughout the world, including in the Southern District of New York, to invest in "OneCoin," a purported cryptocurrency, and thereby caused individuals in the United States and elsewhere to purchase OneCoin packages -- resulting in the receipt of over $1 billion of investor funds into OneCoin-related bank accounts.

(b)     willfully and knowingly, having devised and intending to devise a scheme and artifice to defraud and for obtaining money and property by means of false and fraudulent pretenses, representations, and promises, would and did transmit and cause to be transmitted by means of wire, radio, and television communication in interstate and foreign commerce, writings, signs, signals, pictures, and sounds for the purpose of executing such scheme and artifice, *to wit*: Ruja, and others working on her behalf, made and caused to be made false statements and misrepresentations soliciting individuals throughout the world, including in the Southern District of New York, to invest in "OneCoin," a purported cryptocurrency, and instructed individuals to transmit investment funds to OneCoin depository accounts in order to purchase OneCoin packages, thereby causing individuals to send interstate and international wires representing their OneCoin investments, and resulting in the receipt of over $1 billion of investor funds into OneCoin-related bank accounts

(c)     knowing that the property involved in certain financial transactions represented the proceeds of some form of unlawful activity -- conducted and attempted to conduct such financial transactions which in fact involved the proceeds of specified unlawful activity, *to wit*: approximately $400 million in proceeds of a pyramid scheme involving a purported cryptocurrency known as "OneCoin," knowing that the transactions were designed, in whole or in part, to conceal and disguise the nature, location, source, ownership, and control of the proceeds of such specified unlawful activity; and

(d)     transported, transmitted, and transferred, and attempted to transport, transmit, and transfer a monetary instrument and funds from a place in the United States to and through a place outside the United States,

and to a place in the United States from and through a place outside the United States -- knowing that the monetary instrument and funds involved in the transportation, transmission, and transfer represented the proceeds of some form of unlawful activity, and knowing that such transportation, transmission, and transfer was designed in whole and in part to conceal and disguise the nature, location, source, ownership, and control of the proceeds of specified unlawful activity, *to wit*: approximately $400 million in proceeds of a pyramid scheme involving a purported cryptocurrency known as "OneCoin."

274.  To fulfill his role in the conspiracy, Defendant Greenwood:

(a)  willfully and knowingly, directly and indirectly, by the use of the means and instrumentalities of interstate commerce, and of the mails, and of facilities of national securities exchanges, would and did use and employ, in connection with the purchase and sale of securities, manipulative and deceptive devices and contrivances by: (a) employing devices, schemes and artifices to defraud; (b) making untrue statements of material fact and omitting to state material facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; and (c) engaging in acts, practices and courses of business which operated and would operate as a fraud and deceit upon persons, *to wit*: Greenwood, and others working on his behalf, made and caused to be made false statements and misrepresentations soliciting individuals throughout the world, including in the Southern District of New York, to invest in "OneCoin," a purported cryptocurrency, and thereby caused individuals in the United States and elsewhere to purchase OneCoin packages -- resulting in the receipt of over $1 billion of investor funds into OneCoin-related bank accounts.

(b)  willfully and knowingly, having devised and intending to devise a scheme and artifice to defraud and for obtaining money and property by means of false and fraudulent pretenses, representations, and promises, would and did transmit and cause to be transmitted by means of wire, radio, and television communication in interstate and foreign commerce, writings, signs, signals, pictures, and sounds for the purpose of executing such scheme and artifice, *to wit*: Greenwood, and others working on his behalf, made and caused to be made false statements and misrepresentations soliciting individuals throughout the world, including in the Southern District of New York, to invest in "OneCoin," a purported cryptocurrency, and instructed individuals to transmit investment funds to OneCoin depository accounts in order to purchase OneCoin packages, thereby causing individuals to send interstate and international wires representing their OneCoin investments, and resulting in the receipt

of over $1 billion of investor funds into OneCoin-related bank accounts

(c)     knowing that the property involved in certain financial transactions represented the proceeds of some form of unlawful activity -- conducted and attempted to conduct such financial transactions which in fact involved the proceeds of specified unlawful activity, *to wit*: approximately $400 million in proceeds of a pyramid scheme involving a purported cryptocurrency known as "OneCoin," knowing that the transactions were designed, in whole or in part, to conceal and disguise the nature, location, source, ownership, and control of the proceeds of such specified unlawful activity; and

(d)     transported, transmitted, and transferred, and attempted to transport, transmit, and transfer a monetary instrument and funds from a place in the United States to and through a place outside the United States, and to a place in the United States from and through a place outside the United States -- knowing that the monetary instrument and funds involved in the transportation, transmission, and transfer represented the proceeds of some form of unlawful activity, and knowing that such transportation, transmission, and transfer was designed in whole and in part to conceal and disguise the nature, location, source, ownership, and control of the proceeds of specified unlawful activity, *to wit*: approximately $400 million in proceeds of a pyramid scheme involving a purported cryptocurrency known as "OneCoin."

275.    To fulfill their role in the conspiracy, Defendants Scott, Pike, Huesmann, and Armenta:

(a)     knowing that the property involved in certain financial transactions represented the proceeds of some form of unlawful activity -- conducted and attempted to conduct such financial transactions which in fact involved the proceeds of specified unlawful activity, *to wit*: approximately $400 million in proceeds of a pyramid scheme involving a purported cryptocurrency known as OneCoin, knowing that the transactions were designed, in whole or in part, to conceal and disguise the nature, location, source, ownership, and control of the proceeds of such specified unlawful activity;

(b)     transported, transmitted, and transferred, and attempted to transport, transmit, and transfer a monetary instrument and funds from a place in the United States to and through a place outside the United States, and to a place in the United States from and through a place outside the United States -- knowing that the monetary instrument and funds involved in the transportation, transmission, and transfer

represented the proceeds of some form of unlawful activity, and knowing that such transportation, transmission, and transfer was designed in whole and in part to conceal and disguise the nature, location, source, ownership, and control of the proceeds of specified unlawful activity, *to wit*: approximately $400 million in proceeds of a pyramid scheme involving a purported cryptocurrency known as "OneCoin."

276.    ONECOIN LTD. conducted no legitimate business -- something of which each of the Defendants were aware and which they accepted as part of the scheme to defraud ONECOIN LTD. investors and accountholders, including Plaintiffs and the Class Members.

277.    As a direct and proximate result of Defendants' conspiracy, Plaintiffs and the Class Members have suffered damage.

## COUNT XI – COMMERCIAL BAD FAITH
### [AGAINST DEFENDANT THE BANK OF NEW YORK MELLON]

278.    Plaintiffs re-allege, and adopt by reference herein, Paragraphs 1 – 278 above, and further allege:

279.    Defendant BNY Mellon either had actual knowledge of the fraudulent laundering of OneCoin's criminal proceeds through its organization or, at minimum, was complicit in the scheme by turning a blind eye to clear red flags, declining to conduct the bare minimum of due diligence required, and/or refusing to adopt safeguards sufficient to prevent the alleged fraud. BNY Mellon's participation in and assistance with the laundering of fraudulently obtained funds from the Class amounts to bad faith.

280.    As a direct and proximate result of BNY Mellon's participation or complicity in the laundering of OC's criminal proceeds, Plaintiffs and the Class Members have suffered damage.

## PRAYER FOR RELIEF

**WHEREFORE**, Lead Plaintiff Donald Berdeaux and Plaintiff Christine Grablis, individually and on behalf of all others similarly situated, respectfully pray for relief as follows:

(a) Declaring that this action is properly maintainable as a class action and certifying Plaintiffs as the Class representative and their counsel as Class counsel;

(b) Declaring the OneCoin Defendants are liable to Plaintiffs and the Class under Sections 10(b) and/or 20(a) of the Exchange Act;

(c) Declaring the Scott Group Defendants and Defendant BNY Mellon liable to Plaintiffs and the Class for their aiding and abetting of the OneCoin Defendants' fraud on the Class;

(d) Declaring Defendant OneCoin liable to Plaintiffs and the Class due to breach of contract, fraudulent inducement, fraudulent misrepresentation, negligent misrepresentation, conversion, and civil conspiracy

(e) Preliminarily enjoining Defendants from making further transfers or dissipations of the investments raised from the fraudulent offering of OneCoins and in connection with the OneCoin trader packages/memberships, or using such funds in any further purchases or transactions;

(f) Requiring an accounting of the remaining funds and assets raised from Plaintiffs and the Class in connection with the fraudulent offering of OneCoins and the OneCoin trader packages/memberships;

(g) Imposing a constructive trust over the funds and assets rightfully belonging to Plaintiffs and the Class;

(h) Ordering rescission of the investments made by Plaintiffs and the Class relating to the fraudulent offering of OneCoins and the OneCoin trader packages/memberships and/or compensatory damages;

(i) Awarding Plaintiffs the costs of this action, including reasonable allowance for Plaintiff's attorneys' and experts' fees; and

(j) Granting such other and further relief as this Court may deem just and proper.

## **DEMAND FOR TRIAL BY JURY**

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Plaintiffs demand trial by jury in this action of all issues so triable.

Respectfully Submitted

*/s/ Donald J. Enright*
**LEVI & KORSINSKY, LLP**
Donald J. Enright (admitted *pro hac vice*)
Adam M. Apton
1101   30th   Street,   N.W.,   Suite   115
Washington, DC 20007
Telephone: (202) 524-4290
Facsimile: (202) 363-7171
E-mail: denright@zlk.com
Email: Aapton@zlk.com

John A. Carriel (*pro hac vice* forthcoming)
Email: jcarriel@zelle.com
**ZELLE LLP**
1775 Pennsylvania Ave, NW, Suite 375
Washington, DC 20006
Telephone: (202) 899-4111
Facsimile: (612) 336-9100

**SILVER MILLER**
David C. Silver (*pro hac vice* forthcoming)
Jason S. Miller (*pro hac vice* forthcoming)
11780 W. Sample Road
Coral Springs, FL 33065
Telephone: (954) 516-6000
E-mail: DSilver@SilverMillerLaw.com
E-Mail: JMiller@SilverMillerLaw.com

*Attorneys for Lead Plaintiff Donald Berdeaux and Christine Grablis and Co-Lead Counsel for the Class*