UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

DONALD BERDEAUX and CHRISTINE GRABLIS,
Individually and Behalf of All Others Similarly Situated,

Plaintiffs,

- against -

ONECOIN LTD.; RUJA IGNATOVA; SEBASTIAN
GREENWOOD; MARK SCOTT; DAVID PIKE; NICOLE
J. HUESMANN; GILBERT ARMENTA; and THE BANK
OF NEW YORK MELLON,

Defendants.

No. 19-cv-4074-VEC

Hon. Valerie Caproni

**ORAL ARGUMENT
REQUESTED**

**MEMORANDUM OF LAW IN SUPPORT OF THE
BANK OF NEW YORK MELLON'S MOTION TO DISMISS**

Audra J. Soloway
Elizabeth M. Sacksteder
Daniel S. Sinnreich
Paul, Weiss, Rifkind, Wharton & Garrison LLP
1285 Avenue of the Americas
New York, New York 10019-6064
(212) 373-3000

*Counsel for Defendant The Bank of New York
Mellon*

## <u>TABLE OF CONTENTS</u>

<u>Page</u>

PRELIMINARY STATEMENT .................................................................................................. 1

STATEMENT OF FACTS ...................................................................................................... 3

    A.    BNY Mellon and Its Business ................................................................ 3

    B.    The Alleged OneCoin Fraud and Money Laundering Scheme ................................. 4

    C.    BNY Mellon's Purported "Role" in the OneCoin Fraud............................................ 6

    D.    BNY Mellon's Investigation of OneCoin Transfers .................................................. 7

    E.    The SAC's Claims Against BNY Mellon ................................................................ 10

ARGUMENT ...................................................................................................................... 10

I.    Legal Standard ............................................................................................................ 10

II.    Plaintiffs Fail to Plead Claims Against BNY Mellon with the Particularity
Required by Rule 9(b)................................................................................................. 11

III.    Plaintiffs Fail to State a Claim for Aiding and Abetting Common Law Fraud.................. 12

    A.    The SAC Fails to Raise a Strong Inference That BNY Mellon Had "Actual
Knowledge" of the OneCoin Fraud ........................................................................ 13

    B.    The SAC Fails to Allege a Strong Inference That BNY Mellon
"Substantially Assisted" the OneCoin Fraud ......................................................... 17

IV.    Plaintiffs Fail to State a Claim for Commercial Bad Faith ................................................. 21

CONCLUSION.................................................................................................................... 22

## **TABLE OF AUTHORITIES**

**Page(s)**

CASES

*In re Agape Litig.*,
    773 F. Supp. 2d 298 (E.D.N.Y. 2011) .......................................................................12, 16, 21

*Ashcroft* v. *Iqbal*,
    556 U.S. 662 (2009) ...........................................................................................................11

*Bell Atlantic Corp.* v. *Twombly*,
    550 U.S. 544 (2007) ...........................................................................................................11

*Berlin* v. *JetBlue Airways Corp.*,
    436 F. Supp. 3d 550 (E.D.N.Y. 2020) ...............................................................................11

*Cromer Fin. Ltd.* v. *Berger*,
    137 F. Supp. 2d 452 (S.D.N.Y. 2001).................................................................................19

*de Abreu* v. *Bank of America Corp.*,
    812 F. Supp. 2d 316 (S.D.N.Y. 2011).............................................................................13, 16

*Heinert* v. *Bank of Am., N.A.*,
    410 F. Supp. 3d 544 (W.D.N.Y. 2019) ........................................................................ *passim*

*Landesbank Baden-Wurttemberg* v. *Goldman, Sachs & Co.*,
    821 F. Supp. 2d 616 (S.D.N.Y. 2011).................................................................................12

*Lerner* v. *Fleet Bank, N.A.*,
    459 F.3d 273 (2d Cir. 2006)......................................................................................11, 13, 14

*Libertarian Party of Erie Cnty.* v. *Cuomo*,
    970 F.3d 106 (2d Cir. 2020).................................................................................................7

*Licci ex rel Licci* v. *Lebanese Canadian Bank, SAL*,
    672 F.3d 155 (2d Cir. 2012).................................................................................................11

*Lundstedt* v. *Deutsche Bank Nat'l Tr. Co.*,
    2016 WL 3101999 (D. Conn. June 2, 2016)........................................................................20

*Lynch* v. *City of N.Y.*,
    952 F.3d 67 (2d Cir. 2020)...................................................................................................3

*Nigerian Nat. Petroleum Corp.* v. *Citibank, N.A.*,
    1999 WL 558141 (S.D.N.Y. July 30, 1999) ..............................................................2, 19, 22

*In re Petrobras Sec. Litig.*,
    116 F. Supp. 3d 368 (S.D.N.Y. 2015)..................................................................................7

*Retail Shoe Health Comm'n* v. *Mfrs. Hanover Tr. Co.*,
    558 N.Y.S.2d 949 (N.Y. App. Div. 1990) ............................................................22

*Rizer* v. *Breen*,
    2007 WL 4378149 (N.Y. Sup. Ct. Jan. 29, 2007)...................................................19

*Rosner* v. *Bank of China*,
    2008 WL 5416380 (S.D.N.Y. Dec. 18, 2008) ............................................. *passim*

*Rosner* v. *Bank of China*,
    349 F. App'x 637 (2d Cir. 2009) .................................................................. *passim*

*Ryan* v. *Hunton & Williams*,
    2000 WL 1375265 (E.D.N.Y. Sept. 20, 2000) ........................................15, 19, 21

*Vasquez* v. *Hong Kong & Shanghai Banking Corp. Ltd.*,
    2019 WL 2327810 (S.D.N.Y. May 30, 2019) ............................................. *passim*

*Williams* v. *Bank Leumi Trust Co.*,
    1997 WL 289865 (S.D.N.Y. May 30, 1997) .........................................................19

*Yao-Yi* v. *Wilmington Trust Co.*,
    301 F. Supp. 3d 403 (W.D.N.Y. 2017)...................................................................16

## STATUTES

Bank Secrecy Act, 31 U.S.C. §§ 5311–32.......................................................................8, 20

## OTHER AUTHORITIES

Federal Rule of Civil Procedure 9(b)........................................................................2, 11, 12, 21

Federal Rule of Civil Procedure 12(b)(6) ............................................................................10, 11

## PRELIMINARY STATEMENT

This lawsuit was filed in May 2019 by investors seeking to recover losses from an alleged global Ponzi scheme called OneCoin.  The Bank of New York Mellon ("BNY Mellon") was not named as a defendant in either the initial or first amended complaints in this action, but rather was added as a defendant following the criminal trial of defendant Mark Scott—formerly a partner at the international law firm Locke Lord LLP, and the alleged leader of the OneCoin money laundering operation.  At Scott's trial, the government called two BNY Mellon employees to testify about Scott's alleged efforts to mislead BNY Mellon and evade its anti-money laundering ("AML") protocols.  Plaintiffs appear to have observed the Scott trial and—notwithstanding the testimony that BNY Mellon was misled and defrauded by Scott—concluded that BNY Mellon represented their best chance to add an entity with deep pockets to this litigation.

The operative second amended complaint (the "SAC") was filed in September 2020, when BNY Mellon was added as a defendant.  In the SAC, while purporting to rely on trial evidence, plaintiffs weakly attempt to convert BNY Mellon from a victim of the OneCoin fraud into an aider-and-abettor.  The result is a pleading that barely mentions BNY Mellon and offers purposely vague references to BNY Mellon's purported misconduct.  Indeed, the 280-paragraph SAC contains only seven paragraphs with factual allegations concerning BNY Mellon.  (*See* Compl. ¶¶ 9, 63, 184–88.)  And in one of those paragraphs, plaintiffs concede that BNY Mellon was a *victim* of the OneCoin fraud, just as the jury found in convicting defendant Scott of conspiracy to commit *bank fraud*.  (*Id.*)

On the basis of these vaguely pleaded allegations, plaintiffs now assert two state-law claims against BNY Mellon—one for aiding and abetting the OneCoin fraud and one for commercial bad faith.  The essence of both claims is that BNY Mellon is liable to OneCoin

investors because the alleged OneCoin fraudsters used BNY Mellon's correspondent banking services to facilitate the OneCoin scheme.  But courts in this circuit have repeatedly and uniformly rejected substantially similar allegations against banks like BNY Mellon.  *See, e.g.*, *Heinert* v. *Bank of Am., N.A.*, 410 F. Supp. 3d 544, 549–51 (W.D.N.Y. 2019) (dismissing aiding-and-abetting fraud claim against two banks whose accounts were used to transfer Ponzi scheme proceeds), *aff'd*, 2020 WL 6689287 (2d Cir. Nov. 13, 2020); *Vasquez* v. *Hong Kong & Shanghai Banking Corp. Ltd.*, 2019 WL 2327810, at *19 (S.D.N.Y. May 30, 2019) (dismissing aiding-and-abetting fraud claim against correspondent bank where plaintiffs alleged that bank "received transfers from plaintiffs' bank(s) and relayed them to" foreign account operated by Ponzi scheme); *Rosner* v. *Bank of China*, 2008 WL 5416380, at *3, 14 (S.D.N.Y. Dec. 18, 2008) (dismissing aiding-and-abetting fraud claim against bank where financial services company used bank to convert illicit proceeds into U.S. dollars and transfer proceeds to foreign account), *aff'd*, 349 F. App'x 637 (2d Cir. 2009); *Nigerian Nat. Petroleum Corp.* v. *Citibank, N.A.*, 1999 WL 558141, at *6–8 (S.D.N.Y. July 30, 1999) (dismissing commercial bad faith and aiding-and-abetting fraud claims against bank used for repeated wire transfers of fraud proceeds).

Consistent with these prior cases, the claims against BNY Mellon should be dismissed for at least three reasons:

*First*, neither claim is pleaded with the particularity required by Federal Rule of Civil Procedure 9(b), *i.e.* the "who, what, when, where and how" of BNY Mellon's purported misconduct.  *See infra* at 12.

*Second*, plaintiffs fail to plead particular facts raising a strong inference that BNY Mellon had "actual knowledge" of the underlying fraud—an element of both claims—at the time it allegedly facilitated the OneCoin transfers.  Plaintiffs themselves concede that other

defendants deliberately "disguised" OneCoin-related transfers to circumvent BNY Mellon's AML protocols.  And allegations that BNY Mellon gained "actual knowledge" of the OneCoin fraud through its investigation of suspicious transfers fails because suspicions and investigations of fraud—even those that result in remedial measures—are not "actual knowledge" of fraud.  *See infra* at 13–17, 21–22.

*Third*, the claims must also be dismissed because the provision of banking services to alleged fraudsters—even if the services make it easier to effectuate the scheme—does not qualify as "substantial assistance" of the scheme or "complicity" by bank principals.  *See infra* at 17–22.

Plaintiffs' claims against BNY Mellon contravene decades of case law from courts in this circuit, as well as the very trial testimony that plaintiffs relied on in drafting the SAC.  The claims asserted against BNY Mellon should be dismissed with prejudice.

## STATEMENT OF FACTS[1]

A.   BNY Mellon and Its Business

BNY Mellon is a New York state-chartered bank, headquartered in Manhattan, that provides financial services globally to a wide range of clients, including financial institutions, corporations, foundations and endowments, public funds, and government agencies. (Ex. A at 5.)[2]  This action concerns BNY Mellon's correspondent banking services, in which foreign financial institutions establish accounts with BNY Mellon to facilitate wire transfers, currency exchange, and other banking services for their clients.[3]  This allows foreign institutions

---

[1]   The relevant facts are derived from the SAC, as well as documents incorporated by reference into the SAC.  *See Lynch* v. *City of N.Y.*, 952 F.3d 67, 79 (2d Cir. 2020).

[2]   Citations to "Ex. __" refer to exhibits to the Declaration of Daniel S. Sinnreich, attached hereto.

[3]   The Office of Controller of the Currency has described correspondent banking as a "system of interbank relationships in which a bank sells services to other financial institutions.  The institution providing the services is the correspondent bank or upstream correspondent.  The institution buying the services is the respondent bank

to provide their clients with access to international financial markets without opening international branches.

          **B.**    <u>The Alleged OneCoin Fraud and Money Laundering Scheme</u>

        The allegations in the SAC arise out of a purported pyramid scheme called OneCoin. The SAC alleges that OneCoin Ltd. ("OneCoin") was founded in 2014 by defendants Ruja Ignatova and Sebastian Greenwood (together with OneCoin, the "OneCoin defendants"). (Compl. ¶ 99.) OneCoin allegedly sold "Trader Packages," which provided investors with OneCoin membership. (Compl. ¶¶ 24–25, 107.) Members received access to certain educational literature and "tokens" which could be used to "mine" for OneCoin cryptocurrency, which was allegedly maintained on the company's "private blockchain."[4] (Compl. ¶¶ 107–08.) Investors were told that OneCoin intended to list its cryptocurrency on a national exchange following an initial public offering or initial coin offering, at which point "tokens" would also be exchangeable directly for OneCoin cryptocurrency. (Compl. ¶¶ 98, 108.) OneCoin members received commissions for recruiting others to purchase OneCoin Trader Packages. (Compl. ¶ 25.)

        According to plaintiffs, OneCoin was a fraudulent multi-level marketing scheme, or pyramid scheme, in which OneCoin would pay existing investors with money from new investors, who were in turn incentivized to recruit additional investors to generate more money for themselves and the company. (Compl. ¶ 3.) Plaintiffs allege that OneCoin never actually

---

or downstream correspondent." Ex. B (OCC Interpretive Letter No. 796 (Sept. 1997)). Correspondent banking includes one depository institution establishing an account, called a correspondent account, at another depository institution that may be used to receive deposits from, make payments to, or handle other financial transactions with remote customers of the first depository institution. *Id.*

[4] As alleged in the SAC, a blockchain is "a digitized, decentralized, public ledger that cryptographically records, preserves, and presents information." (Compl. ¶ 94.) As is relevant here, blockchains "are used to record transactions involving virtual currencies." (Compl. ¶ 95.)

created a cryptocurrency, and that no mining of OneCoins ever occurred; rather, OneCoin simply created new "cryptocurrency" at will through "an Excel worksheet masquerading as a blockchain," and unilaterally determined the "value" of OneCoin cryptocurrency without regard to market supply and demand.  (Compl. ¶¶ 117, 120–23.)

Plaintiffs further allege that the OneCoin defendants enlisted several other individuals—including lawyer Mark Scott, then a partner at the international law firm Locke Lord LLP, as well as David Pike, Nicole Huesmann, and Gilbert Armenta (the "Scott Group defendants")—to launder the proceeds of the OneCoin pyramid scheme.  (*See, e.g.,* Compl. ¶¶ 158, 164–74, 183-84.)  The OneCoin and Scott Group defendants purportedly created a system of shell companies and bank accounts around the world, which they used to launder more than $400 million of OneCoin's criminal proceeds between 2015 and 2018.  (Compl. ¶¶ 6, 165, 167, 170.)  Plaintiffs allege that the Scott Group defendants were compensated more than $60 million for their assistance in the scheme.  (Compl. ¶ 8.)

By late 2017, regulators and law enforcement authorities in more than a dozen countries barred OneCoin from offering investments or warned residents not to invest in OneCoin because it was a scam.  (Compl. ¶¶ 193–94.)  Around the same time, federal prosecutors in this district began initiating criminal proceedings against several defendants in this action relating to their roles in the alleged OneCoin fraud.  Specifically:

- Defendant Scott was convicted by a jury in November 2019 of conspiracy to commit money laundering and conspiracy to commit bank fraud.  (Compl. ¶ 47.)

- Defendant Armenta pleaded guilty in January 2018 to conspiracies to commit wire fraud, money laundering, and extortion.  (Compl. ¶¶ 58–59.)

- Defendant Greenwood was indicted in February 2018 for wire fraud, money laundering, securities fraud, and conspiracy to commit the same.  He is currently awaiting trial.  (Compl. ¶ 43.)

- Defendant Pike was indicted in February 2020 for conspiracy to commit bank fraud. (Compl. ¶ 51.)

- Defendant Ignatova is currently "a wanted fugitive in the United States for her crimes involving" OneCoin.  (Compl. ¶ 32.)

C.    <u>BNY Mellon's Purported "Role" in the OneCoin Fraud</u>

BNY Mellon was first added as a defendant in the SAC.  Plaintiffs allege that BNY Mellon "enabled" the OneCoin fraud because BNY Mellon served as a correspondent bank to facilitate the transfer of approximately $300 million in OneCoin proceeds.  (Compl. ¶ 63.) Beyond the allegation that BNY Mellon provided banking services to entities associated with certain defendants, however, the allegations against BNY Mellon are sparse and vague, and more notable for what they omit than what they contain.

In particular, plaintiffs do not allege any contact or communication between BNY Mellon and any participant in the OneCoin fraud.  Indeed, the SAC does not identify a single individual at BNY Mellon who purportedly had any role in the alleged scheme.  Further, plaintiffs do not allege either that BNY Mellon had any motive to participate in the OneCoin fraud or benefitted in any way from the alleged fraud.  While plaintiffs allege in conclusory fashion that BNY Mellon "was complicit in the scheme by turning a blind eye to clear red flags," the SAC does not identify a single "red flag" that BNY Mellon allegedly ignored.  (*See* Compl. ¶¶ 63, 279.)

Further, although plaintiffs allege—again in conclusory fashion—that hundreds of transactions involving more than $300 million of OneCoin proceeds were transferred using BNY Mellon's services, the SAC identifies only *one* such transaction: a $30 million transfer purportedly initiated by defendant Scott on behalf of defendant Ignatova in July or August 2016. (Compl. ¶¶ 184-86.)  But plaintiffs concede that this transfer was "*disguised* as a loan *so the banks and financial institutions would authorize the transfer*."  (Compl. ¶ 184 (emphases

6

added).)  Far from alleging that BNY Mellon was complicit in the OneCoin scheme, plaintiffs

allege that other defendants conspired to hide the fraudulent nature of the transaction from BNY

Mellon to circumvent BNY Mellon's AML protocols.

      The SAC thus acknowledges a fundamental defect in the claims asserted against

BNY Mellon: far from being complicit, BNY Mellon and other financial institutions were

*victims* of the fraud.  Indeed, at Scott's trial, the government presented testimony from two BNY

Mellon employees that Scott and his affiliates provided misleading and incomplete information

to various financial institutions to effectuate money transfers.  (*See* Ex. C at 1392:17-1393:22;

1435:14-1437:13; *see also* Ex. D (USAO Press Release, following Scott's conviction for bank

fraud, among other charges, stating "[a]s part of the [OneCoin] scheme, SCOTT and his co-

conspirators *lied to banks and other financial institutions all over the world, including to banks

in the United States*, to cause those institutions to make transfers of OneCoin proceeds and evade

anti-money laundering procedures.") (emphasis added)).[5]

    D.    <u>BNY Mellon's Investigation of OneCoin Transfers</u>

      The SAC appears to proceed on the factually unsupported allegation that BNY

Mellon "turn[ed] a blind eye" to OneCoin-related transfers.  (Compl. ¶ 63.)  But the SAC admits

---

[5]    Plaintiffs allege that, in drafting the SAC, they relied on "information revealed in connection with the criminal actions brought against, *inter alia*, Defendant[] Scott . . . in this District before the Honorable Eduardo Ramos, *United States* v. *Mark S. Scott*, 1:17-cr-630-ER (S.D.N.Y.)."  (Compl. at 2.)  The allegations against BNY Mellon in the SAC appear to have been lifted in substantial part from the testimony of two BNY Mellon employees who testified as part of the government's case-in-chief during the criminal trial in *United States* v. *Scott*.  *See infra* at 9–10.  Accordingly, the testimony of these employees has been incorporated into the SAC, and defendants may rely on it in their motion to dismiss briefing.  *See Libertarian Party of Erie Cnty.* v. *Cuomo*, 970 F.3d 106, 120 (2d Cir. 2020) ("[W]hen a plaintiff chooses not to attach to the complaint or incorporate by reference a [document] upon which it solely relies and which is integral to the complaint, the defendant may produce the [document] when attacking the complaint for its failure to state a claim.") (citation omitted); *In re Petrobras Sec. Litig.*, 116 F. Supp. 3d 368, 378 (S.D.N.Y. 2015) ("Where a complaint cites reports and testimony whose 'contents as public documents are not subject to reasonable dispute,' the Court may 'consider them in determining the merits and context of the allegations of the [complaint] that are based on them.'") (citation omitted).

that BNY Mellon took affirmative steps to flag, investigate, and prevent future OneCoin-related transfers from being processed through its correspondent bank.

For example, plaintiffs allege that BNY Mellon produced an "incident report citing evidence of money laundering" in which it "identified 275 concerning wires" initiated by entities affiliated with OneCoin. (Compl. ¶¶ 186–87.) Plaintiffs appear to suggest that BNY Mellon should have generated this report faster (*id.*), but they do not allege when the report was generated, how much earlier the report should have been generated, and what information should have caused BNY Mellon to generate the report faster. Nor do they allege why BNY Mellon would have intentionally delayed this report.

Plaintiffs similarly allege that BNY Mellon conducted an "internal investigation" in December 2016 and concluded that OneCoin appeared to be a "Ponzi/pyramid scheme." (Compl. ¶ 186.) Plaintiffs further allege that BNY Mellon submitted a Suspicious Activity Report ("SAR") flagging OneCoin-related transactions for the U.S. Department of Treasury Financial Crimes Enforcement Network in February 2017. (*Id.*)[6] Plaintiffs suggest that the short time period between BNY Mellon's investigation and its alleged submission of a SAR is somehow nefarious, but the SAC contains no information specifying when BNY Mellon should have submitted a SAR, why BNY Mellon would delay such a submission, or whether any actual transfers took place during this short time period.

---

[6]    Although the SAC does not identify its source for this information, it appears that the SAR-related allegations are drawn from a purported leak of more than 2,100 SARs that were published by BuzzFeed in September 2020. (Ex. E (BuzzFeed, *We Got Our Hands On Thousands of Secret Documents. Let's Break Them Down*, Sept. 20, 2020).) Federal law requires that any information about SARs be considered highly confidential. SARs cannot be accessed through Freedom of Information Act requests and cannot be subpoenaed. Financial institutions are prohibited from admitting the existence of a SAR—even to other banks. (Ex. F (Dep't of the Treas., FinCEN Guidance FIN-2010-G006 (effective Jan. 3, 2011)).) Disclosing the filing of a SAR to a participant in the reported transactions is a criminal offense. 31 U.S.C. § 5318(g)(2). In this motion, BNY Mellon thus addresses only the allegation from the SAC concerning the existence of a SAR, does not purport to offer any information concerning such allegation, and reserves all rights to move to exclude any evidence concerning any SARs should the case survive a motion to dismiss.

Plaintiffs also admit that, in response to its internal investigation, BNY Mellon affirmatively created new AML filters to prevent future transfers from a OneCoin-related entity called International Marketing Services Pte Ltd. ("IMS").  (Compl. ¶ 9.)  Plaintiffs appear to complain that BNY Mellon should have created additional filters (*id.*), but they do not identify what additional filters BNY Mellon should have created nor any OneCoin-related transaction that was facilitated after the IMS filter was added in March 2017.[7]

No doubt plaintiffs' allegations in the SAC are sparse because they were selectively drawn from the testimony of BNY Mellon employees at defendant Scott's criminal trial—and the trial testimony undermines any suggestion that BNY Mellon was complicit in the OneCoin fraud.  (*See* Compl. at 2 (stating that plaintiffs relied on "information revealed in connection with the criminal actions brought against, *inter alia*, Defendant[] Scott . . . in this District before the Honorable Eduardo Ramos, *United States* v. *Mark S. Scott*, 1:17-cr-630-ER (S.D.N.Y)").)  When read in full, the trial testimony makes clear that BNY Mellon employs robust AML procedures and was itself a victim of the OneCoin scheme.  In particular, BNY Mellon deployed routine monitoring to flag 275 wires that it executed on behalf of its client, DMS Bank, between July and October 2016.  (Ex. C at 1420:19-1422:2; 1423:13-1424:18; 1430:13-1435:10; Ex. G at 1470:1-22; 1480:10-1481:6; *see* Compl. ¶ 187.)  By December 2016, a member of BNY Mellon's Suspicious Activity Response Team had escalated an "incident report" about these transactions to a subcommittee of BNY Mellon's Anti-Money Laundering Oversight Committee ("AMLOC"), which recommended that BNY Mellon review any transactions involving the associated parties for three months and request information from DMS

---

[7]    The SAC alleges that BNY Mellon "enabled" the OneCoin money laundering scheme "[f]rom approximately May 2016 through April 2017."  (Compl. ¶ 63.)  But the "April 2017" end date is invented out of whole cloth and unsupported by any facts in the SAC.  The *only* transaction specifically referenced in the SAC was alleged to have occurred in either July or August 2016.  (Compl. ¶¶ 184-86.)

Bank about the nature of these transactions.  (Ex. C at 1426:8-1427:9; 1429:20-1432:25; *see*

Compl. ¶ 186 (referring to a "December 2016 internal investigation" into OneCoin-related

transfers).)  When DMS Bank provided the requested information to BNY Mellon in February

2017, the AMLOC subcommittee found it to be incomplete, vague, and concerning.  (Ex. C at

1435:14-1436:18.)  Thereafter, on March 6, 2017, the AMLOC directed BNY Mellon to institute

several remedial measures to prevent further suspicious transactions.[8]

      E.      <u>The SAC's Claims Against BNY Mellon</u>

      Plaintiffs assert two causes of action against BNY Mellon relating to its alleged

provision of banking services to the perpetrators of the OneCoin fraud: (i) aiding and abetting the

OneCoin defendants' common law fraud (Compl. ¶¶ 223-27 (Count IV)), and (ii) commercial

bad faith (Compl. ¶¶ 278-80 (Count XI)).

**ARGUMENT**

**I.      <u>Legal Standard</u>**

      Federal Rule of Civil Procedure 12(b)(6) ("Rule 12(b)(6)") provides that a

complaint should be dismissed where it fails to state a claim upon which relief can be granted.

*See* Fed. R. Civ. P. 12(b)(6).  To avoid dismissal under Rule 12(b)(6), a plaintiff must plead

"factual allegations"—as opposed to "legal conclusion[s]"—sufficient to "raise a right to relief

above the speculative level" and "state a claim to relief that is plausible on its face."  *Bell*

*Atlantic Corp.* v. *Twombly*, 550 U.S. 544, 555, 570 (2007).  Dismissal is thus appropriate where

the complaint does not contain—as to each claim and each defendant—"factual content that

---

[8]    Among other things, BNY Mellon instituted a filter which would stop any future transactions involving IMS
and directed DMS Bank not to send any transactions through BNY Mellon that involved OneCoin or any of the
investment funds that were parties to the 275 wires.  (Ex. C at 1392:17-1393:22; 1439:14-1440:1; 1441:23-
1442:13; *see* Compl. ¶ 9 (providing incomplete description of filter).)

allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft* v. *Iqbal*, 556 U.S. 662, 678 (2009).

Because both claims asserted against BNY Mellon sound in fraud, they are also subject to the heightened pleading standard set forth in Federal Rule of Civil Procedure 9(b) ("Rule 9(b)").  *See Lerner* v. *Fleet Bank, N.A.*, 459 F.3d 273, 292–93 (2d Cir. 2006) (finding that Rule 9(b) applied to claims asserted against a bank for aiding and abetting common law fraud and commercial bad faith).  To meet this exacting standard, a complaint "must: (1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent."  *Id.* at 290.  Plaintiffs must also allege facts that give rise to a strong inference of fraudulent intent, either by alleging facts to show that defendants had both motive and opportunity to commit fraud, or by alleging facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness.  *Id.* at 290–91.[9]

## II.   Plaintiffs Fail to Plead Claims Against BNY Mellon with the Particularity Required by Rule 9(b)

The 280-paragraph SAC contains only seven paragraphs alleging conduct by BNY Mellon.  (*See* Compl. ¶¶ 9, 63, 184–88.)  The allegations in these paragraphs fail to give "notice of the particulars: the who, what, when, where and how required to support a fraud claim."  *Landesbank Baden-Wurttemberg* v. *Goldman, Sachs & Co.*, 821 F. Supp. 2d 616, 622

---

[9]    Both state law claims asserted against BNY Mellon are governed by New York law.  New York's choice-of-law rules apply here because this action is pending in federal court in New York.  *See Berlin* v. *JetBlue Airways Corp.*, 436 F. Supp. 3d 550, 564 (E.D.N.Y. 2020).  Under New York's choice-of-law analysis, the law of the jurisdiction where a tort occurs generally applies because "that jurisdiction has the greatest interest in regulating behavior within its borders."  *Licci ex rel Licci* v. *Lebanese Canadian Bank, SAL*, 672 F.3d 155, 158 (2d Cir. 2012) (citing *GlobalNet Financial.Com, Inc.* v. *Frank Crystal & Co.*, 449 F.3d 377, 384 (2d Cir.2006)).  Here, BNY Mellon's alleged tortious acts occurred in New York, where BNY Mellon is headquartered and where BNY Mellon administers its correspondent banking services.

(S.D.N.Y. 2011) (quotation marks omitted).  The SAC does not identify a single BNY Mellon

employee, much less one involved in the alleged fraudulent scheme.  Nor does the SAC allege

any direct interaction between BNY Mellon and any participants in the alleged scheme.

Plaintiffs allege that OneCoin proceeds were laundered through BNY Mellon from "May 2016

through April 2017" (Compl. ¶ 63), but identify only *one* transfer during that year-long period

(*see id.* ¶ 184).  Plaintiffs refer to an "incident report citing evidence of money laundering"

(Compl. ¶ 187) and a "Suspicious Activity Report" (Compl. ¶ 186) that BNY Mellon allegedly

prepared, but the SAC provides *no details* about who prepared the reports, who received the

reports, when the reports were prepared, and why the reports were inadequate.  The SAC

similarly contains *no details* about an "internal investigation" that BNY Mellon supposedly

conducted in December 2016.  (Compl. ¶¶ 9, 186.)

       These vague allegations do not satisfy the notice pleading standard, much less the

heightened standard for claims governed by Rule 9(b).  *See, e.g.*, *In re Agape Litig.*, 773 F. Supp.

2d 298, 323–24 (E.D.N.Y. 2011) (dismissing aiding-and-abetting fraud claim under Rule 9(b)

where plaintiffs failed to identify "the time, place, . . . and content of the alleged

misrepresentations" made by bank employee).  But even if plaintiffs had pleaded their claims

with the requisite particularity, they would still fail on the merits for the reasons described

below.

## III.    Plaintiffs Fail to State a Claim for Aiding and Abetting Common Law Fraud

       Plaintiffs allege that BNY Mellon aided and abetted the OneCoin fraud by

"permitting in excess of $300 million of [OneCoin's] fraud proceeds to be laundered through its

organization."  (Compl. ¶ 226.)  To establish liability for aiding and abetting fraud under New

York law, a plaintiff must show "(1) the existence of a fraud; (2) the defendant's knowledge of

the fraud; and (3) that the defendant provided substantial assistance to advance the fraud's

commission." *Lerner*, 459 F.3d at 292 (quotation marks and alteration omitted).  The latter two elements are not pleaded here.

      A.     <u>The SAC Fails to Raise a Strong Inference That BNY Mellon Had "Actual Knowledge" of the OneCoin Fraud</u>

New York law requires plaintiffs to plead particular facts demonstrating that a defendant had "actual knowledge" of underlying fraud to state an aiding-and-abetting claim. *Lerner*, 459 F.3d at 292.  "The burden of demonstrating actual knowledge" is "a heavy one," and "even alleged ignorance of obvious warning signs of fraud will not suffice to adequately allege 'actual knowledge.'" *de Abreu* v. *Bank of America Corp.*, 812 F. Supp. 2d 316, 323 (S.D.N.Y. 2011) (quotation marks omitted).  Where allegations are offered against a bank providing routine services, allegations that the bank "*should* have known that something was amiss" are insufficient.  *Rosner* v. *Bank of China*, 349 F. App'x 637, 639 (2d Cir. 2009) (emphasis added).

Nor can "actual knowledge" be pleaded through allegations that a bank ignored red flags.  "[A] bank's ignorance of 'red flags' or obvious warning signs of fraudulent activity cannot establish a bank's actual knowledge sufficient to support a claim of aiding and abetting fraud." *Rosner*, 2008 WL 5416380, at *10; *accord Heinert*, 410 F. Supp. 3d at 549–50 ("It is well settled in the Second Circuit that a bank's negligent failure to identify warning signs of fraudulent activity, such as atypical transactions—even where such signs converge to form a veritable 'forest of red flags'—is insufficient to impute actual knowledge of ongoing fraud.") (collecting cases).

Applying this standard, plaintiffs have not satisfied their heavy burden to plead actual knowledge.  Plaintiffs do not allege any contact or communication between BNY Mellon and any other defendant or participant in the OneCoin fraud.  Plaintiffs allege in wholly conclusory fashion that BNY Mellon "knowingly participated" in and "knowingly enabled" the

scheme.  (Compl. ¶¶ 63, 226.)  But conclusory allegations of actual knowledge cannot state a

claim for aiding and abetting fraud.  *Rosner*, 349 F. App'x at 639.

        Plaintiffs also allege—again in conclusory fashion—that BNY Mellon "turn[ed] a

blind eye to clear red flags" and "blindly process[ed] transactions with clear hallmarks of money

laundering."  (Compl. ¶¶ 9, 63.)  Even if the SAC did contain well-pleaded facts showing that

BNY Mellon ignored "clear red flags" (it does not), such allegations *still* would be insufficient to

demonstrate actual knowledge—rather than constructive knowledge—of the underlying fraud.

In *Rosner*, for example, plaintiffs alleged that a fraudster frequently used Bank of China accounts

to withdraw large sums of cash, convert funds between currencies, and process "atypical and

non-routine" cross-border transactions on a near daily basis.  2008 WL 5416380, at *6.  Judge

Marrero dismissed plaintiffs' aiding-and-abetting fraud claim against Bank of China because, "at

most," the allegations suggested that the bank had constructive knowledge—not actual

knowledge—of the underlying fraud.  *Id.*; *accord Lerner*, 459 F.3d at 292–94 (finding that

bank's knowledge of "red flags"—including that its customer repeatedly transferred funds from

his fiduciary accounts to his own personal accounts—did not give bank actual knowledge that

customer was engaged in fraud).

        If anything, the allegations in the SAC demonstrate that BNY Mellon lacked

actual knowledge of the OneCoin fraud because the Scott Group defendants actively hid their

fraud from the bank to circumvent its AML protocols.  With respect to the one transfer identified

in the SAC (Compl. ¶¶ 184–85), plaintiffs explicitly allege that defendant Scott "disguised [the

transfer] as a loan *so the banks and financial institutions would authorize the transfer*."  (*Id.*

(emphasis added).)  Thus, by plaintiffs' own allegations, BNY Mellon was duped by an

institutional client (DMS Bank), at the direction of Scott, a former partner at a well-respected

international law firm.  That the alleged fraudsters here "disguised" their fraud from BNY Mellon strongly undercuts any allegation that BNY Mellon had "actual knowledge" of the fraud.

Plaintiffs also provide no explanation for *why* BNY Mellon would devote time and resources to investigating OneCoin-related transfers, determine that OneCoin was a Ponzi scheme, and then knowingly facilitate additional OneCoin transfers.  Unlike the Scott Group defendants, who allegedly received $60 million for their role in the fraud (Compl. ¶ 8), plaintiffs do not allege that BNY Mellon received anything for its alleged role.  Plaintiffs' failure to allege any motive is also fatal to their aiding-and-abetting claim.  *See Rosner*, 2008 WL 5416380, at *12 (actual knowledge not pleaded adequately when plaintiff "fails to allege any motive that would result in concrete benefits to [the bank] as a result of the [underlying] fraud").

Nor can plaintiffs fall back on BNY Mellon's routine AML protocols to plead actual knowledge.  (*See* Compl. ¶¶ 186-88.)  These allegations cannot demonstrate BNY Mellon's actual knowledge of the underlying fraud for at least two reasons:

*First*, even if BNY Mellon found certain OneCoin-related transfers "concerning" and chose to investigate them as part of its AML efforts, this would not show "actual knowledge" of the underlying OneCoin scheme.  *See Ryan* v. *Hunton & Williams*, 2000 WL 1375265, at *9 (E.D.N.Y. Sept. 20, 2000) (bank's suspicions of fraud resulting in investigation and termination of accounts amounted only to "suspicions—not actual knowledge—of fraudulent activity"); *Rosner*, 349 F. App'x at 638–39 (finding that even if bank "had reason to suspect that [fraudster] was laundering money," that was insufficient to demonstrate the bank's actual knowledge of the underlying fraudulent scheme).  Courts routinely dismiss similar claims where banks are allegedly aware of far greater indicia of fraud.  *See, e.g.*, *de Abreu*, 812 F. Supp. 2d at 328 (actual knowledge of Ponzi scheme not pleaded adequately even though bank received

15

subpoenas from Manhattan District Attorney requesting records relating to key traders' accounts); *In re Agape Litig.*, 773 F. Supp. at 320–21 (actual knowledge of fraud not pleaded adequately even though investor furnished evidence of fraud to bank's vice president); *Yao-Yi* v. *Wilmington Trust Co.*, 301 F. Supp. 3d 403, 420 (W.D.N.Y. 2017) (actual knowledge of fraud not pleaded adequately despite allegations that bank's managers had a close professional relationship with fraudsters, and that bank was aware that a high volume of "atypical money transfers" was occurring between investor accounts); *Heinert*, 410 F. Supp. 3d at 549–50 (actual knowledge of Ponzi scheme not pleaded adequately even where plaintiffs "clearly establish[ed] that [bank's manager] performed a series of atypical activities, willfully misrepresented the [fraudsters'] account balances to American Express, and demanded a loan from the [fraudsters]"); *cf. Vasquez*, 2019 WL 2327810, at *17 (actual knowledge pleaded adequately where bank conducted independent investigation and issued written report concluding that transfer was part of Ponzi scheme but subsequently allowed $30 million in additional transfers involving same entity).

        *Second*, even if these allegations were sufficient to demonstrate BNY Mellon's actual knowledge of the OneCoin scheme (they are not), the SAC does not allege that BNY Mellon discovered the scheme until December 2016, at the earliest.  (*See* Compl. ¶ 186.)[10]  But there are no well-pleaded facts showing that BNY Mellon continued to facilitate OneCoin-related transfers after that time—or, indeed, at any time after July or August 2016.  (*See* Compl. ¶¶ 184–86.)  To the contrary, plaintiffs allege that BNY Mellon flagged suspicious transfers,

---

[10]    Plaintiffs allege that BNY Mellon conducted an "internal investigation" based on "internet research" and determined in December 2016 that certain OneCoin-related transfers were related to a Ponzi scheme. According to testimony from the *Scott* trial, however, that investigation *began* in December 2016 and was not concluded until *March 2017*, at which time BNY Mellon determined that it would not execute future transactions involving the parties in the suspicious wires.  *See supra* at 8–10.

investigated the transfers, determined the transfers were problematic, and then took steps to

prevent further transfers. *Supra* at 8–10. These allegations reflect BNY Mellon's robust AML

protocols, not the bank's complicity in a global Ponzi scheme. *Compare Vasquez*, 2019 WL

2327810, at \*17 (finding actual knowledge prong satisfied where bank continued to allow dozens

of large transfers to an entity *after* the bank had concluded independently that the entity was

operating a Ponzi scheme).[11]

      B.    <u>The SAC Fails to Allege a Strong Inference That BNY Mellon "Substantially Assisted" the OneCoin Fraud</u>

        The aiding-and-abetting claim must also be dismissed because BNY Mellon's

alleged provision of banking services to the Scott Group defendants does not qualify as

providing "substantial assistance to advance the fraud's commission." To plead "substantial

assistance," a plaintiff must show that "(1) a defendant affirmatively assists, helps conceal, or by

virtue of failing to act when required to do so enables the fraud to proceed; and (2) the actions of

the aider/abettor proximately caused the harm on which the primary liability is predicated."

*Rosner*, 2008 WL 5416380, at \*5 (quotation marks omitted). "Inaction on the part of the alleged

aider and abettor 'ordinarily should not be treated as substantial assistance, except when it was

designed intentionally to aid the primary fraud or it was in conscious and reckless violation of a

duty to act.'" *Id.* (quoting *Armstrong* v. *McAlpin*, 699 F.2d 79, 91 (2d Cir. 1983)).

        Plaintiffs allege that BNY Mellon "permit[ed] the Scott Group to effect

[OneCoin] transactions" which "proximately caused the Class financial injuries." (Compl.

¶ 227.) But substantially identical allegations—accusing banks of enabling a fraudulent scheme

---

[11]    Even if plaintiffs alleged that BNY Mellon had actual knowledge of the fraud in December 2016 and continued to facilitate the fraud after that point, the SAC *still* could not support a claim that BNY Mellon aided and abetted any fraud that affected lead plaintiffs because their last transactions in OneCoin occurred several months earlier—in August 2016. (Compl. ¶¶ 17–20.)

through the provision of banking services—are routinely rejected by courts in this circuit.  Judge

Engelmayer's recent decision in *Vasquez* is instructive.  There, plaintiffs alleged that perpetrators

of a Ponzi scheme directed the scheme's proceeds through a New York-based correspondent

bank.  2019 WL 2327810, at *1.  After conducting an independent review of the transfers, the

correspondent bank issued a report concluding that it "reasonably appeared" that the entity

initiating the transfers "was in fact a Ponzi scheme."  *Id.* at *17.  Even after issuing the report,

the correspondent bank allegedly continued to facilitate the transfer of more than $30 million of

illicit proceeds until the Ponzi scheme was shut down.  *Id.* at *1.  Even in these circumstances,

Judge Engelmayer dismissed the aiding-and-abetting claims because plaintiffs failed "by a good

margin" to plead "substantial assistance."  *Id.* at *18.  The court explained:

> As alleged, [the correspondent bank] merely received transfers from plaintiffs'
> bank(s) and relayed them to [the fraudster's] accounts at HSBC Hong Kong.  The
> [complaint] does not allege that [the correspondent bank] maintained HSBC Hong
> Kong's only correspondent account, or that the use of a correspondent account was
> necessary to these transfers. . . . [A]lthough the actions of the correspondent bank
> may have "made it easier for [the fraudster] to effectuate the scheme, these
> conventional banking transactions were not the proximate cause of the Plaintiffs'
> damages and therefore do not constitute substantial assistance."

*Id.* at *19 (quoting *In re Agape*, 773 F. Supp. 2d at 325).

Here, as in *Vasquez*, plaintiffs have not alleged that BNY Mellon was the only

correspondent bank used to facilitate the fraud.  To the contrary, plaintiffs allege that BNY

Mellon was only one of several "financial institutions though which Scott and Huesmann

knowingly directed their money laundering efforts."  (Compl. ¶ 175.)  Nor have plaintiffs alleged

that "the use of a correspondent account was necessary to make these transfers."  *Vasquez*, 2019

WL 2327810, at *19.  In any event, *Vasquez* makes clear that even if plaintiffs alleged that BNY

Mellon had actual knowledge of the OneCoin fraud (they do not), and even if plaintiffs alleged

that BNY Mellon continued to facilitate OneCoin transfers after acquiring knowledge of the

fraud (they do not), such conduct *still* would not constitute substantial assistance of the underlying fraud.  Courts routinely dismiss substantially similar claims against bank defendants. *See, e.g.*, *Rosner*, 2008 WL 5416380, at *12–13 (finding no substantial assistance where bank allegedly allowed fraudsters "to create accounts, transfer funds among accounts, and make withdrawals from accounts," even where transactions allegedly were "atypical and non-routine").[12]

Plaintiffs also cannot show that BNY Mellon's conduct proximately caused lead plaintiffs' harm, which is also fatal to their claim.  The only OneCoin transfer identified in the SAC that was "conducted through . . . BNY Mellon" "occur[ed] in August 2016" (Compl. ¶¶ 185–86), at the very end of lead plaintiffs' OneCoin investment period.  (*See* Compl. ¶¶ 17, 19 (alleging that lead plaintiffs invested in OneCoin between August 2015 and August 2016).) Plaintiffs do not allege that BNY Mellon facilitated the transfer of *any* funds traceable to lead plaintiffs' own OneCoin investments.  This severs any causal connection between BNY Mellon's alleged conduct and lead plaintiffs' alleged harm.  *See Heinert*, 410 F. Supp. 3d at 552 (substantial assistance not pleaded adequately where "plaintiffs do not allege any causal connection between" bank's conduct "and the harm to investors").

Finally, to the extent plaintiffs allege that BNY Mellon proximately caused their

---

[12]   *See also Heinert*, 410 F. Supp. 3d at 552 (allegations that "defendant banks 'assisted' the individual defendants by providing banking services, including making wire transfers, opening accounts, and clearing account holds . . . even where they are performed with 'atypical' frequency, are insufficient to support an aiding and abetting claim"); *Rizer* v. *Breen*, 2007 WL 4378149, at *7 (N.Y. Sup. Ct. Jan. 29, 2007) (when a bank processes withdrawals, transfers, and deposits, accepts, processes and/or cashes checks, "[s]uch acts do not constitute substantial assistance."); *Cromer Fin. Ltd.* v. *Berger*, 137 F. Supp. 2d 452, 472 (S.D.N.Y. 2001) ("While the Ponzi scheme may only have been possible because of [the bank's] actions, or inaction, [the bank's] conduct was not a proximate cause of the Ponzi scheme."); *Ryan*, 2000 WL 1375265, at *9 ("The affirmative acts of opening the accounts, approving various transfers, and then closing the accounts on the basis of suspected fraud, without more, do not constitute substantial assistance."); *Nigerian Nat'l Petroleum*, 1999 WL 558141, at *8 (finding no substantial assistance by defendant bank where it executed repeated wire transfers for millions of dollars); *Williams* v. *Bank Leumi Trust Co.*, 1997 WL 289865, at *5 (S.D.N.Y. May 30, 1997) ("[T]he mere fact that all the participants in the alleged scheme used accounts at Bank Leumi to perpetrate it, without more, does not rise to the level of substantial assistance necessary to state a claim for aiding and abetting liability.").

injuries by failing to adequately investigate, those allegations fail for several reasons:

   *First*, as a factual matter, the testimony from defendant Scott's criminal trial (on which the SAC relies) demonstrates that BNY Mellon's months-long investigation of OneCoin-related transfers was robust and led the bank to take several affirmative steps to prevent future transactions involving the parties involved in the transfers.  *See supra* at 8–10.

   *Second*, to the extent plaintiffs' vague reference to a SAR suggests that BNY Mellon took too long to issue a SAR in violation of the Bank Secrecy Act, 31 U.S.C. §§ 5311–32, such a claim would fail because the Bank Secrecy Act (which is not mentioned in the SAC) does not create a private right of action.  *See Lundstedt* v. *Deutsche Bank Nat'l Tr. Co.*, 2016 WL 3101999, at *5 (D. Conn. June 2, 2016).[13]

   *Third*, even if plaintiffs did adequately allege that BNY Mellon violated some governing rule or policy, the claim *still* would fail because "fail[ure] to comply with domestic and international bank secrecy, know-your-customer, and anti-money laundering laws, decrees, and regulations" does not constitute substantial assistance.  *Rosner*, 2008 WL 5416380, at *14; *see In re Agape*, 773 F. Supp. 2d at 325 ("[A] violation of an organization's internal policy with respect to financial transactions does not in and of itself constitute substantial assistance.") (quotation marks omitted); *Cromer Finance*, 137 F. Supp. 2d at 471–72 (failure to enforce regulations of the Federal Reserve Bank and New York Stock Exchange do not constitute substantial assistance).

   For these reasons, the aiding-and-abetting claim against BNY Mellon should be dismissed.

---

[13]   Plaintiffs allege that BNY Mellon issued a SAR in February 2017, two months after BNY Mellon supposedly concluded a December 2016 "internal investigation" into suspicious OneCoin-related transfers.  (Compl. ¶ 186.) But as explained *supra* at n.10, this investigation was actually concluded in March 2017.

## IV.   <u>Plaintiffs Fail to State a Claim for Commercial Bad Faith</u>

Liability for commercial bad faith arises when a "bank acts dishonestly—where it has actual knowledge of facts and circumstances that amount to bad faith, thus itself becoming a participant in the fraudulent scheme."  *Ryan*, 2000 WL 1375265, at *10 (quoting *Prudential– Bache Sec., Inc.* v. *Citibank, N.A.*, 73 N.Y.2d 263, 275 (1989)).  To state a claim for commercial bad faith, plaintiffs must allege—subject to the heightened standard of Rule 9(b)—"(1) a scheme or acts of wrongdoing; together with either: (2) allegations of the bank's actual knowledge of the scheme or wrongdoing that amounts to bad faith; or (3) allegations of complicity by bank principals in alleged confederation with the wrongdoers."  *Rosner*, 2008 WL 5416380, at *15 (quotation marks omitted).  Commercial bad faith claims are frequently brought in tandem with aiding-and-abetting fraud claims and dismissed on the same grounds.  *See, e.g.*, *Rosner*, 349 F. App'x at 640 ("Because a 'commercial bad faith' claim under New York law likewise requires a plaintiff to show actual knowledge of the fraudulent scheme, the district court properly dismissed that claim as well.") (citation omitted); *Ryan*, 2000 WL 1375265, at *10 (same).

The SAC does not plead either actual knowledge or complicity by bank principals:

Regarding the "actual knowledge" requirement, the commercial bad faith claim is based on precisely the same conduct as the aiding-and-abetting claim (*see* Compl. ¶ 279), and thus fails for the same reasons addressed *supra* at 13–17.  *See also Rosner*, 349 F. App'x at 640; *Nigerian Nat. Petroleum Corp.*, 1999 WL 558141, at *8 (dismissing commercial bad faith claim where bank allegedly failed to investigate "red flags" and approved additional transactions even after being alerted to potential fraud).

Regarding the required element of complicity by bank principals, the SAC contains *no allegations*—even conclusory ones—describing "complicity" in the OneCoin

21

scheme by any "bank principal."  As addressed *supra* at 12, the SAC does not even name a

single BNY Mellon employee, much less one working "in confederation with the wrongdoers."

*See Retail Shoe Health Comm'n* v. *Mfrs. Hanover Tr. Co.*, 558 N.Y.S.2d 949, 951 (N.Y. App.

Div. 1990) (requiring that plaintiff plead "facts inculpating the principals of the bank as actual

participants in unlawful activity").

       For these reasons, the commercial bad faith claim against BNY Mellon should be

dismissed.

**CONCLUSION**

       For these reasons, BNY Mellon respectfully submits that the claims asserted

against BNY Mellon should be dismissed with prejudice.

Dated: New York, New York
      December 21, 2020

                       **PAUL, WEISS, RIFKIND, WHARTON &**
                       **GARRISON LLP**

                       By:   */s/ Audra J. Soloway*
                           Audra J. Soloway
                           Elizabeth M. Sacksteder

                           Daniel S. Sinnreich
                       1285 Avenue of the Americas
                       New York, New York 10019-6064
                       Tel:  (212) 373-3000
                       asoloway@paulweiss.com
                       esacksteder@paulweiss.com
                       dsinnreich@paulweiss.com

                       *Counsel for Defendant The Bank of New York*
                       *Mellon*