UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

```
USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED:  9/20/21
```

-------------------------------------------------------X

DONALD BERDEAUX and CHRISTINE        :
GRABLIS, Individually and on Behalf of All   :
Others Similarly Situated,            :
                                      :
                         Plaintiffs,  :        19-CV-4074 (VEC)
                                      :
          -against-                   :        OPINION AND ORDER
                                      :
ONECOIN LTD.; RUJA IGNATOVA;          :
SEBASTIAN GREENWOOD; MARK SCOTT;      :
DAVID PIKE; NICOLE J. HUESMANN;       :
GILBERT ARMENTA; and THE BANK OF      :
NEW YORK MELLON CORPORATION,          :
                                      :
                         Defendants.  :
-------------------------------------------------------X

VALERIE CAPRONI, United States District Judge:

        Since the rapid ascension of Bitcoin in the early 2010s, each month seems to bring with it

the emergence of a new cryptocurrency that captures the attention of investors across the world.

Touted for benefits including decentralization, technological advancement, and security,

cryptocurrencies also carry with them risk — and not just in the sense of frequent and significant

fluctuations of value inherent in many financial products.  As a new and ever-developing

concept, and with new cryptocurrencies popping up like dandelions, cryptocurrencies have

evaded significant regulation, raising the risk for fraud and other misconduct.  So it is with

OneCoin, the alleged Ponzi scheme that masqueraded as a cryptocurrency that is at the heart of

this case.  On these motions, however, the central fraud takes a back seat to the conduct of

several individual Defendants and a New York bank, whose assistance allegedly helped the

primary perpetrators of the OneCoin fraud profit from the scheme.

Named Plaintiffs ("Plaintiffs") invested in OneCoin offerings and report having suffered losses from their investments totaling in the hundreds of thousands of dollars.[1] They seek to represent a class of investors consisting of all individuals who invested in a OneCoin offering between April 2014 and March 2018 and who suffered financial losses. Plaintiffs' Second Amended Complaint ("SAC") asserts eleven claims against eight defendants, whom Plaintiffs silo into smaller groups. *See generally* SAC, Dkt. 125. The "OneCoin Defendants" comprise the corporate entity, OneCoin Ltd., and OneCoin's founders, Ruja Ignatova and Sebastian Greenwood, whom Plaintiffs label the "Founder Defendants." Against the OneCoin Defendants, Plaintiffs assert claims arising under the federal securities laws, common law claims for fraud, fraudulent misrepresentation, negligent misrepresentation, conversion, and civil conspiracy, and breach of contract claims. *See id.* at 1–2. The "Scott Group Defendants" comprise Mark Scott, David Pike, Nicole Huesmann, and Gilbert Armenta, against whom Plaintiffs assert claims for aiding and abetting fraud, unjust enrichment, and civil conspiracy.[2] *See id.* Finally, Plaintiffs sue The Bank of New York Mellon Corporation ("BNYM") for aiding and abetting fraud and commercial bad faith.[3] *See id.*

---

[1]   OneCoin offered investors "trader/membership packages," which provided them with access to "educational materials" and "tokens." *See* Second Amended Compl. ¶¶ 1, 107, Dkt. 125. Investors could use the tokens to purportedly "mine" for OneCoins, the supposed cryptocurrency; tokens were also marketed as being exchangeable for OneCoins once the cryptocurrency was listed on a public exchange. *Id.* ¶ 108. Plaintiffs refer to OneCoin's offerings collectively as the "OC Investment Program." *Id.* ¶ 1 n.1. The Court will use the phrase "OneCoin offering" to refer to membership packages, tokens, and OneCoins themselves.

[2]   Gilbert Armenta has defaulted and thus has not moved to dismiss Plaintiffs' complaint. *See* Dkt. 201 (Clerk's Certificate of Default as to Gilbert Armenta). Consistent with the parties' usage, the Court will continue to use the phrase Scott Group Defendants here; for purposes of this Opinion, however, when discussing the parties' motions, "Scott Group Defendants" refers only to Defendants Scott, Pike, and Huesmann, not Armenta.

[3]   Plaintiffs' complaint contradicts itself as to whether Plaintiffs are asserting a claim for civil conspiracy against BNYM. *Compare* SAC at 1 (listing civil conspiracy claim as against "the OneCoin Defendants and the Scott Group Defendants"), *with id.* at 59 (listing "Count X – Civil Conspiracy" as against "All Defendants"). Because the complaint includes a description of the alleged conduct supporting a civil conspiracy claim against each Defendant other than BNYM, and because the parties' briefing proceeded on the premise that the only claims asserted against BNYM are aiding and abetting fraud and commercial bad faith, the Court will consider Plaintiffs' civil conspiracy claim not to have been asserted against BNYM.

While Plaintiffs accuse the OneCoin Defendants of carrying out the fraudulent cryptocurrency scheme, Plaintiffs seek to hold the Scott Group Defendants liable for allegedly assisting the fraud by laundering millions of dollars of fraudulently obtained funds.  Similarly, Plaintiffs sue BNYM for allegedly facilitating the Scott Group Defendants' money laundering.

Defendants Scott, Pike, and Huesmann each moved to dismiss the complaint for lack of personal jurisdiction, pursuant to Federal Rule of Civil Procedure 12(b)(2), and for failure to state a claim, pursuant to Rule 12(b)(6).  *See* Notices of Mot., Dkts. 152, 155, 160.  BNYM has moved to dismiss the complaint against it for failure to state a claim pursuant to Rule 12(b)(6).  *See* Notice of Mot., Dkt. 157.  For the following reasons, the motions to dismiss are GRANTED.

## BACKGROUND[4]

OneCoin Ltd., a foreign corporation headquartered in Dubai, with offices in Bulgaria, the United Arab Emirates, and Hong Kong, was founded in 2014 by Defendants Ruja Ignatova and Sebastian Greenwood.  SAC ¶¶ 21–23, 99.  Investors in OneCoin received packages of "educational materials" that provided access to tokens, which investors could purportedly use to mine for OneCoins, the actual cryptocurrency.  *Id.* ¶¶ 24, 101, 107–108, 111.  OneCoin operated pursuant to a multi-level marketing scheme, in which members were paid commissions for recruiting others to invest in OneCoin offerings.  *Id.* ¶¶ 25, 125–127, 136.  Between 2014 and 2016, OneCoin's referral program and recruitment efforts led OneCoin to experience immense success, generating more than €3.3 billion in sales revenue and €2.2 billion in profits.  *Id.* ¶ 25.

Sebastian Greenwood oversaw OneCoin's marketing efforts.  *See id.* ¶¶ 33, 36–38, 41.  One of Greenwood's primary deputies was Simon Le, a California domiciliary living in either

---

[4]     The facts are based on the allegations contained in the SAC, unless otherwise stated.  For purposes of Defendants' motions, the Court accepts all well-pled, non-conclusory factual allegations in the pleadings as true and draws all reasonable inferences in the light most favorable to Plaintiff.  *Gibbons v. Malone*, 703 F.3d 595, 599 (2d Cir. 2013); *A.I. Trade Fin., Inc. v. Petra Bank*, 989 F.2d 76, 79–80 (2d Cir. 1993).

Vietnam or Dubai, who actively promoted OneCoin to investors, including to some in New York City.  *Id.* ¶¶ 41, 76, 148.

Plaintiffs allege that, despite appearances to the contrary, OneCoin has never been a true cryptocurrency — or even a cryptocurrency at all.  Instead, OneCoin has at all times been a multi-level marketing scheme promoting and selling a fake cryptocurrency under the name OneCoin.  According to Plaintiffs, OneCoin was "nothing more than an old-fashioned Ponzi scheme cloaked in a thin façade of new technology," in which investment returns paid out to investors were not generated based on the rising valuation of the OneCoin cryptocurrency but by redirecting incoming investments from new investors.  *Id.* ¶¶ 3–4, 102–103, 153–154, 156.  The "educational materials" investors obtained were plagiarized from free internet sources including Wikipedia.  *Id.* ¶ 109.  The OneCoin currency never traded on an actual exchange or blockchain; instead, OneCoin manipulated an internal "exchange" by setting prices and artificially manufacturing volatility.  *Id.* ¶¶ 104–105, 123.  Similarly, no mining of OneCoins ever occurred; OneCoin Defendants instead created new OneCoins at will using "an Excel worksheet masquerading as a blockchain."  *Id.* ¶ 117.[5]

While the OneCoin Defendants were the primary fraudsters, they enlisted the assistance of numerous others to launder the fraudulently-obtained proceeds.[6]  Plaintiffs allege that the

---

[5]     Because the details of the OneCoin scheme are largely irrelevant on these motions, the Court includes only a brief discussion of the alleged primary fraud.

[6]     Gilbert Armenta, the defaulting member of the Scott Group Defendants, is a Florida citizen who helped facilitate the OneCoin scheme by, *inter alia*, opening depository bank accounts in Mexico and South America for OneCoin Ltd.; establishing and administering OneCoin "pool accounts" at international banks; transferring OneCoin funds to pay recruitment commissions to OneCoin members in exchange for recruiting new members; and making misrepresentations to domestic and global banks in order to launder OneCoin fraud proceeds.  SAC ¶¶ 54–56.  As part of his money laundering activities on behalf of OneCoin and its principals, Armenta coordinated wire transfers that passed through correspondent bank accounts in New York.  *Id.* ¶ 159.  Other than the general allegation that "Armenta agreed with others — believed to be the OneCoin and Scott Group Defendants — to engage in . . . money laundering," Plaintiffs do not allege facts showing how Armenta is in any way connected to Scott, Pike, or Huesmann, the other Scott Group Defendants.  *Id.* ¶ 160.

Scott Group Defendants used shell companies and bank accounts all over the world to launder more than $400 million in criminal proceeds derived from the OneCoin fraud, in exchange for which they received more than $60 million.  *See id.* ¶¶ 6–8, 45, 158, 171–72.

The purported leader of the Scott Group was Mark Scott, a Florida lawyer licensed to practice in both Florida and New York.  *See id.* ¶¶ 44–46.  Scott first met Ignatova in September 2015.  *Id.* ¶ 162.  Scott's primary role in the fraud appears to have been creating and operating foreign hedge funds, which were used to launder OneCoin proceeds.  *See id.* ¶ 44.  Assisting Scott in this venture was David Pike, also a resident of Florida.  *Id.* ¶ 49.  Specifically, in February 2016, Scott registered MSS International Consultants Limited ("MSSI") — the sole two directors of which were Scott and Pike — in the British Virgin Islands; Scott and Pike opened numerous investment funds through MSSI to facilitate their money laundering activities. *Id.* ¶ 164.  In particular, they registered funds in the British Virgin Islands, the Cayman Islands, and Ireland (collectively the "Fenero funds").  *Id.* ¶ 164 & n.4.  The Fenero funds received and transmitted by wire hundreds of millions of euros in 2016 and 2017.  Several of the wire transfers involved bank accounts associated with the OneCoin fraud; the wire transfers spanned the globe, involving banks in Singapore, Bulgaria, Germany, and Ireland.  *See id.* ¶¶ 165, 167, 169.  Although Scott originally enlisted a separate company to provide administration services for the Fenero funds, when that company raised questions regarding the origin of certain funds transferred into Fenero bank accounts, Scott terminated the relationship.  *Id.* ¶ 168.  Thereafter, Scott directed banks, including some that transact significant business in the Southern District of New York, to transfer money that was the proceeds of the OneCoin fraud; he structured the transactions in order to evade anti-money laundering ("AML") procedures.  *See id.* ¶¶ 166–168, 170.

Plaintiffs provide detail regarding only one money transfer in which Scott was involved. In July 2016,[7] Scott, on behalf of Ignatova, disguised the transfer of OneCoin fraud proceeds by misrepresenting that the money was the proceeds of a $30 million loan; he did so to evade detection by banks and to convince financial institutions to transfer the funds. *Id.* ¶ 184. The transfer was to be made to an account at DMS Bank, a Cayman bank, but was routed through a BNYM correspondent bank account located in Manhattan.[8] *Id.* ¶ 185. Scott knew of BNYM's involvement in the transfer because he forwarded himself an email containing the incoming wire instructions for the transfer. *Id.* Plaintiffs allege generally that, in addition to the July 2016 transaction, Scott and co-Defendant Huesmann "knowingly directed their money laundering efforts [through] Defendant BNY[M]." *Id.* ¶ 175.

Nicole Huesmann is a Florida lawyer who, under the guise of providing routine legal services, allegedly assisted Scott launder the fraud proceeds. *Id.* ¶ 52. Plaintiffs allege that Huesmann participated in deals structured to launder funds between OneCoin-controlled entities, and she facilitated Scott's investment of laundered proceeds in real estate and luxury items. *See id.* ¶ 53. By repatriating funds fraudulently obtained as part of the OneCoin scheme, Huesmann helped Scott use fraud proceeds to acquire, *inter alia*, three Massachusetts homes, a yacht, and multiple luxury cars. *See id.* ¶¶ 171, 174, 176–178.

---

[7]     Plaintiffs' complaint contradicts itself regarding the timing of the transaction; it alleges it to have occurred in July 2016 in one paragraph and in August 2016 in a subsequent paragraph. *Compare* SAC ¶ 184, *with id.* ¶ 186. The Court will refer to the transaction as having occurred in July 2016. For purposes of these motions it does not matter which date is correct, but Plaintiffs' counsel is cautioned to be more attentive to details in documents filed with the Court.

[8]     "A correspondent bank account is a domestic bank account held by a foreign bank, similar to a personal checking account used for deposits, payments and transfers of funds. Correspondent accounts facilitate the flow of money worldwide, often for transactions that otherwise have no other connection to New York, or indeed the United States." *Licci ex rel Licci v. Lebanese Canadian Bank, SAL*, 732 F.3d 161, 165 n.3 (2d Cir. 2013) (*Licci IV*) (cleaned up).

According to the complaint, BNYM, a bank headquartered in New York, assisted the Scott Group Defendants and others to launder hundreds of millions of dollars of proceeds from the OneCoin fraud. *See id.* ¶ 9. Plaintiffs allege that, between 2015 and 2017, hundreds of transactions — including the $30 million transfer overseen by Scott in July 2016 — involving at least $300 million in funds fraudulently obtained from OneCoin investors, were processed through BNYM's correspondent bank accounts. *See id.* ¶¶ 9, 63, 185, 226.

In December 2016, BNYM's compliance team conducted an internal investigation into the July 2016 transfer (and perhaps additional transfers involving OneCoin-affiliated entities); the investigation consisted of "internet research" into a OneCoin shell company, International Marketing Services Pte Ltd. ("IMS"). *See id.* ¶¶ 9, 63. As a result of the investigation, BNYM concluded that IMS was involved with OneCoin and that OneCoin "appears to be operating a pyramid/Ponzi scheme." *Id.* at 9. BNYM did not submit a Suspicious Activity Report ("SAR") until February 2017; in the SAR, BNYM reported that Fenero "received wires from shell entities associated with OneCoin" and that the entities involved in the transfer or transfers appeared to be engaged in "layering."[9] *Id.* ¶ 186. BNYM also prepared a separate SAR[10] detailing 275 suspicious wire transfers totaling over $220 million in funds that had been filtered through BNYM correspondent accounts by OneCoin-affiliated entities. *Id.* ¶ 187. Following its investigation, BNYM imposed a filter to flag future transactions involving IMS. *Id.* ¶ 188.

By late 2017, the jig was up for OneCoin. Regulatory and law enforcement authorities in numerous countries had either barred OneCoin from offering its investments in their jurisdiction

---

[9]     "Layering" occurs when the transferor attempts to disguise the source of illegal funds by routing the funds through multiple transactions. SAC ¶ 186.

[10]     The Complaint alleges that BNYM prepared a separate "incident report." SAC ¶ 187. The Court presumes the Plaintiffs mean it filed an additional SAR.

or warned residents that OneCoin was a scam that should be avoided. *Id.* ¶ 194. Similarly, since 2017, many of the individual Defendants have been criminally prosecuted in this district. *Id.* ¶ 195 (noting that Konstantin Ignatov and Armenta have both pled guilty, Greenwood is awaiting trial, and Ignatova is a fugitive). Mark Scott was arrested, tried, and, in November 2019, found guilty of conspiracy to commit money laundering and conspiracy to commit bank fraud. *Id.* ¶ 47. In February 2020, David Pike was indicted on charges of conspiracy to commit bank fraud. *Id.* ¶ 51. According to Pike's indictment, in or around June 2016, a co-conspirator, whom Defendants allege on information and belief to be another member of the Scott Group Defendants, misrepresented material facts to an FDIC-insured bank in this district, causing the bank to transfer approximately $5 million into an investment fund purportedly operated by Pike. *Id.* ¶ 183.

      Plaintiffs commenced this action in May 2019. *See* Compl., Dkt. 1. Since then, Plaintiffs have twice amended their complaint, dismissing two defendants and adding BNYM. *See* SAC.[11] The Scott Group Defendants and BNYM, the only non-defaulting Defendants remaining in the case, moved to dismiss on December 21, 2020. *See* Notices of Mot., Dkts. 152, 155, 157, 160.

## DISCUSSION

### I.  Scott Group Defendants' Motions to Dismiss

      The Scott Group Defendants, all Florida domiciliaries who were served in Florida, assert that this Court does not have personal jurisdiction over them. Even if the Court finds that they are subject to jurisdiction in New York, they argue that Plaintiffs have failed to state causes of action for aiding and abetting fraud, unjust enrichment, and civil conspiracy, warranting

---

[11]     Plaintiffs voluntarily dismissed Irene Andreeva Dilinska and Sebastian Greenwood in February 2020 after failing to serve them. *See* Dkt. 90. Konstantin Ignatov was dismissed in August 2020 after agreeing to cooperate with Plaintiffs in their prosecution of this case. *See* Dkt. 118. Defendants Ignatova, OneCoin Ltd., and Armenta have defaulted. *See* Dkts. 199, 200, 201, 209.

dismissal of those claims pursuant to Rule 12(b)(6).  Because the Court finds that Plaintiffs have

failed to demonstrate that it has personal jurisdiction over any of the Scott Group Defendants,

Plaintiffs' complaint is dismissed as to Defendants Scott, Pike, and Huesmann, and the Court

need not reach the issue of whether Plaintiffs' complaint adequately alleges claims for relief.[12]

### A.  Legal Standard on a Rule 12(b)(2) Motion

In opposing a motion to dismiss for lack of personal jurisdiction made pursuant to

Federal Rule of Civil Procedure 12(b)(2), the plaintiff bears the burden of demonstrating that the

court has jurisdiction over the defendant.  *Best Van Lines, Inc. v. Walker*, 490 F.3d 239, 242 (2d

Cir. 2007).  To the extent there has not yet been a "full-blown evidentiary hearing," a plaintiff

"need only make a prima facie showing of personal jurisdiction over the defendant."  *Porina v.*

*Marward Shipping Co.*, 521 F.3d 122, 126 (2d Cir. 2008) (cleaned up); *Marine Midland Bank,*

*N.A. v. Miller*, 664 F.2d 899, 904 (2d Cir. 1981).  Although a plaintiff must eventually establish

personal jurisdiction by a preponderance of the evidence, when addressing the issue based on

pleadings and affidavits, the Court must accept the allegations in the plaintiff's complaint and

affidavits as true, and all doubts must be resolved in the plaintiff's favor, notwithstanding any

controverting presentation by the moving party.  *A.I. Trade Fin., Inc. v. Petra Bank*, 989 F.2d 76,

79–80 (2d Cir. 1993).  A plaintiff, however, "must make allegations establishing jurisdiction

with some 'factual specificity' and cannot establish jurisdiction through conclusory assertions

alone."  *Cont'l Indus. Grp. v. Equate Petrochemical Co.*, 586 F. App'x 768, 769 (2d Cir. 2014)

(quoting *Jazini v. Nissan Motor Co.*, 148 F.3d 181, 185 (2d Cir. 1998)); *see also Penguin Grp.*

---

[12]      *See Arrowsmith v. United Press Int'l*, 320 F.2d 219, 221 (2d Cir. 1963) ("[L]ogic compel[s] initial
consideration of the issue of jurisdiction over the defendant—a court without such jurisdiction lacks power to
dismiss a complaint for failure to state a claim."); *Ainette v. Market Basket Inc.*, No. 19-CV-4506, 2021 WL
3371037, at *4 (S.D.N.Y. Aug. 2, 2021) ("When faced with a motion to dismiss brought under [Rule 12(b)(2)], as
well as on substantive grounds, the Court must consider the question of personal jurisdictional first, before
considering arguments regarding the merits of the case.").

*(USA) Inc. v. Am. Buddha*, 609 F.3d 30, 34–35 (2d Cir. 2010) (stating that a prima facie showing of jurisdiction "entails making legally sufficient allegations of jurisdiction, including an averment of facts that, if credited, would suffice to establish jurisdiction over the defendant." (cleaned up)).

A plaintiff must carry his burden with respect to each defendant individually.  *See In re Aegean Marine Petroleum Network, Inc. Sec. Litig.*, No. 18-CV-4993, 2021 WL 1178216, at *12 (S.D.N.Y. Mar. 29, 2021) ("To allege personal jurisdiction over a defendant, group pleading is not permitted.  Instead, the plaintiff is required to establish personal jurisdiction separately over each defendant."); *King County, Wash. v. IKB Deutsche Industriebank AG*, 769 F. Supp. 2d 309, 313 (S.D.N.Y. 2011) ("A plaintiff bears the burden of demonstrating that the court may exercise jurisdiction over each defendant.").  When personal jurisdiction is predicated on specific jurisdiction, a plaintiff must establish a prima facie case of jurisdiction as to each claim. *Ainbinder v. Potter*, 282 F. Supp. 2d 180, 184 (S.D.N.Y. 2003) ("Because this is a matter of specific jurisdiction, each cause of action must be analyzed separately."); *see also Sunward Elecs., Inc. v. McDonald*, 362 F.3d 17, 24 (2d Cir. 2004) ("A plaintiff must establish the court's jurisdiction with respect to *each* claim asserted.") (emphasis original).

In evaluating a motion to dismiss made by a non-domiciliary defendant for lack of personal jurisdiction when the claims arise under state law,[13] district courts must first look to the state's long-arm statute.  *Whitaker v. Am. Telecasting, Inc.*, 261 F.3d 196, 208 (2d Cir. 2001) (citation omitted).  If the exercise of jurisdiction is appropriate under the long-arm statute, then

---

[13]     In their complaint, Plaintiffs expressly invoke both 28 U.S.C. § 1332 and § 1367 as the basis for subject-matter jurisdiction.  Regardless of whether the Court invokes diversity jurisdiction or exercises supplemental jurisdiction over Plaintiffs' state law claims against the Scott Group Defendants based on federal question jurisdiction arising from the federal securities claims asserted against the OneCoin Defendants, New York's long-arm statute governs the Court's analysis.  *See Lipson v. Birch*, 46 F. Supp. 3d 206, 216–17 (S.D.N.Y. 2014).

the court must determine whether the exercise of jurisdiction comports with federal due process

requirements — that is, whether "the defendant has certain minimum contacts with the tate such

that the maintenance of the suit does not offend traditional notions of fair play and substantial

justice." *Daimler AG v. Bauman*, 571 U.S. 117, 126 (2014) (cleaned up).[14]

### B. The Court Does Not Have Personal Jurisdiction Over Any of the Defendants in the Scott Group

Defendants Scott, Pike, and Huesmann are all domiciled in Florida. *See* SAC ¶¶ 44, 49,

52. Plaintiffs make no effort to assert that Scott, Pike, or Huesmann is subject to general

jurisdiction in New York because he or she has contacts with New York that are sufficiently

continuous or systematic to render the Defendant essentially at home in New York,

notwithstanding Florida domicile.[15] Accordingly, the Court considers only whether each

Defendant's contacts, assessed individually, subjects him or her to personal jurisdiction in New

York in connection with Plaintiffs' claims.

### 1. Threshold Issues

Several issues warrant discussion before delving into a more detailed analysis of the

purported statutory bases for exercising jurisdiction over the Scott Group Defendants.

---

[14]     "Where the claim arises out of, or relates to, the defendant's contacts with the forum — i.e., specific jurisdiction — minimum contacts exist where the defendant purposefully availed itself of the privilege of doing business in the forum and could foresee being haled into court there." *Bank Brussels Lambert v. Fiddler Gonzalez & Rodriguez*, 305 F.3d 120, 127 (2d Cir. 2002) ("*Bank Brussels II*") (cleaned up). In this context, the plaintiff's claims "must arise out of contacts that the defendant himself creates with the forum"; in other words, the "analysis looks to the defendant's contacts with the forum state itself, not the defendant's contacts with persons who reside there." *Walden v. Fiore*, 571 U.S. 277, 284–85 (2014) (cleaned up).

[15]     The only arguable basis for general jurisdiction would be that Scott is licensed to practice law in New York, but that, standing alone, does not subject him to general jurisdiction in the state. *See Eastboro Found. Charitable Tr. v. Penzer*, 950 F. Supp. 2d 648, 655 (S.D.N.Y. 2013) (collecting cases rejecting argument that holding license to practice law in a state results in automatic consent to general jurisdiction in that state, a position strengthened significantly by Supreme Court's subsequent decision in *Daimler*); *see also Exec. L. Grp., Inc. v. Exec. L. Grp. PL*, No. 13-CV-1823, 2014 WL 12577090, at *6 (C.D. Cal. Mar. 24, 2014) (collecting cases rejecting position that "mere membership in the [state] bar is sufficient to support the exercise of general jurisdiction").

First, Plaintiffs' complaint is riddled with instances of improper group pleading, in which they refer to actions taken by "the Scott Group Defendants," without distinguishing in the least among the four Defendants whom Plaintiffs' have lashed together in their complaint.  *See, e.g.*, SAC ¶¶ 6–8, 63, 159, 171–72, 183, 191, 225.  Similarly, Plaintiffs often attempt to extend an allegation levied against one particular Defendant to the remaining Defendants in the group, seemingly without any basis for doing so, absent speculative and conclusory allegations.  *See, e.g.*, *id.* ¶¶ 44, 160, 175, 179, 183; *see also* Pls. Scott Group Opp. at 6–9, 11, Dkt. 173.  This tactic is plainly impermissible to satisfy Plaintiffs' burden to establish a prima facie case of personal jurisdiction against *each* Defendant as to *each* claim asserted.  *See HSM Holdings, LLC v. Mantu I.M. Mobile Ltd.*, No. 20-CV-967, 2021 WL 918556, at *15 (S.D.N.Y. Mar. 10, 2021) ("In relying only on group pleadings, in which it conflates multiple parties and fails to provide specific allegations, Plaintiff neglects its burden of establishing personal jurisdiction over each defendant.").  Accordingly, the Court is unable to exercise personal jurisdiction over a particular defendant based on allegations that fail to distinguish among the Scott Group Defendants, leaving the Court no basis to discern who did what.  *See In re SSA Bonds Antitrust Litig.*, 420 F. Supp. 3d 219, 233 (S.D.N.Y. 2019) ("Allegations in the form of a group pleading are insufficient. . . .").

Second, the Court must assess personal jurisdiction over the Scott Group Defendants based on the claims of the Named Plaintiffs, not claims of unnamed putative class members. Named Plaintiffs Donald Berdeaux and Christine Grablis are domiciled in Montana and Tennessee, respectively.  SAC ¶¶ 17, 19.  In assessing whether this Court may exercise personal jurisdiction over Defendants, notwithstanding the fact that Named Plaintiffs purport to represent individuals domiciled across the United States, including in New York, *see id.* ¶¶ 1, 83, 127, the Court can consider only the Named Plaintiffs' claims; the unnamed class members, who may or

may not ever become parties to this action, are irrelevant to the question of specific jurisdiction. *Chernus v. Logitech, Inc.*, No. 17-CV-673, 2018 WL 1981481, at *7 (D.N.J. Apr. 27, 2018) (finding that, in the wake of *Bristol-Myers Squibb Co. v. Superior Ct. of Cal.*, 137 S. Ct. 1773 (2017), "cases [have] universally held that in a putative class action[:] (1) courts are only concerned with the jurisdictional obligations of the named plaintiffs; and (2) unnamed class members are irrelevant to the question of specific jurisdiction"); *see also Suarez v. Cal. Nat. Living, Inc.*, No. 17-CV-9847, 2019 WL 1046662, at *6 (S.D.N.Y. Mar. 5, 2019) (stating that "specific jurisdiction in a class action arises from the <u>named</u> plaintiff's causes of action" and declining to consider at the motion to dismiss stage whether the court had personal jurisdiction over the defendant based on potential out-of-state class members' claims) (emphasis original).

> In an action brought as a class action, personal jurisdiction is based on a defendant's contacts with the forum state and actions giving rise to the named plaintiffs' causes of action[, and c]ontacts with unnamed class members may not be used as a jurisdictional basis, especially before a class has been certified.

*Beach v. Citigroup Alt. Invs. LLC*, No. 12-CV-7717, 2014 WL 904650, at *6 (S.D.N.Y. Mar. 7, 2014) (citations omitted)).

Third, Plaintiffs understandably make frequent mention of the criminal indictments, pleas, and convictions involving a majority of the individual Defendants in this action. *See, e.g.*, SAC ¶¶ 42–43, 47–48, 51, 57–60, 195. With respect to the Scott Group Defendants, Plaintiffs assert, often without any factual support or detail, that the criminal cases involve the same allegations as Plaintiffs are asserting against Defendants in this action, suggesting that if it was appropriate to criminally prosecute the Defendant in the Southern District of New York, then it is also appropriate to sue the Defendant civilly in the Southern District of New York.[16] *See id.* ¶¶

---

[16]     Although Plaintiffs could have submitted affidavits and exhibits derived from the criminal actions against Scott, Pike, and others in an effort to make a prima facie showing of jurisdiction over the Scott Group Defendants, Plaintiffs have not submitted a single declaration or document, other than their opposition brief, in response to the

51, 60, 160.  Plaintiffs' argument notwithstanding, they would not be able to rely on a finding

that venue in this district is proper for the criminal cases against Scott, Pike, and others to prove

that the Court has personal jurisdiction over those Defendants in this separate civil action, even if

the underlying facts were identical (which, as noted, Plaintiffs have not adequately alleged).  *See*

*Robinson v. Kathleen B.*, 196 A.D.3d 1074, 1077 (4th Dep't 2021) ("[The defendant's] alleged

appearance in a separate criminal action arising from the same underlying facts is irrelevant to

the existence of personal jurisdiction over her in this [civil] proceeding.").  The Court is unaware

of any authority supporting the proposition that personal jurisdiction may be exercised over a

party in a particular jurisdiction because venue was proper for criminal charges against that

party.[17]  *Id.* (citation omitted).

## 2.  Long-Arm Jurisdiction

Although the Court will assess the Scott Group Defendants' amenability to jurisdiction

under multiple prongs of New York's long-arm statute, the Court considers Plaintiffs to have

abandoned all bases for personal jurisdiction other than CPLR 302(a)(3)(ii).  In their opening

briefs, each of the Scott Group Defendants argued that he or she was not subject to personal

jurisdiction based on any subsection of CPLR 302; Pike and Huesmann also argued against the

application of a conspiracy theory of jurisdiction.  *See* Scott Mem. at 10–13, Dkt. 156; Pike

Mem. at 5–8, Dkt. 161; Huesmann Mem. at 10–14, Dkt. 153.  In response, Plaintiffs relied

exclusively on CPLR 302(a)(3)(ii) to support the Court's exercise of jurisdiction over each of the

---

Scott Group Defendants' motions to dismiss.  Nor have they appended any similar materials to their complaint.  The Court is unwilling to scavenge through unrelated criminal matters not before this Court in an attempt to find facts that might support the exercise of specific jurisdiction over Defendants in this case.

[17]     The absence of authority supporting that proposition is not surprising.  The federal venue statutes for criminal offenses focus on the district or districts in which the offense was committed; they do not focus on the defendant's contacts with the district.  Thus, for example, a mail fraud indictment is properly venued in any district "from, through, or into which" mail sent in furtherance of the fraud moves.  18 U.S.C. § 3237(a).

Scott Group Defendants.  *See* Pls. Scott Group Opp. at 4–5, 6.  Plaintiffs made no effort to argue

that the Court could exercise jurisdiction over Defendants based on CPLR 302(a)(1) & (2),

instead inviting the Court to do their job for them, noting that Plaintiffs would be perfectly

pleased if the Court were to, on its own initiative, determine that CPLR 302(a)(1) or (2) applies

to Defendants, notwithstanding the fact that Plaintiffs "do not explicitly raise § 302(a)(1) [or (2)

as a basis for] specific jurisdiction."  *See id.* at 6 n.2, 10 n.5.  Plaintiffs also expressly disclaimed

reliance on conspiracy jurisdiction.  *Id.* at 10 n.5 ("Plaintiffs . . . do not raise co-conspirator

jurisdiction. . . .").

     While the Court appreciates counsel's invitation to the Court to conjure arguments on

Plaintiffs' behalf, that is generally not how motion practice works.  Accordingly, although the

Court deems Plaintiffs to have abandoned any statutory provision other than CPLR 302(a)(3)(ii),

including a conspiracy theory of jurisdiction, as the basis for personal jurisdiction over any of the

Scott Group Defendants,[18] to avoid resting its decision on Plaintiffs' abandonment, the Court's

analysis extends beyond Section 302(a)(3)(ii).[19]  Nevertheless, the Court reaches the same

conclusion: there is no statutory basis for the Court to exercise personal jurisdiction over any of

the Scott Group Defendants.

---

[18]    *See Ritchie Cap. Mgmt., L.L.C. v. Costco Wholesale Corp.*, No. 14-CV-4819, 2015 WL 13019620, at *6 (S.D.N.Y. Sept. 21, 2015) ("Plaintiffs do not respond to these arguments—they do not mention Section 302(a) in their briefing or even raise the possibility of specific jurisdiction—and therefore they have abandoned the argument that specific jurisdiction applies here."); *Gundlach v. Int'l Bus. Machs. Corp.*, No. 11-CV-846, 2012 WL 1520919, at *8 n.10 (S.D.N.Y. May 1, 2012) ("Plaintiff explicitly states that he 'did not put forth a Section 302 theory in the amended complaint—because Section 301 applies—and so plaintiff will not respond here to Defendant's Section 302 arguments.'  Accordingly, Plaintiff has abandoned any claim that the Court has jurisdiction over [defendant] under CPLR section 302." (internal citation omitted)).

[19]    To the extent Plaintiffs ask the Court to exercise jurisdiction under 302(a)(2), that would be plainly improper.  "[A] defendant's physical presence in New York is a prerequisite to jurisdiction under § 302(a)(2)." *Bank Brussels I*, 171 F.3d at 790.  Plaintiffs have not alleged that Scott, Pike, or Huesmann ever stepped foot in New York during the relevant period.

### a.   Section 302(a)(1)

Section 302(a)(1) confers specific jurisdiction over a non-domiciliary defendant who, in person or through an agent, transacts any business in the state, if the plaintiff's cause of action arises from defendant's in-state transaction of business.  N.Y. C.P.L.R. § 302(a)(1); *Spiegel v. Schulmann*, 604 F.3d 72, 77 (2d Cir. 2010) (citation omitted).  To determine whether the court has jurisdiction under section 302(a)(1), the court must determine whether the defendant "transacts any business" in New York and whether the plaintiff's cause of action "arises from" such a business transaction.  *Best Van Lines*, 490 F.3d at 246 (cleaned up).  "[T]he overriding criterion necessary to establish a transaction of business is some act by which the defendant purposefully avails itself of the privilege of conducting activities within New York."  *Licci ex rel. Licci v. Lebanese Canadian Bank, SAL*, 673 F.3d 50, 61 (2d Cir. 2012) ("*Licci I*") (quoting *Ehrenfeld v. Bin Mahfouz*, 9 N.Y.3d 501, 508 (2007)).  Looking to the quality of a defendant's contacts with New York, a court must assess the "totality of the circumstances" to determine whether a defendant has transacted business within the meaning of Section 302(a)(1).  *Id.* at 62 (citations omitted).[20]

The Court plainly may not exercise personal jurisdiction over Huesmann under Section 302(a)(1).  Plaintiffs' complaint is devoid of a single factual allegation that Huesmann transacted *any* business in New York.  Although Plaintiffs allege that Huesmann and Scott "directed their money laundering efforts" at BNYM, which is headquartered in New York and does business here, that wholly conclusory allegation is patently inadequate, especially in comparison to

---

[20]      Although Section 302(a)(1) is not limited to contract actions, Sections 302(a)(2) and 302(a)(3) are generally considered to be the more appropriate provisions by which to obtain jurisdiction for tort actions. *Barricade Books, Inc. v. Langberg*, No. 95-CV-8906, 2000 WL 1863764, at *3 (S.D.N.Y. Dec. 19, 2000); *Huang v. Kim Dang Nguyen*, No. 19-CV-3309, 2020 WL 9812921, at *5 (E.D.N.Y. Feb. 11, 2020) ("Section 302(a)(1) is typically invoked for a cause of action against a defendant who breaches a contract with plaintiff, or commits a commercial tort against plaintiff in the course of transacting business or contracting to supply goods or services in New York." (quoting *Eastboro Found. Charitable Tr. v. Penzer*, 950 F. Supp. 2d 2d 648, 658 (S.D.N.Y. 2013))).

Plaintiffs' specific allegations concerning Huesmann's alleged conduct in connection with bank accounts, real estate transactions, and other business affairs in locations other than New York. *See, e.g.*, SAC ¶¶ 174–75, 178.  Plaintiffs have failed adequately to allege any connection among Huesmann's conduct, Named Plaintiffs' claims, and New York.

Similarly, the Court may not exercise personal jurisdiction over Pike under Section 302(a)(1).  The only adequately pled allegation tying Pike to New York is that Pike was indicted in the Southern District of New York for conspiracy to commit bank fraud and that the charging instrument alleges that one of Pike's co-conspirators (the person is not further identified in the complaint) misrepresented material facts to a bank in this district, causing the bank to transfer $5 million into an investment fund purportedly operated by Pike.  *See* SAC ¶¶ 51, 183.  Absent any factual allegations tying the alleged co-conspirator's false statements to Pike himself or to Plaintiffs' claims, Plaintiffs fail to raise an inference that Pike transacted business in New York within the meaning of Section 302(a)(1), let alone transacted any business related to Named Plaintiffs' claims.  Moreover, without additional detail, just making a false statement to a bank is, as a matter of law, likely not sufficient to confer jurisdiction under Section 302(a)(1).  *See DirectTV Latin Am., LLC v. Park 610, LLC*, 691 F. Supp. 2d 405, 420 (S.D.N.Y. 2010) ("[C]ommunications into New York will only be sufficient to establish personal jurisdiction if they were related to some transaction that had its center of gravity inside New York, into which a defendant projected himself." (quoting *Maranga v. Vira*, 386 F. Supp. 2d 299, 306 (S.D.N.Y. 2005)).  Nor could the Court exercise jurisdiction over Pike under Section 302(a)(1) on a conspiracy theory based on the conduct of an alleged co-conspirator.  *See E-Z Bowz, L.L.C. v. Pro. Prod. Rsch. Co.*, No. 00-CV-8670, 2003 WL 22064259, at *9 (S.D.N.Y. Sept. 5, 2003) (indicating the "conspiracy theory" is inapplicable under section 302(a)(1).).

The final member of the Scott Group, Scott himself, is also not subject to personal

jurisdiction pursuant to Section 302(a)(1).  The entirety of Plaintiffs' allegations concerning

Scott's contacts with New York are as follows: Scott is licensed to practice law in New York,

SAC ¶ 46; Scott directed bankers at banks across the world, "including those which do extensive

business in this jurisdiction," to authorize the transfer of fraud proceeds to circumvent AML

procedures, *id.* ¶ 170; Scott, along with co-Defendant Huesmann, "knowingly directed [his]

money laundering efforts [at] Defendant BNY[M], which is headquartered in and does extensive

business in this judicial district," *id.* ¶ 175; Scott emailed himself a copy of wire instructions for

a Cayman Islands bank, indicating that an incoming wire transfer of $30 million would be

processed through a BNYM correspondent bank account located in New York, *id.* ¶ 185; Scott,

along with his co-Defendants, "acted together through an intricate web of shell companies and

bank accounts in New York, elsewhere in the United States, and abroad to launder [OneCoin]

investor funds and to conceal and disguise the nature, location, source, ownership, and control of

the proceeds they had obtained through their illegal activities," *id.* ¶ 158; and, as a result of his

role in the OneCoin scheme, Scott was arrested and convicted in this district of conspiracy to

commit money laundering and conspiracy to commit bank fraud, *id.* ¶ 47.

Stripping away the wholly conclusory allegations and impermissible group pleading,[21]

the specific, factual allegations concerning Scott's New York contacts are that he is licensed to

---

[21]     Even if the Court were to consider the vague and generalized allegation that Scott oversaw the transfer of
fraud proceeds through banks that "do business" in New York, that is plainly insufficient to conclude that Scott
himself transacted business in New York as that term is used in Section 302(a)(1).  There are no factual allegations
that Scott controlled any bank accounts in New York, directed bankers located in New York to transfer funds from
New York accounts, or anything of the sort.  For similar reasons, the conclusory allegation that Scott "directed [his]
money laundering efforts [at] BNY[M]," a New York-based bank, is ineffective to confer jurisdiction under Section
302(a)(1).  Similarly ineffective is the classic group pleading that BNYM enabled the "Scott Group" to launder more
than $300 million in fraud proceeds by serving as correspondent bank for hundreds of transactions.  *See* SAC ¶ 63.
The same analysis applies to the allegation that BNYM "identified 275 concerning wires . . . that were filtered
through BNY[M] by *entities affiliated with OneCoin*."  *Id.* ¶ 186 (emphasis added).  Not only do these allegations
fail to identify the role played by any particular Defendant in these transactions, or whether the entities were in any
way related to Scott as opposed to a different individual involved in laundering OneCoin proceeds, they also fail to

practice law in the state, that he was arrested and convicted for conspiracy to commit bank fraud

and money laundering in the Southern District of New York, and that he was aware that an

incoming wire transfer destined for a Cayman Islands bank was to be routed through a

correspondent bank account in New York.  None of that is anywhere close to sufficient to show

that Scott transacted business in New York.

Plaintiffs' claims against Scott do not arise from Scott providing legal services as a New

York attorney.  Because Scott's license to practice law in New York is wholly divorced from

Plaintiffs' allegations, his membership in the New York bar cannot serve as a basis to exercise

jurisdiction over him under Section 302(a)(1).  *See Eastboro Found. Charitable Tr. v. Penzer*,

950 F. Supp. 2d 648, 659 (S.D.N.Y. 2013) ("Accordingly, even assuming *arguendo* that

[defendant']s maintenance of an active New York license constitutes a transaction of business,

[plaintiff's] claims relate exclusively to actions [defendant] took in New Jersey in connection

with a New Jersey transaction, and thus do not arise from [defendant's] membership in the New

York bar.") (citation omitted); *see also Lipin v. Hunt*, 538 F. Supp. 2d 590, 598 (S.D.N.Y. 2008).

Scott's conviction on criminal charges in this jurisdiction, even if the charges grew out of the

OneCoin fraud, is insufficient, in and of itself, to confer personal jurisdiction over him in this

civil matter.  Plaintiffs have not isolated any facts that were proven in Scott's criminal trial to

establish a prima facie case of specific jurisdiction over Scott in this civil case.

Finally, Scott's knowledge that a wire transfer in furtherance of the fraud passed through

a correspondent bank in New York is insufficient as a matter of law to confer jurisdiction under

---

state whether the BNYM correspondent account through which these hundreds of purported transactions flowed was located in New York.  The sole allegation pled with any specificity identifies a single transfer directed through a BNYM correspondent account located in New York, and that is all the Court may consider for purposes of Defendants' Rule 12(b)(2) motions.  *See First Cap. Asset Mgmt., Inc. v. Brickellbush, Inc.*, 218 F. Supp. 2d 369, 393 n.121 (S.D.N.Y. 2002) (stating that "the vague and conclusory allegation that [defendant] engaged in 'numerous New York-connected transaction[s]' through various agents . . . does not contribute anything to [plaintiffs'] *prima facie* showing of jurisdiction").

Section 302(a)(1).  Under New York law, "the use of a New York correspondent bank account, standing alone, may be considered a 'transaction of business' under the long-arm statute if the defendant's use of the correspondent account was purposeful."  *Licci ex rel Licci v. Lebanese Canadian Bank, SAL*, 732 F.3d 161, 168 (2d Cir. 2013) ("*Licci IV*") (citing *Licci v. Lebanese Canadian Bank, SAL*, 20 N.Y.3d 337, 338–39 (2012) ("*Licci III*")).  Here, Plaintiffs have not alleged that Scott directed the use of a New York correspondent account, nor that the transfer of funds through the New York correspondent account was otherwise purposeful.  Instead, Plaintiffs allege only that Scott was aware that a New York account would be used.  That is patently insufficient under New York law to constitute the transaction of business.[22]  *See id.*; *see also Cmty. Fin. Grp., Inc. v. Stanbic Bank Ltd.*, No. 14-CV-5216, 2015 WL 4164763, at *4 (S.D.N.Y. July 10, 2015) (determining one-time use of correspondent account by defendant, initiated by a third party, to be "adventitious" and thus insufficient to demonstrate that use of the account was "purposeful" (quotation omitted)); *Universal Trading & Inv. Co. v. Tymoshenko*, No. 11-CV-7877, 2012 WL 6186471, at *3 (S.D.N.Y. Dec. 12, 2012) ("[T]he [New York] Court of Appeals recently confirmed that New York law requires that the defendant's use of a correspondent bank account in New York . . . was purposeful,' which has not been alleged." (cleaned up)).  As courts have described in the context of determining whether a foreign bank

---

[22]    Plaintiffs' vaguely pled allegation that "[a]mong the financial institutions through which Scott and Huesmann knowingly directed their money laundering efforts was Defendant BNY[M]" does not alter the Court's analysis. SAC ¶ 175.  To the extent Plaintiffs allege that the Scott Group Defendants specifically directed  foreign banks to use BNYM's correspondent accounts in transferring funds, the allegation is entirely conclusory and provides no basis to determine what role, if any, each Defendant played.  Moreover, to the extent Plaintiffs allege generally that BNYM was one of many banks involved in some way in the money laundering scheme, the fact that Plaintiffs may have been involved in hundreds of transfers that passed through BNYM does not change the Court's conclusion.  Whether one or 100, unless Scott and his alleged co-conspirators played a role in routing the wire transfers through the New York correspondent account, use of the New York correspondent account cannot be described as purposeful.

defendant's use of a correspondent account is purposeful,[23] "the key distinction is between the 'unintended and unapproved use of a correspondent bank account, where the nondomiciliary bank is a passive and unilateral recipient' of money transfers, and the '[r]epeated, deliberate use that is approved by the foreign bank on behalf and for the benefit of a customer[.]'" *Vasquez v. Hong Kong & Shanghai Banking Corp.*, 477 F. Supp. 3d 241, 253 (S.D.N.Y. 2020) (quoting *Al Rushaid v. Pictet & Cie*, 28 N.Y.3d 316, 326–27 (2016)).[24]  Absent allegations that Scott "directed the funds to be deposited or controlled the route of the plaintiffs' funds through the correspondent account," the mere use of a correspondent account does not subject Scott to jurisdiction under Section 302(a)(1). *Id.* at 259.

The same conclusion holds even if Scott not only knew that a New York correspondent account was being used but actually coordinated the use of a New York correspondent bank, an allegation that is not pled in Plaintiffs' complaint.[25]  The vast majority of cases in which the issue is whether the use of a correspondent bank account constitutes the transaction of business under Section 302(a)(1) involve a non-domiciliary bank defendant's use of a correspondent account, not an individual's wiring of funds that incidentally pass through a New York-based

---

[23]    As discussed below, the fact that Scott is an individual and not a foreign bank is alone likely to mean that the use of a correspondent account does not confer jurisdiction under Section 302(a)(1).

[24]    *Vasquez* provides another basis for rejecting the application of Section 302(a)(1) to Scott: Plaintiffs have failed to tie the $30 million in alleged fraud proceeds that were transferred through a New York correspondent account to Named Plaintiffs' own claims and injuries.  When wire transfers through a New York correspondent account do not give rise to the Named Plaintiffs' claims for economic injuries, even if they may implicate the claims of unnamed, putative class members, Named Plaintiffs may not rely on them to support jurisdiction over the defendant. *See Vasquez*, 477 F. Supp. 3d at 256.

[25]    The nature of correspondent banking renders largely nonsensical any attempt to base jurisdiction against the individual Defendants on wire transfers of funds moving through a New York correspondent account. Correspondent banking is a "system of interbank relationships in which a bank sells services to other financial institutions" and involves banks establishing relationships with one another to facilitate transactions involving remote customers of certain banks.  BNYM Mem. at 3–4 n.3 (quoting OCC Interpretive Letter No. 796 (Sept. 1997)), Dkt. 158.  Banks themselves maintain correspondent relationships to facilitate transactions "that otherwise have no other connection to New York, or indeed the United States." *Licci III*, 20 N.Y.3d at 338.  Absent unusual circumstances, an individual bank customer would have no reason to direct its foreign bank to use a New York-based correspondent account for a transaction that, such as those at issue here, has no other connection to New York.

correspondent account.  *See Daou v. BLC Bank, S.A.L.*, No. 20-CV-4438, 2021 WL 1338772, at *8 (S.D.N.Y. Apr. 9, 2021) ("Standing by itself, a correspondent bank relationship . . . may not form the basis for long-arm jurisdiction under § 302(a)(1)[, b]ut where a *foreign bank* repeatedly makes use of a correspondent account in New York on behalf of a plaintiff, it may be concluded that the foreign bank defendant transacted business with that plaintiff in New York." (emphasis added) (cleaned up)).  In *Tymoshenko*, a court in this district rejected the plaintiff's attempt to establish jurisdiction over an individual defendant who transferred money that passed through New York via a correspondent account, concluding that "courts have only found the banks themselves to be subject to jurisdiction where they have moved money through New York." *Tymoshenko*, 2012 WL 6186471, at *3.  Plaintiffs have identified no authority, nor is the Court aware of any, standing for the principle that a non-domiciliary individual defendant may be subject to specific jurisdiction in New York under Section 302(a)(1) because the non-domiciliary moved money between foreign bank accounts, with the transfer passing through New York via a correspondent account.  *See id.* (finding that no authority exists to support argument that passage of money "through" New York banks can establish jurisdiction over a foreign defendant holding foreign accounts that "moved money through New York via a correspondent [bank] account"); *cf. DirectTV Latin Am.*, 691 F. Supp. 2d at 423–24 (concluding that defendant's "use of one New York bank account lacks the articulable nexus necessary to establish jurisdiction" where the allegedly actionable conduct exclusively involved "persons located outside New York" and harm to non-New York plaintiffs, "[e]ven if some individuals received kickbacks from cash wired into and out of a bank account at a New York bank [because] the payments to these persons could

have been made anywhere and it would not have changed the nature of the plaintiffs'
allegations" (cleaned up)).[26]

In short, Scott did not purposefully avail himself of the privilege of transacting business
in New York based on a single transfer of funds that incidentally passed through a New York
correspondent account en route to a foreign bank account.

### b. Section 302(a)(3)

Pursuant to CPLR 302(a)(3), a court sitting in New York may exercise personal
jurisdiction over an out-of-state defendant if the defendant "commits a tortious act without the
state causing injury to person or property within the state . . . if he . . . expects or should
reasonably expect the act to have consequences in the state and derives substantial revenue from
interstate or international commerce." N.Y. C.P.L.R. 302(a)(3)(ii). Five elements must be
satisfied for a court to exercise jurisdiction pursuant to Section 302(a)(3)(ii): (1) the defendant
committed a tortious act outside New York; (2) the cause of action arose from that act; (3) the act
caused injury to a person or property within New York; (4) the defendant expected or should
reasonably have expected the tortious act to have consequences in the state; and (5) the
defendant derives substantial revenue from interstate or international commerce. *Sole Resort,
S.A. de C.V. v. Allure Resorts Mgmt., LLC*, 450 F.3d 100, 106 (2d Cir. 2006) (citing *LaMarca v.
Pak-Mor Mfg. Co.*, 95 N.Y.2d 210, 214 (2000)). Although Section 302(a)(3) can be applied to

---

[26]     Moreover, the fact that Plaintiffs allege (with adequate specificity) Scott's involvement with only a single
wire transfer that passed through a New York correspondent account provides an independent basis to find
jurisdiction lacking under 302(a)(1). *See Daou*, 2021 WL 1338772, at *8 ("Plaintiffs point to only four instances in
which CL Bank used its New York correspondent account in connection with the plaintiffs. This is too infrequent to
establish that the defendant transacted business with the plaintiffs in New York."); *Spetner v. Palestine Inv. Bank*,
495 F. Supp. 3d 96, 116 (S.D.N.Y. 2020) (finding a single wire transfer through New York "insufficient to establish
jurisdiction under the long-arm statute where other New York contacts are lacking"); *Vasquez*, 477 F. Supp. 3d at
258 (deeming three transactions through correspondent account "too sparse" to warrant inference of purposeful
availment); *Cmty. Fin. Grp., Inc. v. Stanbic Bank Ltd.*, No. 14-CV-5216, 2015 WL 4164763, at *4 (S.D.N.Y. July
10, 2015) (determining single use of correspondent bank insufficient for personal jurisdiction); *see also Al Rushaid*,
28 N.Y.3d at 327 (New York Court of Appeals listing the frequency and the deliberateness of defendants' contacts
as critical factors to consider when assessing whether use of correspondent bank was purposeful).

commercial torts, the "trouble" with doing so is that Section 302(a)(3) "was not really designed to cover [such] cases"; instead, it "was enacted in response to a New York Court of Appeals ruling which had denied personal jurisdiction over an out-of-state defendant where that defendant shipped a propane gas tank into this state, after which the tank exploded causing injury." *Chem. Bank v. World Hockey Ass'n*, 403 F. Supp. 1374, 1379 (S.D.N.Y. 1975) (citing *Am. Eutectic Welding Alloys Sales Co. v. Dytron Alloys Corp.*, 439 F.2d 428, 432–33 n.4 (2d Cir. 1971)).

Here, because Plaintiffs have not alleged an injury in New York or that any of the Scott Group Defendants should reasonably have expected his or her conduct to have consequences in New York, the Court need not assess whether Plaintiffs have satisfied the other three elements of Section 302(a)(1).[27]

### i. Whether Any Defendant's Tortious Act Caused Injury to Person or Property in New York

To determine whether a tortious act caused an injury in New York, the court must determine where the original event which caused the injury occurred — i.e., the situs of injury. *Miller Inv. Tr. v. Xiangchi Chen*, 967 F. Supp. 2d 686, 695 (S.D.N.Y. 2013) (citing *Bank Brussels Lambert v. Fiddler Gonzalez & Rodriguez*, 171 F.3d 779, 791 (2d Cir. 1999) ("*Bank Brussels I*")). With a commercial tort, when the alleged injury is solely financial loss, the situs of injury is "where the original critical events associated with the action or dispute took place,

---

[27] To satisfy the first element, a plaintiff "need not actually prove that defendant committed a tort but rather need only state a colorable cause of action." *Bank Brussels Lambert v. Fiddler Gonzalez & Rodriguez*, 305 F.3d 120, 125 (2d Cir. 2002) ("*Bank Brussels II*"); *see also Convergen Energy LLC v. Brooks*, No. 20-CV-3746, 2020 WL 5549039, at *9 (S.D.N.Y. Sept. 16, 2020). In certain instances, the "analysis of whether an action is 'tortious' may well overlap with an assessment of a motion to dismiss for failure to state a claim." *DH Servs., LLC v. Positive Impact, Inc.*, No. 12-CV-6153, 2014 WL 496875, at *14 (S.D.N.Y. Feb. 5, 2014). Although the Court has serious doubts that Plaintiffs have stated a colorable cause of action as to all of their claims against each of Scott, Pike, and Huesmann, as previously stated, the Court does not find it necessary to delve into a Rule 12(b)(6) analysis because Plaintiffs failed to establish a prima facie basis for jurisdiction.

not where any financial loss or damages occurred." *CRT Invs., Ltd. v. BDO Seidman, LLP*, 85 A.D.3d 470, 471–72 (1st Dep't 2011); *see also JCorps Int'l, Inc. v. Charles & Lynn Schusterman Fam. Found.*, 828 F. App'x 740, 744 (2d Cir. 2020) ("Under C.P.L.R. 302(a)(3), the sit[us] of a commercial injury is not where the economic loss is felt, but where the critical events associated with the dispute took place." (quotation omitted)).  The "original event" is neither the initial tort nor the final economic injury and the felt consequences of the tort.  *Bank Brussels I*, 171 F.3d at 791.  When the underlying events take place outside New York, the fact that there are financial consequences in New York due to the fortuitous location of plaintiffs is not a sufficient basis for jurisdiction under Section 302(a)(3).  *Whitaker v. Am. Telecasting, Inc.*, 261 F.3d 196, 209 (2d Cir. 2001) (internal citations omitted); *see also Penguin Grp. (USA) Inc. v. Am. Buddha*, 609 F.3d 30, 38 (2d Cir. 2010) ("It is settled New York law that the suffering of economic damages in New York is insufficient, alone, to establish a direct injury in New York for N.Y. C.P.L.R. § 302(a)(3) purposes.") (quotation omitted); *Mareno v. Rowe*, 910 F.2d 1043, 1046 (2d Cir. 1990) (holding that an injury "does not occur within the state simply because the plaintiff is a resident" (cleaned up)).

Plaintiffs' analysis of this element, as best the Court can understand it, is critically flawed.  First, Plaintiffs seem to argue that because the OneCoin fraud "was international in scope, and harmed investors across the planet . . . , including investors in New York," the Scott Group Defendants' tortious conduct must have caused an injury to persons in New York.  Pls. Scott Group Opp. at 8.  In making that argument, Plaintiffs ignore a wealth of precedent holding that the situs of an economic injury is *not* where the injured party feels the ultimate effect of the injury on account of his or her residence.  *See Whitaker*, 261 F.3d at 209 ("The situs of the injury is the location of the original event which caused the injury, not the location where the resultant damages are felt by the plaintiff." (cleaned up)); *Cooperstein v. Pan–Oceanic Marine, Inc.*, 124

A.D.2d 632, 634 (2d Dep't 1986) ("[T]he plaintiff's allegation that he suffered pecuniary loss

based upon [the non-domiciliary defendant]'s alleged fraud and misrepresentation, without more,

is insufficient to sustain his burden of showing that the injury occurred in New York").

Compounding Plaintiffs' error is that, even as defined by Plaintiffs, the situs of Named Plaintiffs'

injuries is Montana and Tennessee, not New York.  Although Plaintiffs argue that they seek to

assert claims on behalf of "***all*** investors and entities who transferred investment money to the

OneCoin Defendants," Pls. Scott Group Opp. at 8 (emphasis original), for purposes of

determining whether this Court has personal jurisdiction over the Scott Group Defendants, the

Court may consider only the claims brought by Named Plaintiffs.  *Beach*, 2014 WL 904650, at

*6 ("In an action brought as a class action, personal jurisdiction is based on a defendant's

contacts with the forum state and actions giving rise to the named plaintiffs' causes of action.").

Accordingly, Plaintiffs' reliance on economic harm suffered by unnamed putative class members

on account of their New York residency is roundly rejected.

      Nor is there any other basis upon which the Court may uphold jurisdiction.  Pursuant to

Section 302(a)(3), the Court is required to assess the conduct underlying each claim asserted

against each defendant in relation to the Named Plaintiffs' injuries.  Named Plaintiffs' injuries

are the same across all three causes of action: they each suffered significant financial loss on

account of their investments in OneCoin offerings.  *See* SAC ¶¶ 12, 17, 19, 196.

      Plaintiffs allege claims for aiding and abetting fraud, unjust enrichment, and civil

conspiracy against each of the Scott Group Defendants.  The alleged tortious conduct underlying

each of Plaintiffs' claims is, in general terms, the Scott Defendants' transfer and use of

fraudulently obtained OneCoin proceeds.  *See* SAC ¶¶ 227, 256, 275.  The *only* adequately

alleged connection between any of the Scott Group Defendants' money laundering activities and

New York is that Scott knew that a particular wire transfer would move through a New York

correspondent bank account.  In no way does the use of a correspondent account in New York constitute the "original event" that caused Named Plaintiffs' injuries, a conclusion which does not change even if the Court attributes several hundred more transfers involving a New York correspondent account to Scott, Pike, and Huesmann.

With respect to Plaintiffs' unjust enrichment claim, the situs of the injury is either where "the bank accounts holding the funds of the plaintiff were located and controlled" or where the Scott Group Defendants managed those accounts.  *See Landau v. New Horizon Partners, Inc.*, No. 02-CV-6802, 2003 WL 22097989, at *7 (S.D.N.Y. Sept. 8, 2003) ("Any alleged . . . unjust enrichment took place in Sweden, and not in New York, because the funds were located in Sweden.").  Plaintiffs do not allege that Scott, Pike, or Huesmann maintained bank accounts in New York, or that funds that originated with Plaintiffs were held at banks in New York; each of Defendants' accounts that Plaintiffs discuss with specificity was maintained at a bank in a foreign country.  *See* SAC ¶¶ 45, 164, 165, 179, 191.  Moreover, Plaintiffs concede that Scott, Pike, and Huesmann each operated from Florida; that is where they allegedly conducted their money laundering activities.  *See id.* ¶¶ 44, 49, 52.  Finally, the only allegations concerning personal benefit obtained by Scott, Pike, and Huesmann detail homes in Massachusetts and Florida and luxury goods acquired by Scott.  *See id.* ¶ 171.

When a plaintiff alleges fraud committed outside of New York, the critical inquiry is where the "first effect of the tort was located that ultimately produced the final economic injury." *Bank Brussels I*, 171 F.3d at 792.  In some circumstances, the first effect of the tort might be the disbursement of funds.  *See id.*; *see also Weintraub v. Empress Travel Trevose, Two-L's Ltd.*, No. 17-CV-5532, 2018 WL 4278336, at *11 (S.D.N.Y. Mar. 6, 2018) ("[F]or purposes of fraud and breach of fiduciary duty claims, the 'original event that caused the injury' is the actual 'disbursement of funds' or 'loss of money' that resulted from plaintiff's reliance on defendant's

alleged misrepresentations." (citations omitted)); *Villanova v. Harbilas*, No. 08-CV-10448, 2010 WL 1640187, at *5 (S.D.N.Y. Apr. 13, 2010) ("In this case, any fraud or breach of fiduciary duty would be based on the defendant's improper use of the funds in the Pennsylvania account. Therefore, the first effect of either of these torts would have been in Pennsylvania.").  In others, the situs of the injury might be either "where [defendants] allegedly hatched their scheme" or "where they put [the scheme] into effect."  *Troma Ent., Inc. v. Centennial Pictures, Inc.*, 729 F.3d 215, 220 (2d Cir. 2013).  In cases involving misrepresentations, courts have often "found that the situs of injury is New York when the original reliance or other first event causing the injury occurs in New York, even if the defendant has never sent any misrepresentations into the state." *Bank Brussels I*, 171 F. 3d at 792 (citation omitted).

Whether the original event causing the injury is deemed to be where the funds were disbursed, where misrepresentations were made and relied upon,[28] where funds were

---

[28]     Plaintiffs allege that at least one individual outside the Scott Group Defendants made misrepresentations either in New York or directed at individuals in New York, and persons in New York relied on those misrepresentations to invest in OneCoin.  *See* SAC ¶¶ 41, 76, 127, 148, 151.  But none of the Scott Group Defendants is alleged to have made any misrepresentation that caused Named Plaintiffs — or anyone else — to invest in OneCoin.  And, there is no allegation that either of the Named Plaintiffs ever (i) did anything in New York in reliance on misrepresentations made in New York or (ii) felt in New York the repercussions of any misrepresentation upon which the Named Plaintiffs did rely.

Nor can Plaintiffs bootstrap from Simon Le's alleged conduct in New York or directed at New York to assert jurisdiction over the Scott Group Defendants based on a conspiracy theory.  Putting aside the fact that Plaintiffs specifically disclaimed reliance on a conspiracy theory for personal jurisdiction, *see* Pls. Scott Group Opp. at 10 n.5, to allege a defendant's participation in a conspiracy for Section 302(a) jurisdictional purposes, a plaintiff "must show that (a) the defendant had an awareness of the effects in New York of its activity; (b) the activity of the co-conspirators in New York was to the benefit of the out-of-state conspirators; and (c) the co-conspirators acting in New York acted at the direction or under the control or at the request of or on behalf of the out-of-state defendant." *Maersk, Inc. v. Neewra, Inc.*, 554 F. Supp. 2d 424, 442–43 (S.D.N.Y. 2008) (cleaned up); *see also PharmacyChecker.com, LLC v. Nat'l Ass'n of Bds. of Pharmacy*, No. 19-CV-7577, 2021 WL 1199363, at *7 (S.D.N.Y. Mar. 30, 2021) ("In other words, Plaintiff must connect the defendant with transactions occurring in New York." (cleaned up)).  Absent entirely from the complaint is any allegation linking the Scott Group Defendants to Simon Le or to any other member of the OneCoin scheme that had any contact with New York or committed any acts in New York within the meaning of Section 302(a)(2).  For substantially the same reason, Plaintiffs fail to establish the existence of conspiracy jurisdiction over Scott, Pike, or Huesmann based on the conduct in New York of alleged co-conspirator Gilbert Armenta, with whom Plaintiffs allege in only the most conclusory way that the other Scott Group Defendants were associated.  Even under the more lenient theory of conspiracy jurisdiction applied by some courts in this district, Plaintiffs' allegations fall woefully short, as they do not plead facts

misappropriated, or where the Scott Group Defendants concocted and carried out their money-laundering scheme, with respect to Named Plaintiffs' claims, none of those events occurred in New York.  The situs of the injury for Named Plaintiffs' fraud claims is either Florida, a foreign location where funds were disbursed, or Montana and Tennessee, assuming there were misrepresentations directed toward and relied on by Named Plaintiffs in their state of residence.[29]

Finally, Plaintiffs themselves identify an additional impediment to exercising jurisdiction over any of the Scott Group Defendants pursuant to Section 302(a)(3)(ii).  In their brief, Plaintiffs assert that "[w]ithout the participation of each individual Defendant in the Scott Group, the OneCoin fraud could not have been as prolific as it was, if at all."  Pls. Scott Group Opp. at 8.  Entirely absent from the complaint, however, are any specific factual allegations from which the Court could infer that the OneCoin scheme could not have existed absent the money laundering role played by Scott, Pike, and Huesmann; to the contrary, Plaintiffs allege that the Scott Group Defendants laundered "in excess of $400 million" of fraudulent proceeds but that the OneCoin scheme generated proceeds in excess of $3 billion.  *See* SAC ¶¶ 6, 25, 225.  Also absent is any factual allegation from which the Court can infer that the money laundering accomplished by the Scott Group Defendants caused the Named Plaintiffs' injuries.  In fact, Plaintiffs seemingly acknowledge that the Scott Group Defendants' conduct was not the proximate cause of Plaintiffs' injury, a fatal acknowledgment because Section 302(a)(3)(ii) requires the out-of-state

---

demonstrating that Scott, Pike, or Huesmann had any knowledge of the New York acts of any alleged co-conspirators.  *See Contant v. Bank of Am. Corp.*, 385 F. Supp. 3d 284, 292 n.2 (S.D.N.Y. 2019) (citations omitted).

[29]     For purposes of Plaintiffs' civil conspiracy claim, there is no standalone tort of civil conspiracy under New York law; a conspiracy claim must be based on the commission of some other tort.  *See Durante Bros. & Sons, Inc. v. Flushing Nat'l Bank*, 755 F.2d 239, 251 (2d Cir. 1985).  Accordingly, the situs of the injury analysis applicable to Plaintiffs' claims for aiding and abetting fraud and unjust enrichment apply equally to Plaintiffs' claim for civil conspiracy.

acts to have been the proximate cause of Plaintiff's injury.  *See Tri-Coastal Design Grp., Inc. v. Merestone Merch., Inc.*, No. 05-CV-10633, 2006 WL 1167864, at *4 (S.D.N.Y. May 03, 2006) ("As to the tortious act requirement, the out-of-state act must be the proximate cause of the injury in New York, i.e., the act must be 'so close to the injury that reasonable people would regard it as a cause of the injury.'" (quoting *Art Leather Mfg. Co. v. Albumx Corp.*, 888 F. Supp. 565, 568 (S.D.N.Y. 1995))).  In short, the Court cannot exercise jurisdiction over Scott, Pike, or Huesmann pursuant to Section 302(a)(3)(ii).

### ii.   Whether Any Defendant Should Have Expected His or Her Acts to Have Consequences in New York

To satisfy the fourth element of Section 302(a)(3)(ii), Plaintiffs must make a "*prima facie* showing that Defendant 'expected or should reasonably have expected the act to have consequences in the State.'"  *DH Servs., LLC v. Positive Impact, Inc.*, No. 12-CV-6153, 2014 WL 496875, at *13 (S.D.N.Y. Feb. 5, 2014) (quoting *LaMarca*, 95 N.Y.2d at 214).  Whether a defendant expected or should have expected his act to have consequences in New York is an objective test.  *Kernan v. Kurz-Hastings, Inc.*, 175 F.3d 236, 241 (2d Cir. 1999).  "New York courts have sought to avoid conflict with federal constitutional due process limits on state court jurisdiction by applying the 'reasonable expectation' requirement in a manner consistent with United States Supreme Court precedent."  *Id.* (citation omitted).  In other words, absent allegations of concrete facts known to the defendant that would have led him to foresee being sued in New York or tangible manifestations of his intent to target New York, a court may not exercise personal jurisdiction over a nondomiciliary under 302(a)(3).  *See Royalty Network, Inc. v. Dishant.com, LLC*, 638 F. Supp. 2d 410, 424 (S.D.N.Y. 2009) (citations omitted).  The issue of foreseeability "relates to forum consequences generally and not to the specific event which produced injury within the state."  *Fantis Foods, Inc. v. Standard Importing Co.*, 49 N.Y.2d 317,

326 n.4 (1980) (cleaned up); *see also In re DES Cases*, 789 F. Supp. 552, 570 (E.D.N.Y. 1992)

(holding that the reasonable expectation element "requires that a defendant foresee that its

tortious acts will have *some* consequences in New York, although not necessarily the exact

consequences that occurred") (emphasis original).   "[F]oreseeability must be coupled with

evidence of a purposeful New York affiliation, for example, a discernible effort to directly or

indirectly serve the New York market." *Kernan*, 175 F.3d at 241 (quoting *Schaadt v. T.W.

Kutter, Inc.*, 169 A.D.2d 969, 970 (3d Dep't 1991)).

As discussed in connection with the Court's analysis under Section 302(a)(1), Plaintiffs

fail to allege adequately any facts demonstrating that any member of the Scott Group attempted

to target New York or that any would have expected to be sued in New York.   Accordingly, the

Court finds both of Plaintiffs' arguments on this element to be unavailing.   Plaintiffs first

contend that "the Scott Group used BNY[M], a New York headquartered bank, to assist in

laundering hundreds of millions of dollars of fraudulent OneCoin investment proceeds,"

evidencing purposeful availment.   Pls. Scott Group Opp. at 9.   As discussed at length in Section

I.B.2.a, *supra*, Plaintiffs allege adequately only a single transaction, connected only to Scott, that

was routed through BNYM's New York correspondent account.   That is not enough to satisfy the

fourth element of Section 302(a)(3)(ii).   *See Convergen Energy LLC v. Brooks*, No. 20-CV-3746,

2020 WL 5549039, at *9 (S.D.N.Y. Sept. 16, 2020) (deeming a wire transfer through a New

York account, in addition to other alleged connections, insufficient to demonstrate that defendant

reasonably should have expected its conduct to have consequences in New York); *Local 875

I.B.T. Pension Fund v. Pollack*, 992 F. Supp. 545, 561 (S.D.N.Y. 1998) (stating that a document

detailing a wire transfer through a New York correspondent account, without additional detail

concerning the connection to plaintiff's money, does not "suggest[] the possibility of New York

consequences").   Even considering the additional transactions that allegedly flowed through

BNYM, the Court has already concluded that there is no non-conclusory allegation that Scott (or Pike or Huesmann) directed the use of the New York correspondent account.   The incidental use of a New York correspondent account to facilitate Defendants' otherwise non-New York money laundering activities does not constitute purposeful affiliation with New York.  *See Kernan*, 175 F.3d at 241.

Plaintiffs' second argument — that "everyone within the OneCoin operation knew exactly what they were doing" and that the Scott Group Defendants knew of "the overall focus of the OneCoin scheme and the locations they targeted, including New York" — fares no better. Pls. Scott Group Opp. at 9–10.  Plaintiffs have alleged no facts from which the Court can infer that Scott, Pike, or Huesmann was at all involved in or even aware of the OneCoin Defendants' promotional activities, let alone the specific locations in which OneCoin was marketed.  Further, even if Scott, Pike, or Huesmann did know that the OneCoin scheme targeted investors in New York, that still would not be enough, as "foreseeability must be coupled with evidence of a purposeful New York affiliation."  *Kernan*, 175 F.3d at 241 (quotation omitted)*.*

In short, Plaintiffs have failed to allege any facts from which the Court can reasonably infer that Defendants expected or should reasonably have expected their conduct to have consequences in New York as required under Section 302(a)(3).[30]  Accordingly, the Scott Group Defendants' Rule 12(b)(2) motions are granted.

---

[30]     Because the Court concludes that Plaintiffs' allegations do not provide a statutory basis for jurisdiction, the Court need not address whether the exercise of jurisdiction over Scott, Pike, or Huesmann would comport with due process.  *See Best Van Lines*, 490 F.3d at 242 (stating that the court looks first to New York law, and "[i]f, but only if," the court finds long-arm jurisdiction exists must the court conduct a due process analysis).  For all of the reasons stated above, however, were it to address the issue, the Court would conclude that Plaintiffs have not alleged anywhere close to the requisite minimum contacts to demonstrate that each defendant him- or herself engaged in purposeful activities directed at New York or availed him- or herself of the privilege of doing business here such that they could foresee being haled into court here.  *Walden v. Fiore*, 571 U.S. 277, 284–85 (2014); *cf. Hitachi Data Sys. Credit Corp. v. Precision Discovery, Inc.*, 331 F. Supp. 3d 130, 144 (S.D.N.Y. 2018).

## II.      BNYM's Motion to Dismiss

In support of its motion to dismiss Plaintiffs' claims that it aided and abetted fraud and engaged in commercial bad faith, BNYM argues that Plaintiffs have latched onto — and have misleadingly presented — information revealed during related criminal cases.  BNYM complains that Plaintiffs have painted it as a perpetrator of the money laundering scheme when it should truly be seen as a victim.  *See* BNYM Mem. at 1, Dkt. 158.  BNYM asserts that the record plainly reveals that it played no role in actively facilitating any money laundering; instead, BNYM was deceived by fraudsters who intentionally obfuscated transactions to avoid detection. More important for purposes of this motion, however, BNYM contends that Plaintiffs' allegations are not pled with the requisite particularity required by Rule 9(b), and, even accepting Plaintiffs' generalized and conclusory allegations as true, Plaintiffs cannot state a claim against BNYM because Plaintiffs have not alleged — and cannot allege — that BNYM had actual knowledge of the fraud or that BNYM provided substantial assistance to the fraudsters.  Because the Court agrees with BNYM that Plaintiffs' allegations are insufficient, BNYM's motion to dismiss is granted.

### A.  Legal Standard on a Rule 12(b)(6) Motion

"To survive a motion to dismiss under [Rule] 12(b)(6), a complaint must allege sufficient facts, taken as true, to state a plausible claim for relief."  *Johnson v. Priceline.com, Inc.*, 711 F.3d 271, 275 (2d Cir. 2013) (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555–56 (2007)).  "[A] complaint does not need to contain detailed or elaborate factual allegations, but only allegations sufficient to raise an entitlement to relief above the speculative level."  *Keiler v. Harlequin Enters., Ltd.*, 751 F.3d 64, 70 (2d Cir. 2014) (citation omitted).  The Court is not required, however, to credit "mere conclusory statements" or "[t]hreadbare recitals of the elements of a cause of action."  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Twombly*, 550 U.S. at555).

When considering a Rule 12(b)(6) motion to dismiss, the Court accepts all factual allegations in the complaint as true and draws all reasonable inferences in the light most favorable to the plaintiff.  *See Gibbons v. Malone*, 703 F.3d 595, 599 (2d Cir. 2013).

Rule 9(b) requires a party alleging fraud to state with particularity "the circumstances constituting fraud."  Fed. R. Civ. P. 9(b).  To comply with Rule 9(b), "the complaint must: (1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent."  *Mills v. Polar Molecular Corp.*, 12 F.3d 1170, 1175 (2d Cir. 1993) (citation omitted).  Although Rule 9(b) allows "[m]alice, intent, knowledge, and other conditions of a person's mind" to be "alleged generally," Fed. R. Civ. P. 9(b), because a court "must not mistake the relaxation of Rule 9(b)'s specificity requirement regarding condition of mind for a license to base claims of fraud on speculation and conclusory allegations, . . . plaintiffs must allege facts that give rise to a strong inference of fraudulent intent."  *Lerner v. Fleet Bank, N.A.*, 459 F.3d 273, 290 (2d Cir. 2006) (cleaned up); *In re Agape Litig.*, 773 F. Supp. 2d 298, 307–08 (S.D.N.Y. 2011).  "The requisite 'strong inference' of fraud may be established either (a) by alleging facts to show that defendants had both motive and opportunity to commit fraud, or (b) by alleging facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness."  *Shields v. Citytrust Bancorp, Inc.*, 25 F.3d 1124, 1128 (2d Cir. 1994) (citations omitted).  Plaintiffs' claims for aiding and abetting fraud and commercial bad faith are both subject to the heightened pleading standards under Rule 9(b).  *See Wight v. BankAmerica Corp.*, 219 F.3d 79, 91–92 (2d Cir. 2000).

### B.  Aiding and Abetting Fraud

"To establish liability for aiding and abetting fraud, the plaintiffs must show '(1) the existence of a fraud; (2) [the] defendant's knowledge of the fraud; and (3) that the defendant

provided substantial assistance to advance the fraud's commission.'" *Lerner*, 459 F.3d at 292

(quoting *JP Morgan Chase Bank v. Winnick*, 406 F. Supp. 2d 247, 252 (S.D.N.Y. 2005)).  Rule

9(b) requires that the pleadings give rise to a strong inference of fraudulent intent, which may be

inferred either from motive or from recklessness on the part of the defendant.  *See Shields*, 25

F.3d at 1128.

Here, even assuming that Plaintiffs have adequately pled the existence of a fraud,

Plaintiffs have not pled that BNYM had the requisite knowledge of the fraud or that BNYM

provided substantial assistance to aid in the commission of the fraudulent OneCoin scheme.

### 1.   Actual Knowledge

Plaintiffs fail to plead particular facts raising a strong inference that BNYM had actual

knowledge of the underlying fraud at the time it allegedly facilitated transfers of proceeds of the

fraud.  "With respect to the element of knowledge, plaintiffs must plausibly allege actual

knowledge of the underlying fraud on the part of the defendant bank[]: constructive knowledge is

not sufficient, nor is 'a lower standard such as recklessness or willful blindness.'"  *Heinert v.*

*Bank of Am., N.A.*, 410 F. Supp. 3d 544, 549 (W.D.N.Y. 2019) (quoting *Rosner v. Bank of*

*China*, No. 06-CV-13562, 2008 WL 5416380, at *7 (S.D.N.Y. Dec. 18, 2008)); *see also de*

*Abreu v. Bank of Am. Corp.*, 812 F. Supp. 2d 316, 322 (S.D.N.Y. 2011); *Williams v. Bank Leumi*

*Tr. Co. of N.Y.*, No. 96-CV-6695, 1998 WL 397887, at *8 (S.D.N.Y. 1998).  The requirement

that a plaintiff allege "actual knowledge" to state a claim for aiding and abetting fraud is "a

distinct requirement from the scienter required to allege the underlying fraud."  *In re Agape*, 773

F. Supp. 2d at 308; *see also Vasquez*, 2019 WL 2327810, at *15 (describing actual knowledge

requirement as "a distinct scienter requirement from an allegation of fraud itself").  Allegations

that the defendant "should have known of the conduct" are insufficient to raise an inference of

actual knowledge, *Anwar v. Fairfield Greenwich Ltd.*, 728 F. Supp. 2d 372, 442 (S.D.N.Y.

2010), as are allegations of a "bank's negligent failure to identify warning signs of fraudulent

activity, . . . even where such signs converge to form a veritable forest of red flags," *Heinert*, 410

F. Supp. 3d at 549–50 (cleaned up).  Under New York law, if a defendant is under no

independent duty, allegations that the defendant ignored obvious warning signs of fraud are not

sufficient to allege "actual knowledge."  *Chemtex, LLC v. St. Anthony Enters., Inc.*, 490 F. Supp.

2d 536, 547 (S.D.N.Y. 2007).  In short, "pleading knowledge for purposes of an aiding and

abetting claim requires allegations of facts that give rise to a 'strong inference' of actual

knowledge." *Fraternity Fund Ltd. v. Beacon Hill Asset Mgmt., LLC*, 479 F. Supp. 2d 349, 367

(S.D.N.Y. 2007).

    None of the facts alleged in Plaintiffs' complaint, considered individually or collectively,

raises a strong inference of actual knowledge.  At the outset, because it is critical to consider

whether BNYM had actual knowledge of the OneCoin fraud at the time that it engaged in the

conduct on which Plaintiffs' claim for aiding and abetting fraud is based, the Court must

distinguish between the period preceding BNYM's alleged investigation of transfers through its

correspondent accounts involving OneCoin-affiliated entities and the period following the

investigation.  In the period before December 2016, Plaintiffs allege that BNYM "turn[ed] a

blind eye to clear red flags" and "blindly process[ed] transactions with clear hallmarks of money

laundering without conducting cursory due diligence."  SAC ¶¶ 9, 63; *see also id.* ¶ 279 (alleging

BNYM failed to adopt safeguards sufficient to prevent the fraud).  As a result, Plaintiffs allege,

BNYM transferred in excess of $300 million of OneCoin fraud proceeds over the course of 200-

plus transactions conducted over a six-month period "before bothering to conduct a minimal

internal review." *Id.* ¶ 9.

    Plaintiffs' allegations that BNYM ignored obvious warning signs are insufficient as a

matter of law to raise an inference of actual knowledge.  *See Rosner v. Bank of China*, 349 F.

App'x 637, 639 (2d Cir. 2009) ("Even if [defendant] had reason to suspect that [the fraudster] was laundering money, this does not mean that [defendant] had actual knowledge of the fraudulent scheme perpetrated by [the fraudsters].")); *Liu Yao-Yi v. Wilmington Tr. Co.*, 301 F. Supp. 3d 403, 421 (W.D.N.Y. 2017) ("[T]he alleged volume of substantial 'atypical money transfers' does not create a strong inference of 'actual knowledge' of fraudulent conduct.") (citation omitted); *Chemtex*, 490 F. Supp. 2d at 547 ("[E]ven alleged ignorance of obvious warning signs of fraud will not suffice to adequately allege 'actual knowledge.'") (citation omitted).  Patterns of behavior highly indicative of fraud support, at most, constructive knowledge of a fraud scheme; they are insufficient to give rise to an inference of actual knowledge of an underlying fraud.  *Mazzaro de Abreu v. Bank of Am. Corp.*, 525 F. Supp. 2d 381, 390 (S.D.N.Y. 2007).  Similarly, "a lapse of wary vigilance or even suspicious circumstances which might well have induced a prudent banker to investigate" do not give rise to an inference of actual knowledge necessary to plead a claim for aiding and abetting fraud. *Renner v. Chase Manhattan Bank*, No. 98-CV-926, 2000 WL 781081, at *17 (S.D.N.Y. June 16, 2000).

　　　　Plaintiffs next rely on BNYM's investigation of transfers of funds involving OneCoin-affiliated entities.  BNYM's suspicions of fraud and its decision to investigate transfers of funds involving OneCoin are insufficient in and of themselves to generate an inference of actual knowledge.  *See Nigerian Nat'l Petroleum Corp. v. Citibank, N.A.*, No. 98-CV-4960, 1999 WL 558141, at *7–8 (S.D.N.Y. July 30, 2009) (finding no inference of actual knowledge despite allegations of suspicious transfers, some of which were flagged as fraudulent); *Nathel v. Siegal*, 592 F. Supp. 2d 452, 469 (S.D.N.Y. 2008) ("Even where a bank was on notice of 'red flags' that indicated certain accounts may have been vehicles for fraudulent activity and referred the case to its internal fraud unit, the bank had only suspicions but not actual knowledge of fraud.") (citation

omitted); *Winnick*, 406 F. Supp. 2d at 255 ("[S]uspicion, without confirmation, does not satisfy

the actual knowledge requirement for a claim of aiding and abetting fraud."); *Ryan v. Hunton &*

*Williams*, No. 99-CV-5938, 2000 WL 1375265, at *9 (E.D.N.Y. Sept. 20, 2000) ("Allegations

that [defendant bank] suspected fraudulent activity, however, do not raise an inference of actual

knowledge of . . . fraud.").

     Plaintiffs' strongest argument is that BNYM developed actual knowledge *as a result of*

*its investigation*.  *See* SAC ¶ 9 (alleging that BNYM investigation indicated "that OneCoin

'appears to be operating a pyramid/Ponzi scheme'"); *id.* ¶ 186 (same).  In support of this

argument, Plaintiffs rely principally on *Vasquez*, in which the court determined that, where

plaintiffs alleged that a bank conducted its own "independent internet research" and concluded

that the fraudster's "business model, as advertised, was a 'pyramid/ponzi scheme' devoid of any

'underlying products/services,'" the plaintiffs had adequately pled actual knowledge.  *Vasquez*,

2019 WL 2327810, at *17.  Because the defendant bank had conducted its own investigation and

independently reached the conclusion that a fraudulent scheme was afoot, the *Vasquez* court

distinguished the circumstances before it from cases in which other courts in this district had

found allegations of a bank's actual knowledge lacking "even where [the banks] have been

specifically informed by a third party of its conclusion that fraudulent conduct was afoot."  *Id.*

(citing *In re Agape*, 773 F. Supp. 2d at 320–21; *Kolbeck v. LIT Am., Inc.*, 939 F. Supp. 240, 247–

48 (S.D.N.Y. 1996); *Ryan*, 2000 WL 1375265, at *9).

     Although the general contours of Plaintiffs' allegations are similar to the scenario

described in *Vasquez*, Plaintiffs have failed to plead specific facts to support a strong inference

that BNYM had actual knowledge of the fraud as opposed to merely a strong suspicion of fraud,

which courts have universally deemed inadequate to constitute actual knowledge.  Plaintiffs'

complaint contains no information concerning any specifics of BNYM's investigation; instead,

Plaintiffs allege only that BNYM's compliance group conducted an investigation based on "internet research," which yielded the conclusion that OneCoin "appeared to be" a Ponzi scheme and that entities and individuals associated with OneCoin-related transfers "appeared to be engaged in 'layering.'" SAC ¶¶ 9, 186. That is inadequate to satisfy Plaintiffs' pleading burden under Rule 9(b).

Plaintiffs' inadequate pleading dooms its assertion of actual knowledge predicated on BNYM's investigation in an additional, even more fundamental way. Plaintiffs allege no facts supporting an inference that BNYM knew, at the time it transferred funds derived from OneCoin-related transactions through its correspondent bank account, that OneCoin was a Ponzi scheme. Plaintiffs' complaint alleges with the requisite particularity only a single transfer of funds implicating BNYM, and that transfer occurred in July 2016.[31] *See* SAC ¶¶ 184–85. But according to Plaintiffs, BNYM did not conclude its investigation into OneCoin-related transfers until December 2016.[32] *See id.* ¶¶ 9, 186. Accordingly, even by Plaintiffs' own allegations, BNYM could not possibly have had actual knowledge of the OneCoin fraud at the time of the only adequately pled transfer of fraud proceeds through a BNYM correspondent account.

Plaintiffs' allegations that BNYM continued to provide correspondent banking services to OneCoin-affiliated accounts after it conducted its investigation are entirely conclusory and fail to meet even the general pleading requirements of Rule 8(a), let alone the particularity requirements

---

[31] As discussed in note 7, *supra*, Plaintiffs are unclear as to whether the transfer occurred in July or August 2016; the precise month is irrelevant for purposes of this analysis, however, because Plaintiffs appear to concede that the earliest BNYM could have gained actual knowledge of the fraud scheme was December 2016. *See* Pls. BNYM Opp. at 8, Dkt. 174.

[32] BNYM contends that the record evidence demonstrates that the investigation began in December 2016 and was not completed until March 2017. *See* BNYM Reply at 5 n.3, Dkt. 180. The Court need not and may not consider this factual dispute on BNYM's motion to dismiss, but it is ultimately irrelevant. Even using Plaintiffs' purported timeline, BNYM did not acquire actual knowledge, if it ever really did, until after it had provided the allegedly actionable correspondent banking services for OneCoin.

of Rule 9(b).  Plaintiffs point to Gilbert Armenta's statement in his guilty plea allocution that he transferred OneCoin fraud proceeds via international wires that passed through "corresponding bank accounts in New York," SAC ¶ 159, to support their argument that they have adequately alleged that BNYM provided correspondent banking services at a time when it had actual knowledge of the fraud.  But nowhere in their complaint do Plaintiffs allege that any of the transfers made by Armenta passed through a BNYM correspondent account.  Similarly, Plaintiffs point to allegations in the complaint that assert that BNYM processed OneCoin-related transactions through its correspondent accounts "through April 2017," but Plaintiffs allege no facts to support that conclusory allegation.[33]  *See id.* ¶¶ 63, 226.  The facts that are pled raise the inference that all transfers processed through BNYM correspondent accounts occurred *before* BNYM concluded that OneCoin appeared to be a Ponzi scheme.  *See id.* ¶¶ 186–87 (discussing the SAR filed *in February 2017* and another "incident report" that flagged OneCoin-related transfers).  In short, Plaintiffs have failed to plead any facts that raise a strong inference that BNYM had actual knowledge of an underlying fraud at the time it allegedly facilitated the transfer of funds related to OneCoin.[34]  This failure is fatal to Plaintiffs' claims against BNYM.  *See In re Enron Corp. Sec., Derivative & ERISA Litig.*, 761 F. Supp. 2d 504, 540 (S.D. Tex. 2011) (finding allegations ineffective to show that defendant "knew at the time of entering into the transactions . . . that they were improper, or that [defendant] was entering into them to

---

[33]   Plaintiffs also seem to argue that because they allege that Armenta engaged in money laundering between 2015 and 2017 — a timeline totally unsupported by any well-pled facts in the complaint — BNYM must have transferred funds through its correspondent accounts as late as 2017.  The Court is unwilling to engage in that sort of speculation.

[34]   Plaintiffs' allegations and arguments in opposition to BNYM's motion often proceed "on information and belief," or other similarly speculative basis.  But "allegations of fraud cannot ordinarily be based upon information and belief, except as to matters peculiarly within the opposing party's knowledge."  *Campaniello Imports, Ltd. v. Saporiti Italia S.p.A.*, 117 F.3d 655, 664 (2d Cir. 1997) (cleaned up).

commit fraud" and that "[a]bsent such details, the aiding and abetting claim must be dismissed for failure to plead actual knowledge of the underlying fraud").

Finally, Plaintiffs argue that BNYM "consciously avoided taking appropriate responsive measures" and "consciously avoided taking the necessary steps to remove itself from the pipeline of fraud" after conducting its investigation and concluding that OneCoin appeared to be a Ponzi scheme. Pls. BNYM Opp. at 9–10, Dkt. 174. Plaintiffs' argument fundamentally misunderstands the theory of conscious avoidance, and their complaint contains no allegations supporting an inference of actual knowledge based on a theory of conscious avoidance.

Conscious avoidance is distinct from constructive knowledge and exists "when it can almost be said that the defendant actually knew [of the fraud] because he or she suspected a fact and realized its probability, but refrained from confirming it in order later to be abl[e] to deny knowledge." *Vasquez*, 2019 WL 2327810, at *15–16 (quoting *Fraternity Fund Ltd.*, 479 F. Supp. 2d at 368). There is some dispute in this district concerning whether allegations of conscious avoidance are sufficient to plead actual knowledge for purposes of the civil tort of aiding and abetting fraud. *See Rosner*, 2008 WL 5416380, at *8 (stating that "a minority of cases in this District . . . have permitted an allegation of willful blindness to satisfy the scienter requirement of actual knowledge"); *but see In re Agape*, 773 F. Supp. 2d at 309 (concluding that "many courts" since the decision in *Fraternity Fund* "have at least considered whether, and in some cases found, that allegations of conscious avoidance constitute actual knowledge") (citations omitted).

Even assuming conscious avoidance is a viable theory of actual knowledge in this context, Plaintiffs do not plead any facts supporting an inference that BNYM consciously avoided discovering the OneCoin fraud. *See Hongying Zhao v. JPMorgan Chase & Co.*, No. 17-CV-8570, 2019 WL 1173010, at *6 (S.D.N.Y. Mar. 13, 2019) ("Absent from the [complaint] are

particular and non-conclusory allegations that defendants determined to evade learning of facts

confirming underlying fraudulent activity.").  To the contrary, the facts that Plaintiffs allege with

particularity demonstrate that BNYM actively investigated suspicious circumstances surrounding

an account linked to OneCoin and took measures to combat the fraud.  Plaintiffs' generalized

assertions that BNYM's remedial measures were ineffective fully to prevent proceeds from

OneCoin-related transactions from being transferred through BNYM's correspondent accounts

are entirely inadequate to support the inference that BNYM took certain actions "*specifically* to

avoid learning of the fraud." *In re Agape*, 773 F. Supp. 2d at 320 (emphasis original).

Accordingly, even assuming a civil plaintiff can allege actual knowledge based on a conscious

avoidance theory, Plaintiffs have failed to plead facts from which the Court can infer conscious

avoidance.

### 2.  Substantial Assistance

Even if Plaintiffs had adequately alleged BNYM's actual knowledge, Plaintiffs' aiding

and abetting claim would still fail because they have not alleged that BNYM provided substantial

assistance to the OneCoin fraud.

To plead substantial assistance, a plaintiff generally must plead facts from which the

Court can infer that (1) the defendant affirmatively assisted, helped conceal, or failed to act when

required to enable the fraud to proceed; and (2) "the actions of the aider/abettor proximately

caused the harm on which the primary liability is predicated." *Rosner*, 2008 WL 5416380, at

*12 (cleaned up).  "'But-for' causation is insufficient; aider and abettor liability requires the

injury to be a direct or reasonably foreseeable result of the conduct." *Cromer Fin. Ltd. v. Berger*,

137 F. Supp. 2d 452, 470 (S.D.N.Y. 2001) (citation omitted).  "Inaction on the part of the alleged

aider and abettor 'ordinarily should not be treated as substantial assistance, except when it was

designed intentionally to aid the primary fraud or it was in conscious and reckless violation of a

duty to act.'" *Rosner*, 2008 WL 5416380, at *5 (quoting *Armstrong v. McAlpin*, 699 F.2d 79, 91

(2d Cir. 1983)); *see also Kolbeck*, 939 F. Supp. at 247.

The only service that Plaintiffs allege BNYM provided to further the fraud was the

transfer of funds involving OneCoin proceeds through its correspondent bank accounts.  As a

matter of firmly established Second Circuit precedent, such conduct is patently insufficient to

plead substantial assistance necessary to support a claim for aiding and abetting fraud.  The

provision of routine banking services to alleged fraudsters, even if it aids in the commission of

the fraud, simply does not qualify as substantial assistance.[35]

Nor can Plaintiffs rely on BNYM's alleged inaction or inadequate response in the wake

of its investigation of OneCoin-related transactions to demonstrate substantial assistance.

Although a bank defendant may provide substantial assistance by failing to act when it was

required to act, "[a]bsent a confidential or fiduciary relationship between the plaintiff and the

aider and abettor, the inaction of the latter does not constitute substantial assistance warranting

aider and abettor liability."  *Ryan*, 2000 WL 1375265, at *10.  Put differently, inaction

constitutes substantial assistance for purposes of aiding and abetting liability only when the

defendant owes a fiduciary duty directly to the plaintiff.  *Lerner*, 459 F.3d at 295; *see also In re*

*Agape*, 773 F. Supp. 2d at 322 ("When a defendant has no affirmative duty to act, [its] failure to

---

[35]    *See Berman v. Morgan Keegan & Co.*, 455 F. App'x 92, 96 (2d Cir. 2012) (deeming it "well-established"
that fraudsters' use of accounts at a financial institution alone does not constitute substantial assistance); *Nigerian*
*Nat'l Petroleum Corp.*, 1999 WL 558141, at *8 ("The mere fact that participants in a fraudulent scheme 'use
accounts at [a bank] to perpetrate it, without more, does not rise to the level of substantial assistance necessary to
state a claim for aiding and abetting liability.'" (quoting *Williams v. Bank Leumi Tr. Co. of N.Y.*, No. 96-CV-6695,
1997 WL 289865, at *5 (S.D.N.Y. May 30, 1997))); *Strauss v. Credit Lyonnais, S.A.*, No. 06-CV-702, 2006 WL
2862704, at *9 (E.D.N.Y. Oct. 5, 2006) ("The maintenance of a bank account and the receipt or transfer of funds
does not constitute substantial assistance.") (citations omitted); *Heinert*, 410 F. Supp. 3d at 552 (holding that
plaintiffs' allegations that defendants made wire transfers, opened accounts, and performed other banking services
were "routine matters" that, even when "performed with 'atypical' frequency, are insufficient to support an aiding
and abetting claim" (citation omitted)); *Rosner v. Bank of China*, 528 F. Supp. 2d 419, 427 (S.D.N.Y. 2007)
("Financial transactions that are not considered 'atypical' or 'non-routine' do not constitute substantial assistance.")
(citation omitted).

act may not serve as the basis for claiming that the defendant provided substantial assistance.")
(citation omitted).  "A bank that maintains another bank's correspondent account is not, without
more, under an independent duty to act affirmatively to terminate accounts of an entity suspected
to be engaged in fraud."  *Vasquez*, 2019 WL 2327810, at *18 (citation omitted); *see also Musalli
Factory for Gold & Jewelry v. JPMorgan Chase Bank, N.A.*, 261 F.R.D. 13, 27 ("[B]anks do not
owe non-customers a duty to protect them from the intentional torts of their customers." (quoting
*In re Terrorist Attacks on Sept. 11, 2001*, 349 F. Supp. 2d 765, 830 (S.D.N.Y. 2005)).

   Accordingly, because Plaintiffs were not BNYM customers, and because the Complaint
has no allegations supporting any other duty running from BNYM to them, BNYM owed
Plaintiffs no duty; for that reason, BNYM's alleged failure to take more exhaustive or efficacious
measures following its investigation of OneCoin does not, as a matter of law, demonstrate that
BNYM provided substantial assistance to the fraud.[36]  *See Vasquez*, 2019 WL 2327810, at *18
(concluding no substantial assistance where no freestanding duty owed by bank to plaintiffs,
notwithstanding court's finding that bank had actual knowledge of fraud); *Musalli*, 261 F.R.D. at
25 ("[T]o the extent that [plaintiff] bases its aiding and abetting claim on [defendant's] failure to
prevent the diversion by failing to shut down the account or to inform [plaintiff] of the account

---

[36] Plaintiffs' reliance on *Yao-Yi*, 301 F. Supp. 3d at 425–26, is misplaced.  The court in *Yao-Yi* relied on
language from *Lerner*, 459 F.3d at 287–88, in which the Circuit was assessing a depository bank's potential liability
for inaction in the context of a claim for aiding and abetting a breach of fiduciary duty where clear evidence existed
of a potential fraud involving fiduciary accounts maintained at the bank.  That situation is far removed from the
circumstances alleged in this case, and the Court instead follows the general and well-trodden rule that a bank
providing routine bank services has no duty to non-customers, a point also made in *Lerner*, *id*. at 286.

withdrawals, these omissions also do not rise to the level of substantial assistance because there

was no fiduciary relationship between the bank and [plaintiff].").[37]

A final, independently fatal problem in Plaintiffs' pleading as to substantial assistance is

that the complaint entirely fails to allege that the maintenance of a correspondent account

through which fraud proceeds passed was the proximate cause of Plaintiffs' injury. As BNYM

points out, Plaintiffs do not allege that a BNYM account was the only correspondent account that

was used to facilitate the OneCoin scheme; instead, Plaintiffs allege that the Scott Group

Defendants "directed their money laundering efforts" at multiple financial institutions, only one

of which was BNYM. *See, e.g.*, SAC ¶ 175. Allegations supporting but-for causation are not

enough: while the Ponzi scheme may have needed the assistance of banks, the proximate cause

of Plaintiffs' injury was not BNYM's transfer of funds. "[A]lthough the actions of the

correspondent bank may have 'made it easier for [OneCoin] to effectuate the scheme, these

conventional banking transactions were not the proximate cause of the Plaintiffs' damages and

therefore do not constitute substantial assistance." *Vasquez*, 2019 WL 2327810, at *19 (quoting

*In re Agape*, 773 F. Supp. 2d at 325).

In short, Plaintiffs have not alleged that BNYM provided substantial assistance in

furtherance of the fraud, and, therefore, Plaintiffs' aiding and abetting claim is dismissed.

---

[37]        Even if the Court were to find that BNYM could be held liable for its inaction or failure to engage in more robust oversight in the wake of its investigation, the fact that Plaintiffs failed to allege adequately any transfers of funds through BNYM post-investigation vitiates Plaintiffs' argument that BNYM provided substantial assistance by failing to take affirmative steps to prevent the OneCoin fraud. Similarly, to the extent Plaintiffs argue that BNYM did not comply with governing rules and regulations because it waited several months to conduct its investigation or because it only took certain actions in response to its investigation, *see* SAC ¶¶ 9, 186, such a claim is similarly insufficient as a matter of law. *See Rosner*, 2008 WL 5416380 at *3 (holding that "fail[ure] to comply with domestic and international bank secrecy, know-your-customer, and anti-money laundering laws, decrees, and regulations" does not, as a matter of law, constitute substantial assistance); *Mazzaro de Abreu*, 525 F. Supp. 2d at 391 ("A violation of a federal regulation . . . does not [in and] of itself constitute substantial assistance.") (citation omitted).

### C. Commercial Bad Faith

A claim for commercial bad faith against a bank has three elements.  The plaintiff must allege: "(1) a scheme or acts of wrongdoing; together with either: (2) allegations of the bank's actual knowledge of the scheme or wrongdoing that amounts to bad faith; or (3) allegations of complicity by bank principals in alleged confederation with the wrongdoers."  *Mazzaro de Abreu*, 525 F. Supp. 2d at 394–95.  Plaintiffs' complaint contains no allegations concerning complicity by any principal of BNYM; in fact, Plaintiffs do not so much as mention by name or title any individual BNYM employee or any connection between any BNYM employee and any alleged perpetrator of the fraud or money laundering scheme.  Absent complicity by bank principals, *actual knowledge* is a required element of a claim for commercial bad faith; "a [defendant's] lapse of wary vigilance, disregard of suspicious circumstances which might have well induced a prudent banker to investigate and other permutations of negligence are not relevant considerations."  *Lerner*, 459 F.3d at 293 (quotation omitted).  As discussed above, Plaintiffs have failed to allege adequately BNYM's actual knowledge of the OneCoin fraud.  Accordingly, Plaintiffs' commercial bad faith claim necessarily fails.

## CONCLUSION

For the foregoing reasons, Defendants' motions to dismiss are GRANTED.  Plaintiffs' request for jurisdictional discovery is DENIED.  This case has been ongoing for over two years, Plaintiffs have had the assistance of a cooperator who played a central role in the OneCoin scheme, and they are on their third iteration of the complaint.  Moreover, Plaintiffs' jurisdictional allegations are doomed by multiple failures of law, and, therefore, additional discovery would not cure the jurisdictional defects.  All claims against Defendants Mark Scott, David Pike, Nicole Huesmann, and The Bank of New York Mellon are, therefore, DISMISSED.

The Clerk of Court is respectfully directed to close the open motions at Dkts. 152, 155, 157, and 160.

**SO ORDERED.**

**Date:  September 20, 2021**
       **New York, New York**

                                        **VALERIE CAPRONI**
                               **United States District Judge**